```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF IOWA
 2

 3   UNITED STATES OF AMERICA,    )
                                  )
 4             Plaintiff,         )
                                  )
 5       VS.                      )    20-CR-1042
                                  )
 6   AMY JURISIC,                 )
                                  )
 7             Defendant.         )

 8

 9                        APPEARANCES:

10   ATTORNEY ANTHONY RUSSELL MORFITT, U.S. Attorney's Office,
     111 Seventh Avenue S.E., Box 1, Cedar Rapids, Iowa 52401,
11   appeared on behalf of the United States.

12   ATTORNEY CHRISTOPHER J. NATHAN, Federal Public Defender's
     Office, 222 Third Avenue S.E., Suite 290, Cedar Rapids,
13   Iowa 52401, appeared on behalf of the Defendant.

14

15                     SENTENCING HEARING,

16            HELD BEFORE THE HON. C.J. WILLIAMS,

17   on the 13th day of December, 2021, at 111 Seventh Avenue

18   S.E., Cedar Rapids, Iowa, commencing at 9:25 a.m., and

19   reported by Patrice A. Murray, Certified Shorthand

20   Reporter, using machine shorthand.

21   Transcript Ordered:  12/27/21
     Transcript Completed:  1/19/22
22

23                 Patrice A. Murray, CSR, RMR, FCRR
                         Court Reporter
24                        PO Box 10541
                      Cedar Rapids, Iowa 52410
25                  PAMurrayReporting@gmail.com
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 1 of 139

1                              **INDEX**

2     **WITNESS**                                                  **PAGE**

3      LORI WIGNALL
          DIRECT EXAMINATION - BY MR. MORFITT                10
4         CROSS-EXAMINATION - BY MR. NATHAN                  43
          REDIRECT EXAMINATION - BY MR. MORFITT              75
5         RECROSS EXAMINATION - BY MR. NATHAN                82
          FURTHER RECROSS EXAMINATION - BY MR. NATHAN        88
6      TINA NOBIS
          DIRECT EXAMINATION - BY MR. MORFITT                90
7         CROSS-EXAMINATION - BY MR. NATHAN                  92

8                              * * * * *

9

10    **EXHIBITS**

11     Exhibits 1 through 3                                  9
       Exhibits A through E                                  8
12                             * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 2 of 139

1        (The following proceedings were held in open court.)

2              THE COURT:  The matter now before the Court is

3    United States of America versus Amy Jurisic, criminal

4    case 20-CR-1042.  This matter comes on for a sentencing

5    hearing.  The United States is represented by Assistant

6    United States Attorney Tony Morfitt.  The defendant is

7    personally present and represented by Assistant Federal

8    Public Defender Chris Nathan.  Participating by telephone

9    is Jill Freese.  She is the United States Probation

10   Officer who authored the presentence investigation report

11   filed at document number 31 in the court's file.

12        On June 14, 2021, the defendant pled guilty to one

13   count of a two-count indictment.  She pled guilty to

14   Count 1, a crime which charged her with theft of mail by

15   a postal employee.  This was in violation of Title 18

16   United States Code Section 1709.

17        By statute that crime is punishable by up to 5 years

18   in prison without the possibility of parole.  After the

19   defendant has served her prison sentence, the Court can

20   place her on a term of supervised release for up to

21   3 years.  Probation is an option; and were the Court to

22   impose probation, it would be for a term of 1 to 5 years.

23   The court can impose a fine of up to $250,000.  And the

24   Court must impose a special assessment of $100.

25        Mr. Morfitt, on behalf of the United States, have

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 3 of 139

1   you had a full and fair opportunity to review this

2   presentence report?

3           MR. MORFITT:  Yes, Your Honor.

4           THE COURT:  Does the government have any

5   objections to the calculation of the advisory guidelines

6   or anything else in this report?

7           MR. MORFITT:  No, Your Honor.

8           THE COURT:  This is a victim case.  Is there

9   any victims who wish to address the Court in the course

10  of this hearing?

11          MR. MORFITT:  Not to my knowledge, Your Honor.

12          THE COURT:  And I understand you have some

13  witnesses to testify as well?

14          MR. MORFITT:  Yes, Your Honor.  One, perhaps

15  two --

16          THE COURT:  All right.  We don't have any

17  marshals in the courtroom right now, but what is the

18  government's position about at the end of the hearing, if

19  I order a term of imprisonment, whether the defendant

20  should be granted the privilege of self-surrender?

21          MR. MORFITT:  The government would not have any

22  objection to self-surrender, Your Honor.

23          THE COURT:  All right.  Thank you.

24      Mr. Nathan, on behalf of your client, have you and

25  your -- Ms. Jurisic had a full and fair opportunity to

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 4 of 139

```
 1   review this presentence report?

 2            MR. NATHAN:  Yes, Your Honor.

 3            THE COURT:  And I noted a number of objections.

 4   I saw objections at 6, 7, 9, 10, 12, 17, and 18, at those

 5   paragraphs of the offense conduct section of the

 6   presentence report; an objection at paragraph 19 having

 7   to do with victim impact and I guess identification of

 8   the victims; paragraph 22 on the loss amount; paragraphs

 9   34 and 35 having to do with criminal history narrative;

10   paragraph 39 having to do with a pending charge

11   narrative; at paragraph 46, having to do with the DHS

12   finding; and then at paragraph 81, having to do with the

13   amount of restitution.

14        First of all, have I identified all the objections

15   the defendant has to this presentence report?

16            MR. NATHAN:  Yes, Your Honor.

17            THE COURT:  Could you make a brief record --

18   I'm sorry, just a second.

19        Gentlemen, I'm not going to need you at this

20   hearing.  Thank you.

21            DEPUTY MARSHAL:  Thank you, Judge.

22            THE COURT:  Mr. Nathan, could you make a brief

23   record of how you went through this report with your

24   client?

25            MR. NATHAN:  Yes, Your Honor.  My office mailed
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 5 of 139

1  a copy of the draft PSR to the defendant.  She's

2  currently being supervised out of Georgia, so I then

3  arranged for a phone conference, during which we went

4  through the draft PSR paragraph by paragraph.  And our

5  objections are as Your Honor stated.

6          THE COURT:  Thank you, Mr. Nathan.

7      Ms. Jurisic, first of all, am I pronouncing your

8  name correctly?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  All right.  Were you able to go

11 through this report on your own?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Do you feel like you've had

14 sufficient time to go through this report with

15 Mr. Nathan?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Whenever you spoke with Mr. Nathan

18 about this report, was he able to answer any questions

19 you had about it?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Do you have any questions today

22 about this report?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  All right.  Let's turn then to the

25 calculation of the advisory guidelines as determined by

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 6 of 139

1 the probation office. That calculation begins at page

2 11. At paragraph 21 the probation office has assessed

3 the defendant with a base offense level for this offense.

4 This is under guideline section 2B1.1(a)(2).

5     At paragraph 22, the probation office has assessed

6 the defendant with a 14-level enhancement for loss

7 amount. This is under guideline section 2B1.1(b)(1)(H).

8 The probation office has determined that the intended

9 loss amount was $825,781.45. This falls within the range

10 of more than $550,000 but less than $1.5 million for the

11 14-level enhancement.

12     At paragraph 24 the probation office has assessed

13 the defendant with a 2-level enhancement for abuse of a

14 position of public or private trust. This is under

15 guideline section 3B1.3. That gives us an adjusted

16 offense level of 22.

17     Defendant has pled guilty to this offense, and so

18 the probation office has awarded her with a 2-level

19 reduction for acceptance of responsibility under

20 guideline section 3E1.1(a). Mr. Morfitt, what is the

21 government's position about whether the defendant should

22 receive an additional 1-level reduction for acceptance

23 under guideline section 3E1.1(b)?

24         MR. MORFITT: The government would move for the

25 additional level, Your Honor.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 7 of 139

1            THE COURT:  The Court grants that motion.  And

2   so with 3 levels off for acceptance of responsibility,

3   the defendant's total offense level would be 19.

4        The defendant has some criminal history, which the

5   probation office has summarized and scored beginning at

6   paragraph 31 and carrying over to paragraph 37.  The

7   defendant's prior convictions have resulted in 2 criminal

8   history points.  That places the defendant in criminal

9   history category II.  So with a total offense level of

10  19, criminal history category II, the advisory guideline

11  range of imprisonment is 33 to 41 months.

12       In preparation for today's hearing, I have reviewed

13  in detail, of course, the presentence investigation

14  report.  I've also reviewed the pleadings by the parties.

15  The defendant filed a sentencing memorandum at document

16  number 35, and attached to that were Exhibits A through

17  D.  And then at document -- I'm sorry, at 38 it appears

18  the defendant filed Exhibit E.

19       Mr. Nathan, are you moving Exhibits A through E into

20  evidence?

21            MR. NATHAN:  Yes, Your Honor.

22            THE COURT:  Any objection?

23            MR. MORFITT:  No, Your Honor.

24            THE COURT:  A through E will be received.

25       (Whereupon, Exhibits A through E were received.)

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 8 of 139

```
1              THE COURT:  And then the government filed a

2    sentencing memorandum at document number 36 and attached

3    Exhibits 1 through 3.  And, Mr. Morfitt -- is it 1

4    through 3 or is it 1 through 2?

5              MR. MORFITT:  Your Honor, 1 through 2 were

6    filed at docket 36 and then 3 was filed separately.

7              THE COURT:  At docket 37, yep, thank you.  Are

8    you moving Exhibits 1 through 3 into evidence?

9              MR. MORFITT:  Yes, Your Honor.

10             THE COURT:  Any objection?

11             MR. NATHAN:  No, Your Honor.

12             THE COURT:  1 through 3 will be received.

13        (Whereupon, Exhibits 1 through 3 were received.)

14             THE COURT:  Mr. Nathan, do you intend to

15   present any evidence here, any live evidence here today?

16             MR. NATHAN:  No, Your Honor, just the exhibits.

17             THE COURT:  All right.  Very good.

18        So, Mr. Morfitt, I will turn to you.  It is the

19   government's burden to establish loss amount and

20   restitution by a preponderance of the evidence.  And, so,

21   Mr. Morfitt, you may call your first witness.

22             MR. MORFITT:  The United States calls Lori

23   Wignall.

24             THE COURT:  Good morning.  Please raise your

25   right hand.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 9 of 139

```
 1                       LORI WIGNALL,
 2   called as a witness, being first duly sworn or affirmed,
 3   was examined and testified as follows:
 4           THE COURT:  Thank you.  Please have a seat in
 5   the witness chair.  And pull your chair up to that
 6   microphone and adjust it so it's right in front of you.
 7   And when you are comfortable, please state your name and
 8   spell your name for the court reporter.
 9           THE WITNESS:  Lori Wignall.  First name
10   L-O-R-I; last name W-I-G-N-A-L-L.
11           THE COURT:  Thank you.
12       Mr. Morfitt, you may proceed.
13                     DIRECT EXAMINATION
14       BY MR. MORFITT:
15   Q.   Ma'am, how are you currently employed?
16   A.   I'm a special agent with the Postal Service, Office
17   of Inspector General.
18   Q.   And how long have you been in federal law
19   enforcement?
20   A.   For about 19-and-a-half years.
21   Q.   And has that all been with the Office of Inspector
22   General, or did you switch at some point?
23   A.   I switched agencies.  The Postal Service actually
24   has two law enforcement branches.  There's an external
25   side, which they're called postal inspectors.  I was a
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 10 of 139

```
 1   postal inspector for four years and then switched to the
 2   internal side, which is the Office of Inspector General.
 3   Q.   So you've been with OIG for approximately 15 years?
 4   A.   Yes.
 5   Q.   And have you been -- or let me ask you this, where
 6   are you currently based out of?
 7   A.   Des Moines.
 8   Q.   And have you been in Des Moines the entirety of that
 9   15 years?
10   A.   Yes.
11   Q.   What region of the Postal Service do you cover out
12   of Des Moines, how much of Iowa?
13   A.   I cover some of the processing facilities, so Des
14   Moines has two processing facilities.  And I pretty much
15   cover all the western side of the state, except for a
16   small portion of it, and then north of Highway 30.
17   Q.   And does that particularly include the Post Office
18   facilities that are located in Dubuque, Iowa?
19   A.   Yes.
20   Q.   And are you familiar as part of your duties with the
21   Dubuque, Iowa, Post Office, its facilities, its
22   operation, that sort of thing?
23   A.   Yes.
24   Q.   Can you just describe for the Court briefly what the
25   Dubuque Post Office setup is, if you will?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 11 of 139

1   A.   Sure.  At the time of the investigation, Dubuque had

2   three postal facilities.  They had the Main Post Office,

3   the White Street Annex, and the West Side Carrier Annex.

4   Q.   When you say "at the time of the investigation," are

5   you particularly talking about the investigation you did

6   involving the defendant in this matter, Amy Jurisic?

7   A.   Yes.

8   Q.   So you said there was the Main Post Office and then

9   the two different annexes.  Can you just briefly describe

10  what the role of each of these three facilities was back

11  at the time of the investigation?

12  A.   Sure.  The Main Post Office was just -- that's where

13  the window was, so if you as a customer, a postal

14  customer, wanted to mail an item, purchase stamps,

15  purchase a money order, the P.O. Box section is at Main

16  as well, that's what transpired there.

17       The White Street Annex was designed -- it's -- it's

18  what I call a hub, so all of the mail coming into Dubuque

19  and out of Dubuque went to the hub, so it went to White

20  Street.  That facility is no longer in operation.

21       And then you have the West Side Carrier Annex, which

22  houses all the rural carriers and city carriers.

23  Q.   And so just, if I'm following you correctly, say a

24  piece of mail was coming into Dubuque to be delivered to

25  somebody in Dubuque, it would first come through the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 12 of 139

1  White Street Annex?

2  A.   Yes, from a processing facility.

3  Q.   And then it would be sorted or somehow transferred

4  to either the Main Post Office or the Carrier Annex; is

5  that correct?

6  A.   Yes.  Usually all the sortation happened at the

7  processing facilities, so at the hub was -- most of the

8  mail was cross-docked, so it was taken off of trucks and

9  then put back on trucks to be disbursed to other

10 facilities or offices.

11 Q.   So there wasn't actually any or very much sorting

12 going on at the White Street Annex?

13 A.   No, I don't believe there was that much in terms of

14 what you think sorting would be.  So I do believe that

15 some of the mail that was sorted to sequence, delivery

16 sequence for the carriers, those were unsleeved at White

17 Street.  I believe that that's what happened there.

18 Q.   But essentially it was a transfer facility, if you

19 will?

20 A.   Yes, that's a good description.

21 Q.   Okay.  And you became involved in an investigation

22 involving mail that was going missing from the Dubuque

23 postal system, if you will, in 2017 and 2018; is that

24 correct?

25 A.   Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 13 of 139

1  Q.   Can you just describe how you or how the Postal

2  Service first became aware in 2017 that there was the

3  potential that mail was being stolen or going missing

4  from the Dubuque Post Office?

5  A.   Yeah, we received an allegation in approximately --

6  I believe it was October of 2017, from a company called

7  Nord Gear that was based out of Wisconsin.  Their banking

8  institution is Wisconsin Bank and Trust, and Heartland

9  Financial is over Wisconsin Bank and Trust.  Heartland

10  Financial is in Dubuque, so the mailing address for Nord

11  Gear was a P.O. Box in Dubuque.

12  Q.   Specifically, if, like, vendors or people who had

13  purchased things from Nord Gear were sending payments in,

14  they would send them to this P.O. Box in Dubuque?

15  A.   Correct.

16  Q.   It was actually maintained by this company called

17  Heartland Financial?

18  A.   Yes.

19  Q.   Sorry, I interrupted you there.  Go ahead and go on.

20  A.   When we received the allegation, it actually came

21  from the Postal Inspection Service, because they had

22  looked into the external aspects of it -- was it a

23  courier; was it an employee of Nord Gear -- so they had

24  to eliminate the outside before they turned to the

25  inside, was it a postal employee who was responsible.  So

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 14 of 139

1  basically that initial part of the investigation was
2  trying to track down where the compromise occurred.  We
3  were never able to determine that, and so that initial
4  investigation was closed.
5  Q.   Okay.  And let me unpack that just a little bit.  So
6  the first complaint, when this was first handled by the
7  Postal Service after Nord Gear or the bank had
8  complained, it was first with the postal inspectors who
9  were looking to see if somebody employed by Nord Gear or
10 Heartland Financial was stealing these checks?
11 A.   Correct.
12 Q.   And so then after they had excluded that
13 possibility, the postal inspectors turned it over to your
14 office, OIG, to investigate whether there was someone who
15 actually worked in the Post Office who was stealing the
16 checks?
17 A.   Correct.
18 Q.   And you say "initially," so you looked into this
19 sometime in late 2017 and you weren't able to identify at
20 that time any suspects in the Post Office; is that fair?
21 A.   Yes, that's correct.  At the time we knew of nine
22 checks from Nord Gear that had been compromised, and I
23 believe the compromise happened in the months of -- in
24 between May to July, and then nothing ever happened after
25 that with Nord Gear, and we didn't hear of any other

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 15 of 139

1  complaints.

2  Q.   But then turning to the next calendar year, January

3  of 2018, did you receive some information that kind of

4  sparked a new investigation or at least made you

5  concerned that there might still be somebody who had

6  stolen checks who worked in the Dubuque Post Office?

7  A.   Yes, a complaint came into our hotline at the

8  beginning of January 2018 that actually identified Amy

9  Jurisic by name as a person who was stealing mail at the

10 Dubuque Post Office, checks specifically, and she was

11 selling those checks in Chicago.

12 Q.   And this tip that came into the complaint [sic], was

13 this an anonymous tip?

14 A.   Yes, it was.

15 Q.   So you don't know who actually made that tip?

16 A.   Yes, there was a name attached to the complaint, but

17 the name didn't go back to anyone at all.

18 Q.   Based upon this tip, did you then start

19 investigating whether or not Ms. Jurisic was involved in

20 mail theft?

21 A.   Yes.

22 Q.   What did you initially do after you received the

23 tip?

24 A.   We went -- we looked into the various components of

25 processing as to where she worked, because she actually

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 16 of 139

```
 1   worked in two places.  She was assigned to White Street,
 2   but she would go to the Main Post Office approximately
 3   five times a month, and there she put up Post Office Box
 4   mail.  So we were trying to figure out where the
 5   compromise was happening, was it at White Street or did
 6   it happen at the Main Post Office.  But it wasn't until
 7   mid 2018 that the investigation started to heat up once
 8   we got more additional complaints about mail theft.
 9   Q.   Okay.  I'll come to that in a second, but first, if
10   you could, you said the defendant was employed or worked
11   at both the White Street Annex and the -- five times a
12   month at the Main Post Office, correct?
13   A.   Yes, it was my understanding that she would be sent
14   to the Main Post Office periodically.  The postmaster
15   guesstimated five times a month she would go.
16   Q.   Just as needed?
17   A.   Yes.
18   Q.   What were her duties at the actual White Street
19   Annex when she was working there?
20   A.   It's my understanding she worked mainly on the dock
21   area, so that meant that she dealt with unloading the
22   trucks and then dispatching mail, so it would be mail
23   going back onto the trucks.
24   Q.   When you say "dispatching mail," what did that --
25   what would that have involved?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 17 of 139

1  A.    There were specific times that trucks had to leave,

2  so she would make sure those times were met and that they

3  had the proper mail on them.

4  Q.    So her job was to ensure that mail was loaded onto

5  the proper trucks before that truck needed to leave to go

6  to wherever?

7  A.    Yes.

8  Q.    So she would actually be involved in handling the

9  mail, taking it off of the incoming trucks, handling it,

10  and then putting it on the trucks that are leaving the

11  annex?

12  A.    Yes.

13  Q.    And during the time she was doing this, were there

14  other employees often present at the White Street Annex,

15  or was she working alone in that facility?

16  A.    To my understanding, she only worked by herself on

17  Sundays, and I believe that was to deliver Express Mail.

18  Q.    Okay.  So does that mean -- what other days of the

19  week would she work?

20  A.    Whatever her regular schedule was, she would work.

21  There were only a handful of employees assigned to White

22  Street.

23  Q.    So less than five?

24  A.    I'm -- less than ten.

25  Q.    Okay.  Now, you said that later in 2018 -- so you

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 18 of 139

1  received the tip in January of 2018 naming the defendant.

2  But then later in 2018 the investigation, I think you

3  said, heated up?

4  A.    Yes.

5  Q.    What caused the investigation to heat up in the

6  summer, into fall of 2018?

7  A.    We were contacted in approximately August 2018 by a

8  company called Flexsteel that's based out of Dubuque.

9  They also have a P.O. Box.  And they informed us that

10 they were having their -- their incoming -- basically

11 their bill payments, so invoices that were being paid by

12 their customers, were being taken, so the checks were

13 being altered or they were being counterfeited and cashed

14 outside of Iowa.

15 Q.    And, again, this is the same situation you kind of

16 described with Nord Gear, where Flexsteel, based in

17 Dubuque, maintained a P.O. Box for their customers to

18 send them checks?

19 A.    Correct.

20 Q.    To pay invoices?

21 A.    Yes.

22 Q.    And Flexsteel is a furniture company essentially?

23 A.    Yes.

24 Q.    And so Flexsteel, did they -- I don't need the exact

25 number, but did they identify how many checks at that

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 19 of 139

1  point approximately they had suspected had gone missing?

2  A.    I don't remember the number, but they did provide me

3  a spreadsheet because they had started to have quite a

4  few.  So they were starting to focus on their books and

5  reach back out to companies that were late in making

6  their payments to find out if they had submitted

7  anything.

8  Q.    And based upon this information, what did your

9  office then do?

10  A.    Well, we started -- you know, we needed to find out,

11  again, similar to Nord Gear, did we have an issue

12  internally or was this externally, so all during this

13  time we were trying to figure out -- Flexsteel was

14  looking in-house at their employees, they were looking at

15  the person who picked up the P.O. Box mail at the Main

16  Post Office, so that was all going through the process.

17  About the same time that they reached out to us -- I was

18  in fairly constant contact with Flexsteel because the

19  theft was continuing, and they were upset by it, so they

20  were wanting something done and wanted to make sure we

21  were doing something.  So Flexsteel actually informed me

22  of something that happened in Illinois with a search

23  warrant and some of the -- some Flexsteel checks being

24  found during the search of a house.

25  Q.    And that was a search that occurred in Rock Falls,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 20 of 139

1  Illinois; is that correct?

2  A.   Yes.

3  Q.   I'm displaying for you what's been admitted as

4  Exhibit 1.  Briefly -- and this is page 1 of Exhibit 1.

5  Do you recognize what this is?

6  A.   Yes.

7  Q.   What is Exhibit 1?

8  A.   This is a spreadsheet that initially Flexsteel

9  provided in terms of checks that had gone missing that

10  were compromised.

11  Q.   And then did you end up adding other information,

12  color coding it, and adding other checks along the way to

13  this spreadsheet?

14  A.   Yes.

15  Q.   So this is a product you essentially produced?

16  A.   Yes.

17  Q.   Looking at page 3 of Exhibit 1, down at the bottom

18  where there's really no color coding, there's a section

19  or heading that says Nord Gear Checks.  Do you see where

20  I'm looking?

21  A.   Yes.

22  Q.   Is that a summary of the checks that you described

23  that went missing that had been sent to Nord Gear in the

24  summer and early fall of 2017?

25  A.   Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 21 of 139

1   Q.   And so based upon the information you received

2   during the course of your investigation, these are the

3   checks that were sent to Nord Gear that they never

4   actually received during that time frame?

5   A.   Yes, that was information that Nord Gear provided to

6   us.

7   Q.   And then going back to page 1 of Exhibit 1, there at

8   the very top there's a heading called Flexsteel Checks,

9   and then essentially for the next -- all of the rest of

10  this page, and then all of page 2, and then the first two

11  lines of page 3, are these checks that during the course

12  of your investigation Flexsteel identified to you as

13  having gone missing from the Dubuque Post Office?

14  A.   Yes.

15  Q.   Okay.  Now, I want to talk to you first about the

16  ones at the top of page 1 that are under another heading

17  called Checks Recovered by Sterling PD, Illinois.  Do you

18  see where I'm looking there?

19  A.   Yes.

20  Q.   Now, you were just talking about a search in Rock

21  Falls, Illinois, but was that search actually conducted

22  by the Sterling Police Department?

23  A.   Yes, I believe it was a task force because I think

24  the state police in Illinois was involved in the search.

25  Q.   So when we talk about checks recovered by Sterling

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 22 of 139

1  PD, we're also -- those were the ones that were recovered
2  in Rock Falls?
3  A.    Yes.
4  Q.    And Flexsteel actually told you about this
5  investigation in Illinois, correct?
6  A.    Yes.
7  Q.    Did you then reach out to Illinois law enforcement
8  to follow-up with them?
9  A.    Yes.
10 Q.    And what did you learn about the checks, these
11 particular checks that had been recovered in Rock Falls?
12 A.    That they were recovered during a search, and there
13 were four arrests incident to the search.  It was the --
14 they were drug-related arrests.  So the checks themselves
15 were just recovered during the search, but they did
16 not -- they had no information about the checks, other
17 than they knew that they belonged to Flexsteel, and they
18 actually returned them to Flexsteel.
19 Q.    Okay.  When you say they belong to Flexsteel, if you
20 look here, I believe there's seven checks listed.  The
21 first six were actual legitimate checks that had been
22 sent by the respective vendors to Flexsteel; is that
23 correct?
24 A.    Correct.
25 Q.    And then the seventh one returned, which was from

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 23 of 139

1  Globe Furniture, second one from Globe Furniture, was

2  actually an attempt at making a counterfeit check?

3  A.   Yes.

4  Q.   And, now, on your spreadsheet here at Exhibit 1 you

5  have these color coded as green, and you kind of have a

6  key or a legend up there at the top right, but does

7  that -- if it's color coded green, does that mean those

8  checks were never attempted to be negotiated?

9  A.   Correct.

10  Q.   Never tried to be deposited or anything?

11  A.   Correct.

12  Q.   So those were recovered without any actual loss?

13  A.   Right.

14  Q.   Now, as part of your investigation, did you look

15  into whether or not the defendant had any connection to

16  these four individuals that had been arrested in Rock

17  Falls?

18  A.   Yes.

19  Q.   And what did you discover?

20  A.   We actually went over and interviewed three of the

21  people that were arrested.  The fourth one had been

22  transported closer to Chicago.  So we interviewed -- two

23  of them were still incarcerated, one had been released,

24  so we interviewed those three individuals.

25  Q.   And were these individuals -- do you remember their

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 24 of 139

1  names?

2  A.    Yes.

3  Q.    And what were their names?

4  A.    Michael Blandin, Vivica Turio (phonetic), and the

5  last one escapes me.

6  Q.    Is it initials S.T.?

7  A.    Sonja Tarrick (phonetic).

8  Q.    So you -- you interviewed people with initials M.B.,

9  V.T., and S.T.?

10  A.    Correct.

11  Q.    And did you discover any connections between these

12  three individuals and Amy Jurisic?

13  A.    Yes.  Two of the people that were arrested were

14  actually brothers, Nicholas Blandin and Michael Blandin.

15  And through investigation, the Blandin brothers were

16  connected to Amy.

17  Q.    And how were they connected to her?

18  A.    Michael said that he knew Amy through Facebook, that

19  he had corresponded with her; that they had never talked

20  about checks.  He never said he got the checks from Amy,

21  but he identified Amy as a postal employee that he knew

22  in Dubuque.

23  Q.    And during the course of your investigation, did you

24  ultimately obtain Facebook records from Ms. Jurisic's

25  Facebook account?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 25 of 139

1  A.   Yes, her account from Facebook Messenger and from

2  Michael Blandin's.

3  Q.   And were there, in fact, messages between Michael

4  Blandin and Amy Jurisic in those records?

5  A.   The only message between Michael and Amy was -- I

6  want to say it was like one or two messages, and it was

7  relative to Nicholas Blandin.

8  Q.   And what about -- but were they friends on Facebook?

9  A.   Yes, they were.

10 Q.   And was she also friends with Nicholas Blandin on

11 Facebook?

12 A.   Yes.  She was not friends with the other two

13 individuals.

14 Q.   Now, because of the connection with the Facebook

15 Messenger, did you also then end up looking at additional

16 Facebook records from the defendant, like communications

17 with other people other than just the Blandin brothers?

18 A.   Correct, from the warrant, yes.

19 Q.   And, specifically, going back to June of 2017, did

20 you find communications that the defendant had with an

21 individual related to checks?

22 A.   Yes.

23 Q.   And what specifically was that?

24 A.   The conversation -- there were a few times where

25 credit cards were mentioned or checks were mentioned in

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 26 of 139

1  terms of "What can you do with them," "They're

2  business-to-business checks," "How do you know," "I'm a

3  postal employee."

4  Q.   And specifically, these conversations in like June

5  of 2017 were between defendant and an individual with the

6  initials D.V.?

7  A.   Yes.

8  Q.   And the check that the defendant has pled guilty to

9  stealing in this matter was actually reflected in a

10 picture that the defendant sent to D.V. on June 16th of

11 2017, correct?

12 A.   Yes.

13 Q.   That was a checked made payable to Truck Country for

14 $2,280?

15 A.   Yes.

16 Q.   And Truck Country, is that a business similar to

17 Nord Gear and Flexsteel that was located in Dubuque,

18 Iowa?

19 A.   Yes.

20 Q.   And incoming -- had mail, checks paying off from its

21 customers, that would go through the White Street Annex?

22 A.   Yes, they had a P.O. Box mailing address.

23 Q.   Now, moving forward into later in 2018, did you

24 become aware of another investigation in Illinois related

25 to stolen checks that was connected ultimately to the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 27 of 139

1  defendant?

2  A.    Yes.

3  Q.    And how did you become aware of that?

4  A.    It started out initially where I reached out to some

5  banks where these checks had been deposited to get

6  accountholder information.  So through the bank

7  investigators, they were able to connect me to some other

8  investigators and to let me know, hey, you might want to

9  reach out to these people because you guys have parallel

10 investigations going on.

11 Q.    Specifically, did you end up reaching out to some

12 law enforcement in Chicago who was investigating a stolen

13 check or check-cashing ring involving an individual named

14 Davey Hines?

15 A.    Yes.

16 Q.    And Davey Hines is D-A-V-E-Y H-I-N-E-S?

17 A.    Yes.

18 Q.    What did you discover when you reached out to these

19 other investigators who were investigating Mr. Hines?

20 A.    They informed me that they had seized a telephone of

21 his and that they had obtained a warrant for the data on

22 the phone.  So when they did the data dump and started

23 reviewing it, that -- they were able to connect Amy

24 Jurisic to Davey Hines.

25 Q.    Specifically, they identified a phone number that

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 28 of 139

1 belonged to Ms. Jurisic that was communicating with

2 Mr. Hines via Facebook Messenger?

3 A.   It was either Facebook Messenger or via text

4 message, yes.

5 Q.   I'm showing you exhibit -- page 1 of Exhibit 3.  I

6 know this is a little small and hard to read, so let me

7 know if you ever need me to zoom in or zoom out.  But do

8 you recognize what the three pages of Exhibit 3 are?

9 A.   Yes.

10 Q.   And are they a portion of the communications between

11 Mr. Hines and Ms. Jurisic --

12 A.   Yes.

13 Q.   -- that was recovered?

14 A.   Yes.

15 Q.   So this -- but this is only a portion of it.  This

16 isn't all of the communications that they had?

17 A.   Correct.

18 Q.   And if I look, there's two different numbers

19 involved here.  Here where there's outgoing with a 630

20 area code number, is that the number that belonged to

21 Davey Hines?

22 A.   Yes.

23 Q.   And then, right below it, incoming is a 563 number,

24 is that a Dubuque area code?

25 A.   Yes, that's Amy's phone number.

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 29 of 139

1  Q.   So wherever it says outgoing 630, that's what

2  Mr. Hines is sending to Ms. Jurisic, correct?

3  A.   Correct.

4  Q.   And then the incoming from the 563 is what she's

5  sending back?

6  A.   Yes.

7  Q.   And then if you look on approximately the middle of

8  page 1 of Exhibit 3, you'll see an incoming message here

9  that there's an attachment with a .jpeg file extension.

10  Do you see that?

11  A.   Yes.

12  Q.   And that indicates that a photograph was sent along

13  with the message; is that correct?

14  A.   Yes.

15  Q.   Okay.  And then when you look on page 2, still on

16  October 14th, you see two more .jpeg images incoming,

17  correct?

18  A.   Yes.

19  Q.   Were those photos also recovered as part of the

20  search warrant that Illinois law enforcement did on

21  Mr. Hines's phone?

22  A.   Yes.

23  Q.   And I'm going to show you Exhibit 2, starting on

24  page 1.  Now, is page 1 one of the three photos that was

25  recovered from this text string?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 30 of 139

1    A.    Yes.

2    Q.    And then looking at page 5, is page 5 one of the

3    three that was recovered from a portion of this text

4    string?

5    A.    Yes.

6    Q.    Was page 6 the third one that was recovered from

7    this text string?

8    A.    Yes.

9    Q.    And then, pages 2, 3, and 4 of Exhibit 2 were

10   recovered from other portions of this same text string

11   between Ms. Jurisic and Mr. Hines, correct?

12   A.    Yes.

13   Q.    Now, back on Exhibit 3, page 1, just below the

14   first .jpeg attachment, there's an outgoing message that

15   says "That paper can't be touched cuz of the imprinted

16   ink that don't come off," what does that mean to you?

17   A.    That means to me that they couldn't wash the check

18   in order to add somebody's name to it.

19   Q.    So one of the ways this check fraud would work is

20   that they would attempt to wash out or delete out who the

21   check was made paid to, correct?

22   A.    Correct.

23   Q.    Then they would substitute a different name into it?

24   A.    Correct.

25   Q.    Allowing them to cash the check into an account?

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 31 of 139

1   A.   Yes, deposit it.

2   Q.   And then, a couple messages below that, incoming

3   from Ms. Jurisic's number, it says, "Can't they be

4   scratched," what does that mean to you?

5   A.   "Can't they be scratched" to me means "Can they be

6   counterfeited?"

7   Q.   And then below that, she says, "I've been getting

8   these," correct?

9   A.   Yes.

10  Q.   And then turning to page 2, near the top, at --

11  October 14th at 10:52:40, an incoming message where

12  Ms. Jurisic says she's got more.  Do you see that?

13  A.   Yes.

14  Q.   And then Mr. Hines responds by asking to see the

15  other checks?

16  A.   Yes.

17  Q.   And that's when Ms. Jurisic then sends two more

18  images, correct?

19  A.   Yes.

20  Q.   And then following that, Mr. Hines says in a couple

21  different messages, "Leave 'em.  They too low."  And you

22  take "They too low" to mean the dollar amounts are not as

23  high as he would like them to be?

24  A.   Yes.

25  Q.   And then he says, "And they all to da same company,"

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 32 of 139

 1  correct?

 2  A.    Correct.

 3  Q.    And, in fact, of the three images that were

 4  recovered from this portion of the text string, you can

 5  identify that they were all made out to Flexsteel; is

 6  that correct?

 7  A.    Yes.

 8  Q.    If you can see who they are made out to?

 9  A.    Yes.

10  Q.    And then continuing on, you see down lower where

11  Ms. Jurisic says, "I'm mad that 20 one"?

12  A.    Yes.

13  Q.    And one of the checks, in fact, the check on page 5

14  of Exhibit 2, is a $20,000 check made payable to

15  Flexsteel, correct?

16  A.    Yeah, you have to show me the image so I can --

17  Q.    There you go.

18  A.    Yes.

19  Q.    And then, do you see down here where Ms. Jurisic

20  says, "I know I'm mad.  ASLL was moving too quick"?

21  A.    Yes.

22  Q.    And then Mr. Hines responds, "You took all of them?"

23  A.    Yes.

24  Q.    And then, Ms. Jurisic replies, "Yeah," and then the

25  next one down was "There was a lot more"?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 33 of 139

1  A.    Yes.

2  Q.    And then she responds, "But I wasn't doing all

3  that."  And Mr. Hines asks, "Why would you take all the

4  ones to da same company?"

5  A.    Yes.

6  Q.    And her response is, "Cuz that's the only one that

7  be getting them"?

8  A.    Yes.

9  Q.    And then she identifies that these checks are going

10  to P.O. Boxes?

11  A.    Yes.

12  Q.    And then eventually down here they agree that even

13  though initially they said they were too small and they

14  weren't going to work, Mr. Hines still directs her to

15  bring them to him, and she agrees to try?

16  A.    Yes.

17  Q.    And looking back at Exhibit 2, the checks we have

18  here are all dated, at least on page -- I'll start with

19  page 1 of Exhibit 2.  Those checks are dated in October

20  of 2018; is that correct?

21  A.    Correct.

22  Q.    And the same with the check in page 5?

23  A.    Yes.

24  Q.    And the checks on page 6 are also from that same

25  approximate time frame in October of 2018?

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 34 of 139

1    A.    Yes.

2    Q.    Now, when I compare the checks that are listed in

3    Exhibit 2 to the checks that you have on the spreadsheet

4    from Flexsteel in Exhibit 1, it appeared only three of

5    the checks in those three pictures we just looked at are

6    actually reflected in your spreadsheet; is that correct?

7    A.    Yes.

8    Q.    And, now, the information that you have in the

9    spreadsheet was actually provided to you by Flexsteel; is

10   that correct?

11   A.    Yes.

12   Q.    So the checks listed in the spreadsheet are the ones

13   that they knew had gone missing?

14   A.    Yes.

15   Q.    So it's possible that some checks had gone missing

16   and they simply hadn't been able to identify that they

17   had gone missing or been stolen?

18   A.    Correct.

19   Q.    And that's why these checks that are in these

20   pictures may not necessarily be on your spreadsheet?

21   A.    Yes.

22   Q.    And looking at page 2 of Exhibit 1, just to identify

23   the three checks that are on the spreadsheet and in the

24   photos, do you see here there's a check that was made

25   payable to Flexsteel from Dewey Furniture and Carpet?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 35 of 139

1   A.   Yes.

2   Q.   And that's dated October 12, 2018, in the amount of

3   $2,602.80?

4   A.   Yes.

5   Q.   And looking at page 1 of Exhibit 2, does that appear

6   to be the check that's reflected at the top of the page?

7   A.   Yes.

8   Q.   And then, if you go to the very last line of page 2

9   of Exhibit 1, there's a check from Rucker's,

10  Incorporated, Rucker's Furniture, made payable to

11  Flexsteel; is that correct?

12  A.   Yes.

13  Q.   Dated October 9, 2018, in the amount of $1,009.50?

14  A.   Yes.

15  Q.   And this one's a little harder to identify, but

16  based upon the Rucker's name on the check that's at the

17  bottom of page 1 of Exhibit 2 and kind of the end where

18  it says "dollars and 50 cents," and maybe the end of the

19  word 9 there before dollars, does that appear to be that

20  check?

21  A.   Yes, it does appear to be the check.

22  Q.   And then the last one is on page 6 of Exhibit 3.  Do

23  you see where there's a -- here, a check on page 2 of

24  Exhibit 1, from Blackstone Emporium, Inc., made payable

25  to Flexsteel on October 9th of 2018 in the amount of

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 36 of 139

1    $6,672.32?

2    A.    Yes.

3    Q.    And this one has a hole in it, but does that appear

4    to be the check that's at the very top of page 6 of

5    Exhibit 3?

6    A.    Yes, other than the majority of the name is

7    obscured, but it does look to be the same check.

8    Q.    Same amount and date on it anyway?

9    A.    Yes.

10   Q.    Now, I want to talk to you in a little bit more

11   detail about your spreadsheet.  Did checks continue to go

12   missing over the course of your investigation from

13   Flexsteel?

14   A.    Yes.

15   Q.    So did they continue to provide you supplemental

16   information, if you will, about more checks that were

17   going missing?

18   A.    Yes.  As time went on, it got less and less.

19   Q.    And does the information reflected in Exhibit 1

20   reflect all of the information you received from

21   Flexsteel of checks that they said had gone missing

22   during the, sort of the early spring -- I think the

23   earliest is April of 2018 -- through approximately

24   October of 2018.  Are all those checks reflected in this

25   spreadsheet in this kind of middle section on pages -- or

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 37 of 139

1  bottom section of page 1 and all of page 2?

2  A.    Yes, all of the checks listed would have been checks

3  that Flexsteel notified us about.  There may be a few

4  checks that we learned about through the banks.  When

5  they determined that an account was fraudulent, they

6  would look at all the checks that had been deposited, so

7  any that contained Flexsteel checks were directed to me.

8  Q.    So you learned of this either from Flexsteel or from

9  the bank identifying checks that were being deposited

10  into fraudulent accounts?

11  A.    Correct.

12  Q.    Now, I want to talk to you about a few other things

13  that are reflected on your spreadsheet here.  We already

14  talked about the green color coding.  What about the --

15  you have a number of these that are in an orange or gold

16  highlight color coding.  What does that represent on the

17  spreadsheet?

18  A.    Can you pull the spreadsheet down just a little bit?

19  Q.    Sure.

20  A.    Okay, the orange reflects the actual loss.  There's

21  actual loss connected to the check.

22  Q.    So the ones highlighted in orange or gold were

23  checks that were actually deposited into bank accounts?

24  A.    Yes, and the full amount of the check may have not

25  been lost.  There might have just been a portion because

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 38 of 139

1  they learned about the fraud and then shut the account

2  down.

3  Q.   And on the right side of your spreadsheet, if we

4  look at this first one on page 1 that's color coded

5  orange, you have the actual loss written out there.  In

6  this case it is the same as the actual check amount, but

7  if it were different, on the spreadsheet you have the

8  actual loss amount written in this far right column; is

9  that correct?

10  A.   Yes.

11  Q.   And then, you have some here that are color coded as

12  gray.  What does that mean?

13  A.   That means I knew about the check, but I didn't have

14  an image of the check.

15  Q.   So you never received a digital image --

16  A.   Correct.

17  Q.   -- or picture of it?

18  A.   Yes.

19  Q.   And then some are in blue.  What does that mean?

20  A.   That means there were some banks that never

21  responded as to whether there was a loss, and there were

22  a few banks that I did not contact to determine if there

23  was actual loss.

24  Q.   So some of these checks may have been deposited into

25  banks, but you don't know if that bank actually paid out

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 39 of 139

1  on the check or not?

2  A.   Correct.

3  Q.   And then, also in here, in the far right column,

4  there are names that are in red.  Do you see that?

5  A.   Yes.

6  Q.   What do the red names represent?

7  A.   Those were the names on the check, so either

8  Flexsteel was removed from the check and that name was

9  added or that name was in addition to Flexsteel.

10 Q.   So they were added to the made payable line either

11 in replacement of Flexsteel or in addition to Flexsteel?

12 A.   Correct.

13 Q.   And you say some of these were an endorsed name on

14 the check.  Does that mean they were actually signed on

15 the back by -- in that name?

16 A.   Yes.

17 Q.   Now, they were initially deposited into accounts in

18 these names, correct?

19 A.   Yeah, so, for example, you'll see a check that was

20 endorsed by Joshua Keys.  He would be the accountholder.

21 Q.   Okay.  So if -- the endorsed name on here, it would

22 also reflect the name that the bank had as the holder of

23 the account?

24 A.   Correct.

25 Q.   And as you went through these checks and saw the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 40 of 139

```
 1   names of -- being endorsed, did you see the same names
 2   popping up multiple times?
 3   A.    Yes.
 4   Q.    So, for example, looking here on page 2, do you see
 5   where the name Ad Thomas shows up in a couple different
 6   locations?
 7   A.    Yes.
 8   Q.    And also the name Gabrielle Sharpe appears multiple
 9   times?
10   A.    Yes.
11   Q.    And then looking on page 3, the first two lines of
12   page 3 of Exhibit 1 also reflect checks that were made
13   payable to Flexsteel that went missing, correct?
14   A.    Yes.
15   Q.    And then below that we have a section called Dubuque
16   Checks Other Than Flexsteel, and there's four checks
17   reflected, correct?
18   A.    Yes.
19   Q.    So these were checks made payable to companies other
20   than Flexsteel that during the course of your
21   investigation you learned had been stolen and
22   attempted -- or fraudulently deposited in the case of the
23   first three; is that correct?
24   A.    Correct.
25   Q.    And do you see where -- well, first, the top check
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 41 of 139

1  in the Dubuque Checks Other Than Flexsteel portion was

2  made payable to Kendall Hunt Publishing, correct?

3  A.   Correct.

4  Q.   And they too had a P.O. Box in Dubuque, Iowa, where

5  checks would be mailed?

6  A.   Yes.

7  Q.   And that was in September of 2018, is the date on

8  the check?

9  A.   Yes.

10  Q.   And that ended up being made -- endorsed by,

11  deposited by Ad Thomas into his Bank of America account;

12  is that correct?

13  A.   Yes.

14  Q.   And I think it kind of varies in here, but sometimes

15  we refer to Bank of America as B of A?

16  A.   Yes.

17  Q.   And then the check right below that was made payable

18  to Tama USA, Incorporated; is that correct?

19  A.   Correct.

20  Q.   And is that also a business located in Dubuque that

21  had a P.O. Box at the Dubuque Post Office?

22  A.   Yes.

23  Q.   And that check was dated August 28th of 2018?

24  A.   Yes.

25  Q.   And then the one below it is also to Tama USA,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 42 of 139

1   Incorporated, correct?

2   A.    Yes.

3   Q.    And that was deposited by Gabrielle Sharpe?

4   A.    Correct.

5   Q.    So those two names were the same names as we had

6   seen on checks being deposited that had been made out to

7   Flexsteel, correct?

8   A.    Correct.

9   Q.    And then the fourth check here in the Dubuque Checks

10  Other Than Flexsteel category, that's the check that

11  Ms. Jurisic actually pled guilty to stealing, correct,

12  the Truck Country check that we talked about earlier?

13  A.    Yes.

14          MR. MORFITT:  Nothing further, Your Honor.

15          THE COURT:  Cross-examination.

16          MR. NATHAN:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18      BY MR. NATHAN:

19  Q.    Good morning, Agent.  How are you doing?

20  A.    Good morning.  Good.

21  Q.    I'm displaying Defense Exhibit E on a screen in

22  front of you.  It appears to be the rear of the building.

23  Do you see that?

24  A.    Yes.

25  Q.    Now, this is the rear of the White Street Annex,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 43 of 139

1 correct?

2 A.    Yes.

3 Q.    The White Street Annex building, it was occupied in

4 part by the United States Postal Service, correct?

5 A.    Correct.

6 Q.    It was also occupied by numerous other organizations

7 or businesses, correct?

8 A.    That's what I understand, yes.

9 Q.    You see a number of docks at the rear of the

10 building, correct?

11 A.    Yes.

12 Q.    Were all of those docks used by the United States

13 Postal Service, or is it your understanding that some of

14 those docks were used by other companies or organizations

15 who used that building?

16 A.    I have no idea as to whether other companies -- I

17 have no knowledge of that.  I would assume they were used

18 only by the Postal Service.

19 Q.    Okay.  Is there a reason that, without any knowledge

20 of by whom they were used, that you would assume they

21 were used only by the Postal Service?

22 A.    I would assume that, yes.  I can't say that another

23 business didn't ask to borrow the dock to move something

24 in for some reason, but . . .

25 Q.    You're aware obviously that there was an

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 44 of 139

     1  administrative proceeding against Ms. Jurisic?

     2  A.    Yes.

     3  Q.    Are you familiar with some of the evidence that was

     4  introduced at that hearing?

     5  A.    No.

     6  Q.    Are you familiar with the names of any other postal

     7  employees from the White Street Annex in Dubuque?

     8  A.    I know that Amy's sister works for the Post Office,

     9  yes.  There's a few employees that I know by name, but,

    10  no, I don't recognize the name on the exhibit.

    11  Q.    So you are looking at Exhibit C in front of you

    12  right now, I believe.

    13  A.    Yes.

    14  Q.    Do you see a Tom Olinger?

    15  A.    Yes.

    16  Q.    Maintenance?

    17  A.    Yes.

    18  Q.    Do you see where he states that the docks at the

    19  White Street location were, in fact, shared?

    20  A.    Which part does it say that it was shared, which

    21  bullet point?

    22  Q.    If you look at the first bullet point, it says,

    23  "Sometime in 2018 the overhead door between the Fischer

    24  side and the postal side of the dock was off the rails

    25  and would not open further or close."  So that means --

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 45 of 139

1  to me, that means that the inside space off the exterior

2  dock, that there would have been an inside door between

3  Fischer and USPS.  Is that how you read that?

4  A.    That's how I read it, yes.

5  Q.    Okay.  And if the interior door between Fischer and

6  USPS would not close, then there would have been an

7  opening between the Fischer Company and USPS, their

8  shared spaces -- or, excuse me, their separate spaces?

9  A.    Correct.  Apparently there was a door that was

10 separating them.

11 Q.    And the letter, as authored by Tom Olinger,

12 indicates that door that was supposed to separate the

13 Fischer space from the USPS space would, in fact,

14 sometimes not be closed?

15 A.    It says that it was open and couldn't be closed or

16 was partially open.

17 Q.    And, in fact, the letter states that it would remain

18 open approximately 3-and-a-half feet off the ground until

19 USPS moved out in November of 2018?

20 A.    Yes, that's what it says.

21 Q.    The next bullet point down says the dock doors for

22 the Fischer side were broken.  Do you see that?

23 A.    Yes.

24 Q.    Now, when I read that, it makes me think that some

25 of the docks that we saw at the rear of 750 White Street

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 46 of 139

1  belong to Fischer.  Is that how you interpret that?

2  A.    The dock doors for the Fischer side were broken.

3  That's what it says.

4  Q.    Okay.  So that means that it is possible or likely

5  that Fischer used some of those dock doors at the rear of

6  750 White Street, correct?

7  A.    According to this document.

8  Q.    That, of course, means that in addition to the

9  approximately ten employees for the United States Postal

10  Service, that there would have been employees for the

11  Fischer Company working on those docks, correct?

12  A.    I don't know if the Fischer Company had employees

13  working on their dock.

14  Q.    Why would you have a dock unless there were

15  employees working on the dock?

16  A.    I don't know what the Fischer Company does, so I

17  don't know what their purpose would be for the dock.

18  Q.    No, I understand, but can you think of a reason why

19  a company would have a dock unless it were using that

20  dock?  I can't.  I'm just asking you.

21  A.    Yeah, but I can't attest to how often they used it

22  or what they were moving in and out.

23  Q.    Got it.  So you can't think of a reason why a

24  company would have a dock and not use it, right?

25  A.    I can't think of a reason, no.  Unless it was part

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 47 of 139

1  of their lease arrangement.

2  Q.   The letter also states that the Fischer dock doors

3  would not lock and they were not fixed until after the

4  Post Office moved out, correct?

5  A.   Yes, that's what it says in the second bullet point.

6  Q.   Are you aware of some sort of door that would have

7  connected the Fischer side of the building and the USPS

8  side of the building?

9  A.   No.

10  Q.   But this letter says there was, right?

11  A.   That's what it says.

12  Q.   Okay.  And the letter then says that the door

13  between the Fischer side and the Post Office side would

14  not lock, right?

15  A.   That's what it says.

16  Q.   Suggesting that Fischer employees would have had

17  access to the USPS space, correct?

18  A.   I -- I can't say yes or no or -- I don't know what

19  the Fischer employees did.  I don't know why they would

20  have reason to come on another business's side of the

21  building.

22  Q.   I'm going to direct your attention now to Defense

23  Exhibit D.  It's a statement from Donita Black.  Are you

24  aware Ms. Black was employed at USPS?

25  A.   No, this employee is not familiar to me.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 48 of 139

1   Q.   Okay.  Do you see the sixth bullet point down from

2   the top?

3   A.   Yes.

4   Q.   Where it states that the dock doors were frequently

5   left open during the day due to the extreme heat during

6   the warmer months?

7   A.   Yes.

8   Q.   Now, that suggests that the USPS dock doors were

9   left open during the summer, correct?

10  A.   Correct.

11  Q.   And if the dock doors were left open during the

12  summer, then anyone could have access to the interior of

13  the USPS space?

14  A.   If the dock doors were open, you would have to be

15  tall enough to get up onto the -- because it doesn't

16  touch the ground, so . . . But I suppose, technically, an

17  individual could access the Post Office climbing through

18  the dock access door.

19  Q.   The dock doors don't look particularly high to me

20  off the ground.  Would you agree that they're

21  approximately 2 or 3 feet off the ground?

22  A.   I don't know.  I can't tell.  But if you look,

23  there's a car that's parked up next to the dock, dock

24  doors.

25  Q.   Yep.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 49 of 139

1  A.   And the door's kind of -- is it -- that looks like a

2  Suburban or a Tahoe, so that's a pretty big vehicle, and

3  the dock door is above that, above the hood of the

4  vehicle.

5  Q.   So the dock doors are above the hood of the vehicle.

6  So it might be 3 or 4 feet off the ground?

7  A.   I would say probably -- if I walked up to it, it was

8  probably more like 5 feet.

9  Q.   Okay.  In addition to the full-time employees for

10 the United States Postal Service that worked at the White

11 Street Annex, were there other employees who worked

12 there?  Contract employees, for example?

13 A.   I don't know.  I don't know of any contract

14 employees.  If they would, they would be truck drivers.

15 Q.   So when you don't -- when you say you don't know of

16 any contract employees, is that because you have no firm

17 knowledge as you sit here of actual names, or are you

18 saying that there were no other contractor employees who

19 worked there?

20 A.   The only contract employees that the Postal Service

21 has would be the truck drivers, the highway contract

22 route drivers.

23 Q.   So then there are, as you said, highway contractor

24 truck drivers who would also go to that location and drop

25 off mail?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 50 of 139

1    A.    Correct.

2    Q.    Okay.

3    A.    And pick up mail as well.

4    Q.    Now, what is a star route driver?

5    A.    A star route driver is a contract driver that goes

6    out.  Again, the White Street Annex in Dubuque -- so

7    Dubuque is a hub, so all of the incoming mail for Dubuque

8    and the surrounding areas is going to come through

9    Dubuque, so it's going to come from Cedar Rapids mainly

10   to Dubuque.

11   Q.    So a star route driver, for example, is not an

12   actual employee of USPS; they're a contract employee?

13   A.    Yes, there are some actual postal employees who will

14   run routes, but a lot of them are contracted.

15   Q.    I'm going to direct your attention back to Exhibit

16   D, and now it's the seventh bullet point from the

17   bottom -- excuse me, from the top, where it says "Star

18   route drivers accessed the inside of the building to get

19   whatever equipment they needed for their routes.  They

20   had free roam of the postal facilities and would pass

21   through the areas where the mail was to get to and from

22   the men's room."  Right?

23   A.    Yes, that's what it says.

24   Q.    So in addition to USPS employees -- of which there

25   are approximately ten, is my understanding -- there were

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 51 of 139

1  also additional contract employees who had access to the

2  inside of that White Street Annex, correct?

3  A.    Yes, the star route drivers; sounds like they used

4  the restroom.

5  Q.    And, finally, do you see the bottom of Exhibit D?

6  It's the very last bullet point on the letter authored by

7  Donita Black, where it states "After May of 2018, if I

8  worked an earlier shift, 9:30 start time instead of my

9  normal time, 11:30, there were times that none of the

10 doors were locked when I arrived and no one was there"?

11 A.    Yes, I see that.

12 Q.    And then would you agree with me that from Exhibit

13 E, which shows the rear of the White Street location,

14 that there are no fences around the rear of the White

15 Street location?

16 A.    Yes, there's no fence that would lock people out of

17 the lot.

18 Q.    There's no gates, correct?

19 A.    Correct.

20 Q.    And I don't see any security cameras, but I could be

21 wrong?

22 A.    No.

23 Q.    So in addition to the fact that the facility is not

24 secured by a fence or a gate or security cameras, it also

25 appears that some of the doors were left unopened [sic]

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 52 of 139

1  overnight?

2  A.   Well, she didn't say they were left opened

3  overnight.  She just --

4  Q.   "Unlocked," I apologize, you're right, "unlocked."

5  A.   Yes, when she got there, they were unlocked.

6  Q.   I'm going to show you another statement from JoAnn

7  Huss, marked as Exhibit D1, dated 4-19-19.  The very

8  first dashed or hyphened point states "White Street

9  entrance on White left unlocked between blue box

10  collection times."  What is blue box collection times, to

11  your knowledge?

12  A.   Those are the times that is designated, so you'll

13  see those times posted on the blue boxes, as to when the

14  mail is picked up out of the box.

15  Q.   Any of the mail that you've discussed so far --

16  would any of those pieces of mail been in a blue box?  I

17  don't know.  I'm just asking.

18  A.   No.

19  Q.   I have now put Exhibit D2 on the screen in front of

20  you.  It's a letter authored by Wade Lux.  Do you see

21  that?

22  A.   Yes.

23  Q.   It states, "The south side of the annex was open to

24  whomever walked in."  Do you see that?

25  A.   Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 53 of 139

1  Q.   So, again, I think he probably means the door was

2  not locked instead of actually just wide open, correct?

3  A.   Correct.

4  Q.   And it says on the next bullet point down, "The

5  keypad door, truck drivers came in, left the door wide

6  open, would come in to get any equipment they needed," is

7  this sort of consistent with the other information, that

8  the star route drivers would come in and have access to

9  the interior space?

10  A.   Yes.

11  Q.   And then the third point down says "Dock doors left

12  open and unlocked all day"?

13  A.   Yes, that's what the bullet point says.

14  Q.   And it says "open and unlocked," which suggests not

15  just that they were unlocked but also open, as in someone

16  could walk in without actually opening the door?

17  A.   Yes.

18  Q.   And the bottom bullet point sort of states what I

19  alluded to earlier, that because there are no fences, no

20  gates, no security, no cameras, that if there were

21  monthly festivals on Jackson Street, which I believe is

22  nearby to this location, that people could park illegally

23  in the USPS lot?

24  A.   I have no information about that, but there's no

25  gate, there's no fence around the lot, so I would assume

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 54 of 139

1    other cars that weren't postal employees could park in

2    there.  No one would stop them.

3    Q.    That's what I'm getting at, that no reason to

4    believe they would have been stopped from parking there

5    and loitering.

6    A.    Correct.

7    Q.    I believe that the defendant started in 2016; is

8    that right?

9    A.    Yes.

10    Q.    So no issues that you are aware of in 2016, right?

11    A.    Not that I am aware of.

12    Q.    And just to be clear, do you know actually how many

13    employees either -- worked full-time at the White Street

14    Annex, or are you just guesstimating?

15    A.    It's just an estimate.  I don't know the exact

16    number.

17    Q.    So what is your -- what is your estimate as to how

18    many employees are at the White Street location as their

19    permanent assignment?

20    A.    There's a handful of employees that work there.  I

21    estimated around ten.  And they all wouldn't be there at

22    the same time because they would have different start

23    times.

24    Q.    How many other employees who are not permanently at

25    the White Street location would also, for example,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 55 of 139

1  transfer there -- five to six times a month, for

2  instance -- or even just cover there once in a while?

3  A.    I don't have any knowledge.

4  Q.    Could be a few, could be a lot, you just don't know?

5  A.    I don't know.

6  Q.    How many contractors that we discussed earlier would

7  come and go through the White Street Annex, if you know?

8  A.    I don't know.

9  Q.    Could be a lot, could be a little?

10  A.    I don't actually know how many star routes there

11  are.

12  Q.    So it could be a lot, could be a little, you just

13  don't know?

14  A.    I don't know.

15  Q.    All right.  I believe there are 76 checks to

16  Flexsteel, approximately, right?

17  A.    I don't know the number that's listed on the

18  spreadsheet, I'm sorry.  I don't know the exact number.

19  Q.    Okay.  But you agree the vast majority of checks

20  that we're discussing here are to Flexsteel?

21  A.    Yes, except for the ones to Nord Gear --

22  Q.    Right.

23  A.    -- and then those other four I believe that were not

24  Flexsteel checks.

25  Q.    And then approximately eleven checks to Nord Gear?

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 56 of 139

```
1   A.    Yes.

2   Q.    And then literally like one or two checks to Truck

3   Country, Kendall Hunt Publishing, and Tama USA?

4   A.    Yes.

5   Q.    Okay.  And would you agree that these checks are

6   literally sent from almost every state in the country?

7   A.    Yes.

8   Q.    If I told you the checks came from Florida, Idaho,

9   Georgia, Virginia, California, Texas --

10         (Interruption by the court reporter.)

11              MR. NATHAN:  Sorry.  I'll try to go slower, but

12  there's a lot of states to go through.

13  Q.    Florida, Idaho, Georgia, Virginia, California,

14  Texas, Kentucky, Nevada, New York, New Hampshire,

15  Vermont, Maryland, Alabama, Arizona, Illinois,

16  Washington, South Carolina, Wisconsin, Indiana, Montana,

17  Ohio, North Carolina, Pennsylvania, that would sound

18  right to you, wouldn't it?

19  A.    Yes.

20  Q.    Now, I believe that all of these checks were sent

21  regular mail?

22  A.    Yes, First-Class Mail.

23  Q.    First-Class Mail means that the mail was not

24  tracked, right?

25  A.    There is some First-Class Mail that has tracking,
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 57 of 139

1  yes, but these pieces would not.

2  Q.    So I understand, of course, that it's the

3  implication that Ms. Jurisic is responsible for these

4  pieces of mail going lost, but there's no information

5  regarding where these checks were -- I'm going to use the

6  word "seen," but no information regarding where they were

7  last seen, other than that we know they were mailed by

8  the payor, right?

9  A.    They were mailed by the payor, yes; they were put

10  into the mail stream.

11  Q.    And after that, there's no direct evidence

12  suggesting -- excuse me, there's no direct evidence

13  indicating where they went missing, right?

14  A.    No, there's evidence to suggest they went missing in

15  Dubuque.

16  Q.    Okay.  How many facilities would each of these

17  checks have gone through before they arrived in the I

18  guess Dubuque ZIP Code?

19  A.    A few.

20  Q.    How many other locations within Dubuque would these

21  checks have gone through before going to the White Street

22  Annex location?

23  A.    Probably one processing facility.  It doesn't mean

24  that they were processed.  It could mean they were just

25  cross docked.  So I would say -- yeah, I'll just leave it

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 58 of 139

1   at that.

2   Q.   So it sounds like you are saying most of these

3   checks would have gone through another processing

4   facility in Dubuque before going to the White Street

5   Annex?

6   A.   Yes, they would have been put in delivery point

7   sequence, so they would have received processing in Iowa,

8   so they went through a processing facility in Iowa.

9   Q.   Am I correct that Ms. Jurisic never worked at this

10   other separate processing location?

11   A.   Correct.

12        THE COURT:  Can I get a clarification?  The

13   question to you was, it would have gone through a

14   processing facility in Dubuque before going to the White

15   Street Annex.  I understood you not to identify a

16   processing facility in Dubuque.  So the processing

17   facility would have been located where in Iowa?

18        THE WITNESS:  Cedar Rapids more than likely is

19   where it went through.

20        THE COURT:  All right.  Thank you.

21     BY MR. NATHAN:

22   Q.   You indicated during the earlier portion of your

23   direct that law enforcement was initially unable to

24   determine the point at which these pieces of mail were

25   stolen?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 59 of 139

1  A.   For Nord Gear?

2  Q.   For Nord Gear, correct.

3  A.   Yes.

4  Q.   Okay.  And I think that after some back and forth,

5  that you then said that the postal inspectors determined

6  that the source of the thefts were not external, meaning

7  that Nord Gear was not responsible for the thefts; is

8  that right?

9  A.   Correct, they had exhausted the external aspect of

10 the investigation and believed that it was an internal

11 issue.

12 Q.   I expect that when law enforcement initially did an

13 internal investigation into the Nord Gear checks, that

14 they looked at all of the employees at the Dubuque Main

15 facility, correct?

16 A.   Yes, I would -- for the internal investigation, yes,

17 we were looking at all postal employees, anyone who would

18 have had access to the mail, so that would have been at

19 White Street and the Main Post Office.

20 Q.   And OIG, the internal investigation, was not able to

21 exclude at that time any of the employees at the main

22 entrance -- or Main facility, correct?

23 A.   Initially, correct.

24 Q.   And initially, OIG was unable to exclude any of the

25 employees at the White Street Annex, correct?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 60 of 139

1   A.    Initially.

2   Q.    So from that, I gather that there were numerous

3   employees who would have had access to the Nord Gear

4   checks, correct?

5   A.    Any employee at White Street and any employee at the

6   Main Post Office, yes, would have had access to it, but

7   Amy was the only common denominator with all of these

8   checks.

9   Q.    I'm sorry, are you saying that there weren't

10  additional common denominators in the form of the other

11  employees at White Street Annex?

12  A.    No, there were no connections to any employees,

13  other than Amy.

14  Q.    You mean other than if the employees also worked at

15  the White Street Annex, right?

16  A.    Employees from the Main Post Office or employees at

17  White Street?

18  Q.    White Street.  The White Street employees also would

19  have had access to all of these checks, correct?

20  A.    Correct.

21  Q.    And that's at least ten actual employees at White

22  Street, right?

23  A.    Yes, and I don't know the exact number of who was

24  full-time and part-time at White Street.

25  Q.    Sure.  So it's some number of full-time employees,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 61 of 139

1  some number of employees who would have occasionally

2  moonlighted at White Street, and then you don't know how

3  many star route drivers also had access to White Street,

4  right?

5  A.    I do not know the number of star routes.

6  Q.    There are, of course, a number of checks that are

7  not photographed, fair to say?

8  A.    No, every one that was listed as far as a loss goes,

9  I would have a copy of the check.

10 Q.    I'll rephrase that.  What I mean is that there are a

11 number of checks that were not photographed and sent

12 between Ms. Jurisic and another person, correct?

13 A.    I -- I don't know.  We're only dealing with the

14 Davey Hines portion.  I know that Amy was connected to

15 other individuals in the Chicago area who were also

16 cashing stolen checks.

17 Q.    How many photographs in total were photographed and

18 sent from the defendant to Davey Hines?  I see maybe less

19 than two handfuls in the government's exhibits, so is

20 that accurate?

21 A.    Yeah.  I'm going to say -- of course, you have the

22 three images and then the other images that went between

23 Amy and Davey Hines were -- some of it was credit cards;

24 some of it was pictures of like a debit card or a credit

25 card and then it might have been a portion of the outside

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 62 of 139

1 of the envelope.

2 Q.   All right.  But then my question was simply how many

3 checks were photographed and sent from Amy Jurisic to

4 Davey Hines, and I believe the answer, as reflected in

5 the discovery and the exhibits from the government, are

6 between one and two handfuls?

7 A.   Yes, and I believe it's those three images that were

8 shown as an exhibit, those were the checks.

9 Q.   And of the remaining checks that were not

10 photographed and sent between the defendant and Davey

11 Hines, Ms. Jurisic obviously admitted to stealing none of

12 those remaining checks, correct?

13 A.   The Truck Country check, but you're right, that was

14 sent to Davey Hines.

15 Q.   Right.

16 A.   Yes.

17 Q.   So none of the other Flexsteel checks, correct?

18 A.   She pled to the Truck Country check, so that's the

19 only one I'm aware that she admitted to.

20 Q.   And no one identified her as stealing any of the

21 remaining Flexsteel checks that were not photographed and

22 sent between Ms. Jurisic and Davey Hines, correct?

23 A.   Correct.

24 Q.   I believe there was never a search warrant enforced

25 at Ms. Jurisic's home?

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 63 of 139

```
 1  A.    No, there was not.
 2  Q.    So law enforcement has no information that
 3  Ms. Jurisic was in possession of any of the envelopes of
 4  any of the remaining unphotographed checks, correct?
 5  A.    Correct.
 6  Q.    The checks that were cashed, I saw a long list on
 7  the Excel spreadsheet.  Obviously, the defendant's name
 8  appears nowhere in that list.  She did not endorse any of
 9  the stolen checks, correct?
10  A.    Correct, at least not in her name.  Whether she
11  endorsed it in someone else's name, I don't know.
12  Q.    Great point.  So did law enforcement get any video
13  recordings from any of those ATMs or banks showing the
14  person who deposited those checks?
15  A.    Yes, and Amy was in none of the video.
16  Q.    Okay.  So Amy did not endorse any of the checks in
17  her name and Amy appears in none of the videos, correct?
18  A.    Well, I can't say Amy didn't endorse the checks
19  because she was physically in Chicago.  She could have
20  signed the back but somebody else could have made the
21  deposit.  That's how the check-cashing ring worked.  They
22  involved multiple people.
23  Q.    But you agree none of the names used as endorsements
24  were in Amy's name?
25  A.    Correct.
```

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 64 of 139

```
1   Q.   Was any sort of handwriting analysis done to see if
2   any of the handwriting on the endorsed checks matched
3   Ms. Jurisic's handwriting?
4   A.   No.
5   Q.   And, as you said, I believe, she was not with any of
6   the people who cashed the checks?
7   A.   Not that you could see from the surveillance video.
8   Q.   Were any of those persons interviewed?
9   A.   No, because none of those people were identified.
10  Q.   The anonymous tip, it sounds like they weren't
11  anonymous; they actually went the extra step of inventing
12  some sort of a fictitious name?
13  A.   Yes, they supplied a name and contact information,
14  but it never went to anyone.  It was a bogus phone
15  number; it was a bogus address.
16  Q.   And I don't believe they ever quantified the number
17  of checks that Ms. Jurisic stole?
18  A.   No, there was no number associated to the
19  allegation.
20  Q.   They didn't say which checks she was stealing,
21  correct?
22  A.   No, correct.
23  Q.   In your time with OIG, have you ever seen one USPS
24  employee accuse another employee to hide their own
25  involvement in mail theft?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 65 of 139

1  A.   I'm trying to think --

2  Q.   Okay.

3  A.   -- if I've come across that.  I'm going to say no,

4  because oftentimes guilty people will say, well, I'm not

5  going to accuse so and so of it or this person, so

6  they'll say, no, they don't have any idea who would steal

7  mail.

8  Q.   All right.  The search warrant in Rock Falls, that

9  search warrant was for drug trafficking, correct?

10  A.   Yes.

11  Q.   And I believe that the defendant, Ms. Jurisic, was

12  not named in the search warrant obviously?

13  A.   Correct.

14  Q.   Nothing belonging to -- I'll rephrase that.  Nothing

15  in the defendant's name was found during that search

16  warrant's execution, right?

17  A.   Correct.

18  Q.   Now, the statements from the people that you

19  interviewed, they were unsworn, correct?

20  A.   Well, two of them were incarcerated.

21  Q.   Yep.

22  A.   So they were -- yes, they were advised of their

23  rights, if that's what you mean, but they didn't swear to

24  their statements.

25  Q.   That's what I mean.  So they didn't swear to their

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 66 of 139

1    statements?

2    A.    Correct.

3    Q.    And then I believe at least in the case of Michael

4    Blandin, he asked that the interview not be recorded?

5    A.    That's what he asked.

6    Q.    Any information of connection between Michael

7    Blandin or Nicholas Blandin and Cedar Rapids?

8    A.    I know they had a relative that lived in Dubuque.

9    Q.    Uh-huh.

10   A.    I do not know if they had one that lived in

11   Cedar Rapids.

12   Q.    Would those six checks have traveled through

13   Illinois before arriving in Dubuque, the ones recovered

14   from Rock Falls?

15   A.    It's hard to tell where their main processing is

16   because the checks were coming from different parts of

17   the country, so I'm not going to say it couldn't have

18   gone through Chicago because it certainly could have.

19   Q.    And the Blandins had contacts or connections to

20   Chicago, didn't they?

21   A.    Yes, they're from the Indiana area, Chicago area, up

22   there.

23   Q.    The greater Chicagoland, right?

24   A.    Yes.

25   Q.    The seventh check, the counterfeit check that was

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 67 of 139

1  found in Rock Falls, that was payable to the sister of

2  the Blandins, correct?

3  A.   Yes, she's a sister.

4  Q.   That would suggest, of course, that the Blandins

5  washed that check, right?

6  A.   It was counterfeit, so it wasn't washed, so they

7  actually created it from --

8  Q.   That's what I meant.  I'm sorry, you're right.

9  A.   Yes.

10  Q.   And as you said during direct, while law enforcement

11  obtained the Facebook records between the defendant and

12  Michael Blandin, those communications did not say

13  anything about checks, credit cards, or anything like

14  that, right?

15  A.   Correct.

16  Q.   And the Flexsteel checks that were found during the

17  search warrant, they weren't actually found in the room

18  or rooms that were used by Michael or Nicholas Blandin.

19  I believe they were found in V.T.'s or Ms. Trios's room;

20  is that right?

21  A.   Yeah, she said she used that room, but also Nick

22  Blandin used the room.

23  Q.   And the connection between Nick Blandin and the

24  defendant, did they actually have a connection, or was

25  the connection actually between the defendant and Michael

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 68 of 139

1  Blandin?

2  A.   No, I believe she corresponded with Nick Blandin the

3  most.  He didn't use his name on Facebook.  He used

4  different names.

5  Q.   Okay.  If I could, could I talk to you generally

6  about internal employee theft at USPS.  I saw a report

7  that between October of 2019 and September of 2020, that

8  OIG nationwide investigated approximately 1200 -- 1200

9  suspected mail thefts by employees.  Does that sound

10 right to you?

11 A.   It could be.  They put those national numbers out,

12 but I'm -- if you actually read it from the OIG website,

13 then it's accurate.

14 Q.   So you would agree that it's not uncommon over a

15 12-month period for OIG to investigate over a thousand

16 reports of suspected employee theft?

17 A.   Yes, but I'm better able to attest to what we

18 investigate here in Iowa.

19 Q.   And I'm going to get to Iowa in a second.

20 A.   Okay.

21 Q.   All right.  And I saw something else where between

22 March of 2020 and February of '21 that there were also

23 over a thousand investigations relating to employee mail

24 theft.  Again, would that sound correct to you?

25 A.   Nationwide?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 69 of 139

```
1   Q.   Yep.
2   A.   Yes.
3   Q.   And then between March of '19 and February of 2020,
4   there were over 1100 nationwide investigations relating
5   to employee theft?
6   A.   Yes.  I mean, I don't know where you are getting
7   your statistics from, so . . .
8   Q.   I'm just asking you --
9   A.   I don't know, because I don't pay attention to the
10  national stats, so . . .
11  Q.   I'm asking you just based on your 14 years of
12  experience with OIG whether these numbers sound correct
13  to you, and it sounds like they do.
14  A.   Yeah, they sound like they're probably accurate.
15  Q.   And based on your 14 years of experience with OIG,
16  would you be surprised to learn that 425 postal workers
17  were arrested nationwide for mail theft between January
18  of 2017 and December of 2018?  Would that surprise you or
19  sound incorrect?
20  A.   It wouldn't surprise me.
21  Q.   The defendant's sister I believe was fired from USPS
22  during this same time period?
23  A.   Well, technically she wasn't fired because she still
24  works for the Postal Service.
25  Q.   Was she somehow reprimanded or suspended?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 70 of 139

```
1   A.    Yes, there was -- I guess there was an attempt to
2   terminate her, but she succeeded in maintaining her job.
3           MR. NATHAN:  May I have one moment, please,
4   Your Honor.
5           THE COURT:  Yes.
6           MR. NATHAN:  Thanks.  Thank you.
7       BY MR. NATHAN:
8   Q.    Now, what does it mean that Ms. Jurisic did not prep
9   the box mail?  What does that mean?
10  A.    That just means unsleeve it, so when it's being
11  transported on a truck, it's in trays, and those trays
12  are sleeved and strapped usually.
13  Q.    Okay.  Thank you.  I believe that OIG received
14  information during the course of its investigation that
15  Ms. Jurisic would sometimes show up to work with black
16  eyes?
17  A.    I believe that was just one instance.
18  Q.    Okay.  And then, at some point law enforcement
19  interviewed the postmaster for Dubuque I believe?
20  A.    Yes.
21  Q.    And the postmaster, their opinion was that the theft
22  more than likely occurred at the main location, not the
23  White Street Annex; is that right?
24  A.    That's what the postmaster believed, yes.
25  Q.    And they're fairly well informed, aren't they?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 71 of 139

```
1   A.    I would think so.  They're the postmaster.
2             MR. NATHAN:  May I have one moment, please,
3   Your Honor?
4             THE COURT:  You may.
5        BY MR. NATHAN:
6   Q.    Until when did the defendant work at the White
7   Street location, if you know?
8   A.    I think it was -- she was only at -- she was at
9   White Street most of the time.  She did -- once White
10  Street closed, she went out to the carrier annex and was
11  working out there.
12  Q.    When did the White Street Annex close?
13  A.    I believe it was November 2018.
14  Q.    I believe you've acknowledged previously that,
15  respecting the anonymous tip, that at least the anonymous
16  tip could have had a vendetta against the defendant; is
17  that correct?
18  A.    Absolutely.  In general, with any anonymous tip you
19  have to weigh -- weigh it.  There's always the
20  possibility that it's somebody that is out to get the
21  postal employee.  You have to understand that I'm a
22  former postal employee, so I always give the benefit of
23  the doubt to the postal employee.  So I always say, you
24  know, is it somebody that's disgruntled, somebody they
25  got into an argument with, somebody they have a domestic
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 72 of 139

1  relationship with, that is providing false information.

2  Q.    Okay.  From your review of the Facebook messages

3  between defendant and Davey Hines, in your opinion, who

4  contacted who first and who would have initiated the

5  discussions regarding checks, cards, et cetera?

6  A.    I don't know who initiated the text messages, the

7  Facebook Messenger messages, between Amy and Davey.  I'm

8  assuming that there was conversation had beforehand.

9  Q.    Davey Hines, of course, has been indicted in the

10 Northern District of Illinois?

11 A.    Yes.

12 Q.    And his conspiracy continued through December of

13 2019?  If I told you that, would that sound correct to

14 you?

15 A.    Yes, I'm assuming you got that information from --

16 Q.    PACER.

17 A.    Yes.

18 Q.    Any information regarding how or why the defendant

19 would have targeted Flexsteel?

20 A.    Other than what was indicated in the conversation,

21 that they had checks.  Those were the ones she saw,

22 so . . .

23 Q.    Respecting the nature of the communications between

24 the defendant and Davey Hines, I understand there was

25 some profanity both ways, but would you agree that Davey

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 73 of 139

1  Hines would often verbally abuse Ms. Jurisic?

2  A.   I -- one thing about written messages is you don't

3  know the tone that's used behind it, so I never knew if

4  they were joking back and forth, which some people speak

5  like that.  I don't speak to people that way, but --

6  Q.   Okay.

7  A.   -- some people just do it normally and they're

8  joking, there's no intent behind it, so I can't say.

9  They both said some pretty mean things to one another.

10 Q.   There's profanity both ways; I said that.  But would

11 you agree that some of the things that Davey Hines wrote

12 to Ms. Jurisic could be interpreted or consistent with

13 verbal abuse?

14 A.   Yes, but, again, it's a two-way street.

15 Q.   Sure.  And would you agree that some of the things

16 that Davey Hines wrote to Ms. Jurisic is also consistent

17 with physical abuse?

18 A.   That's hard to say because you don't have the act or

19 the action of the physical abuse, so, you know, when you

20 say you are going to beat somebody's ass --

21 Q.   Right.  So would you agree that numerous times

22 through their communications, Davey Hines wrote something

23 consistent with "I'm going to beat your ass," which, of

24 course, to me at least, is consistent with physical

25 abuse?  I could be wrong.

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 74 of 139

1  A.   Yeah, you have to take it in context because there

2  was some sexual innuendo going on between them.

3  Q.   Okay.

4        MR. NATHAN:  That's it.  Thanks very much.

5  Appreciate it.

6        THE COURT:  Any redirect examination?

7        MR. MORFITT:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9  BY MR. MORFITT:

10 Q.   Agent Wignall, when the defendant started her

11 employment at the Post Office in Dubuque in 2016, she was

12 part-time, correct?

13 A.   Yes.

14 Q.   And then it was in 2017 that she became full-time?

15 A.   Yes.

16 Q.   And she stayed employed with the Post Office through

17 sometime in 2019, correct?

18 A.   Yes.

19 Q.   So after the White Street Annex closed near the end

20 of 2018, you said she moved to the carrier annex?

21 A.   Yes.

22 Q.   And she remained employed there through -- do you

23 know when in 2019 approximately?

24 A.   No.  I do know that once we interviewed her --

25 interviewed her, we did interview her at the carrier

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 75 of 139

1  annex, that -- at that point postal management made a

2  determination to put her off work until they made their

3  decision as to what they were going to do

4  administratively.

5  Q.   Do you know approximately when you interviewed her?

6  A.   I'm going to guess -- no, I don't even want to guess

7  so . . .

8  Q.   Okay.  Was it early in 2019 or later in 2019?

9  A.   It would have to be earlier in 2019.  I want to say

10  February or March, and I could be wrong.

11  Q.   Okay.  And then, you said on cross, looking at

12  Exhibit 2 -- and, again, there's 6 pages to Exhibit 2.

13  We focused primarily on pages 1, 5, and 6.  And pages 1,

14  5, and 6 were the three images that went along with the

15  text string that's in Exhibit 3, correct?

16  A.   Correct.

17  Q.   Okay.  Page 2 -- and I'll show you page 2 right now

18  of Exhibit 2.  That was found in a different text message

19  from the defendant to Davey Hines, correct?

20  A.   Correct.

21  Q.   And that's dated all the way to December 4th of

22  2018, correct?

23  A.   Correct.

24  Q.   And page 3 of Exhibit 2, that was also found in a

25  different text message from defendant to Davey Hines,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 76 of 139

1  correct?

2  A.    Correct.

3  Q.    And there's -- the check you can see up front there,

4  that's dated December 10, 2018?

5  A.    Yes.

6  Q.    Does that appear to potentially be another check

7  behind it as well?

8  A.    Yes.

9  Q.    And then finally page 4, a check dated December 5th

10  of 2018, was also found -- this picture was found in a

11  text message from the defendant to Davey Hines?

12  A.    Yes.

13  Q.    Or Facebook Messenger or whatever form of

14  communication they were using?

15  A.    Yes.

16  Q.    Now, in all of pages 2, 3, and 4 you can't see who

17  the checks are made payable to you, can you?

18  A.    No.

19  Q.    So these checks are not included anywhere in your

20  spreadsheet that's in Exhibit 1?

21  A.    Correct.

22  Q.    And I want to take one more quick look at Exhibit 1.

23  So the red names are the names of the people who endorsed

24  these checks, correct?

25  A.    Yes, those would be the names on the backs of the

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 77 of 139

1 checks.

2 Q.    And then, you have mostly in bold but sometimes not

3 bolded the name of the bank, where the checks were

4 attempted to be deposited or were deposited at, correct?

5 A.    Correct.

6 Q.    Now, were you able to identify the branch locations

7 of these banks that these checks were deposited at?

8 A.    Yes, usually that came with the information from the

9 banks.  They would say where the branch was.  Most of

10 this was done in the Chicago area.

11 Q.    That was going to be my next question.  Would the

12 vast majority of these checks that are contained -- the

13 Flexsteel checks in Exhibit 1 were attempted to be

14 deposited at banks in the Chicagoland area, correct?

15 A.    Yes, and the bank that sticks out to me is Bank of

16 America.  That's the one that I remember.  It was the

17 Chicago area, but specifically with the other banks I

18 cannot say for sure.

19 Q.    And you testified on cross-examination that the

20 defendant was connected to other individuals involved in

21 check cashing besides Davey Hines?

22 A.    Yes.

23 Q.    Who -- what in particular connections are you

24 talking about there?

25 A.    So I don't know that Davey Hines was connected to

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 78 of 139

1  other people, but you have to understand that once we

2  were notified or we made connections to the banks -- so

3  Bank of America, TCF Bank, Wells Fargo -- they would have

4  a fraudulent account, so they would show us checks from

5  those accounts, and some of those checks would be

6  connected to other cases that agents in the Chicago area

7  were working.  So I was concerned about the Flexsteel

8  checks because those are Dubuque checks, but there would

9  be checks deposited that were stolen in the Chicago area

10  and then deposited in the same account.  So I don't know

11  if those accounts were associated to Davey Hines, but I

12  do know that the subject that they were looking at -- I

13  don't know if he has a connection with Davey Hines.

14  Q.    Okay.  So basically there were other fraudulent

15  checks being deposited in the same accounts that these

16  Flexsteel checks have been deposited to?

17  A.    Yes.

18  Q.    I just want to clarify something on the Truck

19  Country check that the defendant pled guilty to stealing.

20  I think you inadvertently testified that she had

21  communicated with Davey Hines about that check, but it

22  was actually another individual named Darrell Vance that

23  she communicated with, correct?

24  A.    Yes, you're correct.

25  Q.    And that was back in June of 2017, that she

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 79 of 139

1  contacted Darrell Vance and sent him a picture of the

2  Truck Country check?

3  A.    Yes, correct.

4  Q.    And I want to talk to you a little bit about

5  First-Class Mail.  You indicated that checks of this

6  nature or all of the checks in this case as they're going

7  through Dubuque would have been in First-Class Mail?

8  A.    Yes.

9  Q.    Now, First-Class Mail, is that separate from

10  something that's called bulk mail?

11  A.    Yes, bulk mail is referred to as Third-Class Mail,

12  so it's -- it's not as stringent.  For example, incoming

13  mail and outgoing mail, so collection mail, and then the

14  incoming mail that's coming in the morning, because

15  Dubuque is a hub, the First-Class Mail is going to go

16  out.  It's going to go out of White Street that morning

17  and be distributed to the offices that it belongs to, so

18  overnight there should be no First-Class Mail at the

19  White Street Annex.

20  Q.    So, in other words, if First-Class Mail comes into

21  the White Street Annex on a day, it is, generally

22  speaking, going to go back out to wherever its ultimate

23  destination is that same day?

24  A.    Correct.

25  Q.    Whereas bulk mail, things like magazines or mailers,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 80 of 139

1  advertisements, that sort of thing, junk mail --

2  A.    Yes.

3  Q.    -- some might call it, would sometimes stay

4  overnight in the annex?

5  A.    Yes.

6  Q.    And I think at one point you were being asked about

7  mail theft across the country and you said you know more

8  about mail theft in Iowa.  I don't know if that was ever

9  followed up on.  So how common in your experience over

10  the last 15 years is mail theft by postal employees in

11  the offices you've served, if you will, over that time

12  frame?

13  A.    Well, in general terms I can tell you that we

14  investigate multiple things besides mail theft.  We have

15  only a few agents.  In fact, there's only two agents, OIG

16  agents, in the state of Iowa.  We cover the whole state,

17  so we look at other things other than mail theft.  But

18  mail theft specifically, for myself, I'm going to

19  estimate it's going to be between six and eight cases

20  that actually turn into investigations.  Now, whether or

21  not those are resolved investigations, they may not be

22  resolved, but those are very few.  Usually there's a

23  resolution.  So that's just me, so if you times that by

24  two because there's two agents who would work mail theft,

25  you might have up to 16 mail theft full-blown

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 81 of 139

1   investigations a year.

2   Q.    And prior to this investigation, have you ever had a

3   mail theft investigation out of the White Street Annex in

4   Dubuque?

5   A.    You know, Dubuque has been my territory for a long

6   time, and I have received allegations of theft out of

7   Dubuque, but I can only think of maybe two cases that

8   have been Dubuque mail theft cases.

9   Q.    Are you -- do you more commonly get case from

10  Des Moines and Cedar Rapids?

11  A.    Yes.

12          MR. MORFITT:  Nothing further, Your Honor.

13          THE COURT:  Any further recross-examination?

14          MR. NATHAN:  May I have one moment, please,

15  Your Honor.

16          THE COURT:  You may.

17                    RECROSS EXAMINATION

18    BY MR. NATHAN:

19  Q.    Am I correct that First-Class Mail would come in on

20  every truck -- or it could come in on every truck; is

21  that right?

22  A.    It could.  I don't know exactly what's on all the

23  trucks.  Sometimes there could be a truck with just

24  equipment on it.

25  Q.    And then the First-Class Mail after it comes into

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 82 of 139

```
 1   the White Street Annex, for example, if the person
 2   handling that First-Class Mail, their shift ends, then
 3   that First-Class Mail would just be left inside the Post
 4   Office, right?
 5   A.   It would be -- I don't know what it would be in
 6   terms of First-Class Mail because if it comes in the
 7   morning off of the truck, it should be disbursed.  So
 8   it's going to be cross docked, it's going to be moved to
 9   the West Side Carrier Annex for the Dubuque area, or it's
10   going to go out to the offices.
11   Q.   Right.  So I heard "if" and then "should be."  So if
12   not if, then possibly not, is that what you are saying?
13   A.   No, it should be.  I don't know of any instances
14   where it would not go out and where it would sit there.
15   I don't know of any shift changes that would happen
16   before that morning mail is distributed to where it needs
17   to go.
18   Q.   The instances or reports that you've received
19   regarding mail theft at the Dubuque locations, of course,
20   other than this case, have those occurred both before and
21   after this case?
22   A.   Not after.
23             MR. NATHAN:  Thanks very much.
24             THE COURT:  Agent, I have a few questions for
25   you.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 83 of 139

1            THE WITNESS:  Sure.

2            THE COURT:  First of all, I understood from

3    your earlier testimony about the defendant's employment

4    that there were times that she would go to the Main Post

5    Office to perform some duties that had something to do

6    with Post Office Boxes.  Am I correct on that?

7            THE WITNESS:  Yes.

8            THE COURT:  Tell me more about what were her

9    duties at the Main Post Office having to do with Post

10   Office Boxes.

11           THE WITNESS:  Well, she would -- and this is

12   according to the postmaster.  She would be sent to the

13   Main Post Office to help out, I assume when they were

14   shorthanded, and it was explained to me that her duties

15   would be putting up the P.O. Box mail, so she would be

16   placing mail in P.O. Boxes.

17           THE COURT:  All right.  And is that area

18   subject to video surveillance?

19           THE WITNESS:  No video surveillance, but there

20   is a catwalk or lookout gallery within that postal

21   facility where we could do surveillance, physical

22   surveillance.

23           THE COURT:  During what time period, did the

24   defendant perform those duties?

25           THE WITNESS:  I don't have a specific time

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 84 of 139

```
 1  frame.  Just -- I think it was just part of -- if they
 2  needed her, they sent her to the Main Post Office to help
 3  out.  I don't know if it was just for a few hours or they
 4  sent her there for her entire shift.
 5          THE COURT:  Did you or other law enforcement
 6  officers perform any surveillance of the defendant as
 7  part of this investigation?
 8          THE WITNESS:  We looked to perform
 9  surveillance, but there was no set time as to when she
10  was going to be at the Main Post Office.  The postmaster
11  couldn't give me a schedule of when she was going to be
12  there, so it would have been hit or miss.
13          THE COURT:  Am I correct that every piece of
14  mail that you believe is tied to the defendant stealing
15  was directed to a Post Office box?
16          THE WITNESS:  Yes.
17          THE COURT:  All right.  Here's my hunch -- and
18  you tell me whether I'm wrong or why it would be wrong --
19  but my hunch from this is the focus on the White Star --
20  or White Street location, the hub location, is misplaced.
21  All the mail that's been stolen was directed to a Post
22  Office Box, and the defendant's job involved her putting
23  mail into Post Office Boxes at the Main Post Office.  It
24  occurred to me that if she was going to steal this mail,
25  it would most likely occur on those occasions when she
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 85 of 139

1  worked at the Main Office and was putting mail in the

2  Post Office Boxes.

3          THE WITNESS:  Yes, and that was -- you know,

4  that was one of the things that we had to look at, where

5  was it happening, because I wouldn't say it couldn't have

6  happened at White Street because it could have, or it

7  very well could have happened at Main when she was there

8  putting up the P.O. Box mail, yes, absolutely.

9          THE COURT:  And you just don't know either way?

10          THE WITNESS:  Correct.

11          THE COURT:  All right.

12          THE WITNESS:  And I do want to go back, Judge,

13  and say you asked if all of the mail that was stolen were

14  checks addressed to P.O. Boxes, there were some pieces

15  that were images of credit cards that I don't know if all

16  of those were addressed to P.O. Boxes.  They could have

17  had a street address associated to them.  But the checks,

18  yes.

19          THE COURT:  You were asked a question on

20  cross-examination and your answer was -- "Do you believe

21  defendant was connected with others in the Chicago area

22  cashing stolen checks," and then I think Mr. Morfitt

23  attempted to follow-up on that, but I'm not quite sure

24  that he answered the question -- or you answered the

25  question that he asked or that I have in my head, which

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 86 of 139

1  is how do you know the defendant was connected to others

2  in the Chicago area cashing checks, other than Hines?

3          THE WITNESS:  Amy had lots of friends in the

4  Chicago area, and she was connected with some people that

5  were part of the check-cashing ring that is being

6  investigated by Chicago agents and postal inspectors

7  there, so I know that she has a connection to them.

8          THE COURT:  And how do you know she has

9  connection to these other people involved in that ring?

10          THE WITNESS:  Because there are messages

11  between her and those individuals.

12          THE COURT:  And "messages."  Text messages,

13  Facebook?

14          THE WITNESS:  Yes.  Not text messages because I

15  didn't have Amy's phone, so the only text messages we

16  would have access to are the conversations between her

17  and Davey Hines.

18          THE COURT:  On this anonymous caller, you were

19  asked the question that the caller didn't say which

20  checks were stolen or the number of checks that were

21  stolen, but were there any other details from the

22  anonymous caller, like how she was stealing them, where

23  she was stealing them, anything like that?

24          THE WITNESS:  No.  She -- she was identified as

25  a postal employee working at the Dubuque Post Office, she

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 87 of 139

1  was identified by name, and that she was stealing checks

2  from the mail and selling them in Chicago.

3          THE COURT:  Was the caller male or female?

4          THE WITNESS:  The voice to me sounds like it

5  was a female, like an older lady, but I believe there was

6  a male name associated to who called it in.

7          THE COURT:  All right.  Mr. Morfitt, questions

8  in light of my questions?

9          MR. MORFITT:  No, Your Honor.

10          THE COURT:  Mr. Nathan?

11          MR. NATHAN:  I do have a few questions.

12                  FURTHER RECROSS EXAMINATION

13      BY MR. NATHAN:

14  Q.   Just to back up for a second, during direct, you had

15  initially testified that the defendant worked alone on

16  Sundays with Express Mail, correct?

17  A.   It's my understanding that when she worked on

18  Sundays, that that was the intent of her working those

19  days.  I don't know what else she would do at that

20  facility on a Sunday.

21  Q.   And no indication that Express Mail was stolen,

22  correct?

23  A.   Correct.

24  Q.   The Judge asked you about conversations between

25  yourself and the postmaster about Ms. Jurisic working at

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 88 of 139

1  the Dubuque Main location.  Now, that conversation with

2  the Dubuque postmaster occurred in January of 2018,

3  right?

4  A.   I believe so, yes.

5  Q.   And then, of course, the Flexsteel checks were all

6  stolen I believe between April of 2018 and later in 2018,

7  right?

8  A.   Yes.

9  Q.   Okay.  So what dates, if any, do you know that

10  Ms. Jurisic would have worked at Dubuque Main after

11  January of 2018?

12  A.   I don't have a listing of the dates that she worked

13  there, so I couldn't -- I couldn't speak to that.

14            MR. NATHAN:  Okay.  Thanks very much.

15            THE COURT:  All right.  Thank you, Agent.  You

16  may step down.  You are excused.

17       Mr. Morfitt, you may call your next witness.

18            MR. MORFITT:  United States calls Tina Nobis.

19                      TINA NOBIS,

20  called as a witness, being first duly sworn or affirmed,

21  was examined and testified as follows:

22            THE COURT:  Thank you.  Please have a seat.

23  And when you are comfortable, please state your name.

24            THE WITNESS:  My name is Tina Nobis.  N-O-B, as

25  in boy, I-S, as in Sam.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 89 of 139

```
 1              THE COURT:  Thank you.
 2         You may proceed, Mr. Morfitt.
 3                      DIRECT EXAMINATION
 4         BY MR. MORFITT:
 5    Q.   How are you currently employed?
 6    A.   I'm currently employed as a US postal inspector for
 7    the past 19 years.
 8    Q.   And are you stationed here in Cedar Rapids?
 9    A.   Yes, Cedar Rapids is one of my locations.
10    Q.   And do you also handle incidents out of Dubuque?
11    A.   Yes.
12    Q.   And how long have you been here in Cedar Rapids and
13    also handling Dubuque?
14    A.   I've been in Cedar Rapids since 2007.
15    Q.   And did you become involved to an extent in the
16    investigation involving the defendant in this case,
17    because there were portions of it at various times that
18    were looking into whether there was an external source of
19    the mail being stolen?
20    A.   Yes.
21    Q.   And over the course of your career here, have you
22    become familiar with the Dubuque Post Office and how it
23    was set up?
24    A.   Yes.
25    Q.   Particularly, as it relates to the timeframe we're
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 90 of 139

1    looking at here in 2017 and 2018?

2    A.    Yes.

3    Q.    Now, when it comes to handling security for the Post

4    Office, the Postal Service, is that done by postal

5    inspectors, such as yourself, or the Office of Inspector

6    General?

7    A.    Security for the US Postal Service is overseen by

8    the US Postal Inspection Service; and specifically within

9    our agency, we have a security specialist by the name of

10   Joanne Dean that sits in Kansas City but covers Iowa as

11   well for security issues.

12   Q.    And if there were breaches in security at a postal

13   facility, such as the White Street Annex in Dubuque when

14   it existed, are those security breaches or deficiencies

15   supposed to be reported to the postal -- to postal

16   inspectors?

17   A.    Yes, they should have been reported immediately to

18   myself or to my co-worker.

19   Q.    And you've heard some -- or seen some exhibits here

20   today.  Were there any such deficiencies noted in Dubuque

21   in the 2017 and 2018 time frame as are indicated in some

22   of the defense exhibits?

23   A.    Not one was reported to myself or my co-worker.

24   Q.    And are you familiar with the process behind like

25   administrative hearings, if you will, regarding whether

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 91 of 139

 1  or not somebody is stealing mail or potentially going to

 2  be fired from their job for some sort of lapse in their

 3  work?

 4  A.    Yes, I am.

 5  Q.    And in your experience, is it common for employees

 6  to try and deflect blame from either themselves or other

 7  employees by citing outside things that could cause

 8  whatever the problem was?

 9  A.    Yes, it's quite common.

10            MR. MORFITT:  Nothing further, Your Honor.

11            THE COURT:  Cross-examination.

12                    CROSS-EXAMINATION

13       BY MR. NATHAN:

14  Q.    I believe I heard during the agent's testimony that

15  the East Side Annex, White Street location is no longer

16  in operation?

17  A.    Yes, that's correct.

18  Q.    The work that was being performed there, has it

19  moved to Main or did it move to the West Side Annex?

20  A.    It's likely -- the US Postal Service is under a

21  nationwide reorganization, therefore, trying to eliminate

22  unnecessary facilities being opened or paying money for

23  leases on things that they could consolidate, and it's my

24  understanding that all of the mail for Dubuque is being

25  processed out of the Cedar Rapids PNDC, Processing and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 92 of 139

1 Distribution facility, right now.

2 Q.   So it sounds like then the Dubuque East Side White

3 Street location was determined to be superfluous, right?

4 A.   Correct.  I'm not exactly sure why it was closed,

5 but that would be my assumption.

6 Q.   Do you have any particular information about why the

7 White Street location was closed?

8 A.   I don't know, other than there was a committee that

9 was put together to look at all these different

10 facilities and decide which ones could be eliminated to

11 try to make mail processing more efficient.

12 Q.   As part of the examination into efficiency, I

13 believe it's probably a fair assumption that one of the

14 factors that go into efficiency is the possibility of

15 mail theft, right, as mail theft would make mail delivery

16 processing more inefficient, right?

17 A.   I'm not quite sure I understand what you are saying

18 or your question.

19 Q.   Yeah.  So when the Post Office confers and they

20 determine to close a particular location, that's based on

21 what you've already said.  And what I am asking is, when

22 that decision is made, they look at a number of factors,

23 right?

24 A.   I would assume so.

25 Q.   One of the factors that makes sense to me at least

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 93 of 139

1  would be whether that location is vulnerable to mail

2  theft, right?

3  A.   I can't -- I don't -- I can't answer that.

4  Q.   But it could be, right?

5  A.   I don't know.

6  Q.   Sure.  As you said, and I already asked you, you

7  said that you don't have any particular information as to

8  why this particular location was closed.  So for all you

9  know, it could have been closed because of security

10 issues, right?

11 A.   I don't know that because none were ever reported to

12 me, nor have I had any other reports of mail theft out of

13 that location prior to Ms. Jurisic.

14           MR. NATHAN:  Thanks very much.

15           THE COURT:  Any further redirect examination?

16           MR. MORFITT:  No, Your Honor.

17           THE COURT:  Thank you, Agent.  You may step

18 down.

19           THE WITNESS:  Thank you.

20           THE COURT:  Any other witnesses you wish to

21 call, Mr. Morfitt?

22           MR. MORFITT:  No, Your Honor.

23           THE COURT:  Mr. Nathan, any witnesses you wish

24 to call?

25           MR. NATHAN:  Just a proffer to close the loop

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 94 of 139

1  in our exhibits, that those exhibits were, in fact,

2  admitted at Ms. Jurisic's administrative hearing with the

3  Post Office.

4        THE COURT:  Any objection to the Court

5  receiving that proffer, Mr. Morfitt?

6        MR. MORFITT:  No, Your Honor.

7        THE COURT:  The Court will do so.  Anything

8  else, Mr. Nathan?

9        MR. NATHAN:  No, Your Honor.  Thank you.

10        THE COURT:  All right.  Thank you.

11     All right.  That completes the evidence on these

12  issues then.  I will now hear argument regarding the loss

13  amount.  And once we establish that, then I'll rule on

14  the disputed issues in the presentence investigation

15  report and then we'll move to disposition.  Hang on just

16  a second.

17     All right.  So let's go ahead and hear argument.

18        MR. MORFITT:  Your Honor, the government

19  doesn't have much in the way of argument on the factual

20  issue.  The Court has heard all of the evidence.

21  Depending on how the Court rules, I do have alternative

22  numbers that I can provide to the Court depending on

23  which checks ultimately the Court believes were stolen.

24  I would say that I think the Flexsteel checks contained

25  on the bottom of page 1, all of page 2, and the top two

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 95 of 139

1  lines of page 3 are certainly proven by a preponderance

2  of the evidence.  We have the defendant taking pictures

3  of and sending similar checks, including three checks

4  that are actually on this spreadsheet, to Davey Hines in

5  Chicago, part of a check-cashing ring.  These names

6  are -- or these checks are connected, via the names of

7  the people who endorsed them, to the other checks in the

8  spreadsheet, as well as the checks to the three other

9  companies in Dubuque, connected by those same names.

10       There could be lots of thrown-out explanations for

11  why checks go missing, but here, the evidence has proven

12  by a preponderance -- by a preponderance that the most

13  likely explanation is that this defendant was stealing

14  checks.  She got castigated by her source or her -- who

15  she was supplying, I guess, in Chicago for taking checks

16  from the same company.  She says, "Well, that's what I

17  can get."  That's why so many of these checks are

18  Flexsteel checks.  Whether she's accessing them at White

19  Street or when she's working behind the P.O. Boxes,

20  ultimately, these are the checks she has access to.

21       And I would note that if the Court finds all these

22  Flexsteel checks are appropriately scored as loss, the

23  actual -- the other checks don't necessarily really

24  matter in terms of which category the loss amount is,

25  because the Flexsteel checks and the other Dubuque

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 96 of 139

checks, not including the ones from Rock Falls, Illinois,
are a total of 651,000 and some change as shown on page 3
of Exhibit 1, which is more than the $550,000 category
that we're currently in that's scored in the PSR.

Looking at the checks in Exhibit 2, I can go through
more detailed math if the Court would like, but totaling
up all the checks reflected in Exhibit 2 that she sent
pictures to Davey Hines, it's 55,000 and some change, so
I think that sets the floor for the Court because even if
those checks aren't on the spreadsheet and the Court
doesn't credit the spreadsheet necessarily or Flexsteel's
information, those checks are ones she clearly stole and
sent to Mr. Hines and indicated she would bring them to
him.  So that's 55,000, which I think under 2B1.1 sets a
floor at least of a 6-level enhancement, rather than the
14-level enhancement.  But, again, the government does
believe it's properly scored as a 14-level enhancement.

THE COURT:  All right.  Thank you, Mr. Morfitt.
Mr. Nathan.

MR. NATHAN:  Thank you, Your Honor.  The
defense would concede that the floor is the amount that
the government mentioned just now, as well as from the
exhibits in the government's briefing.  Respecting the
remaining checks, starting with Nord Gear, the defense
would object to any loss amount based on the Nord Gear

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 97 of 139

1  checks, and the same with the Tama USA check and the

2  Kendall Hunt Publishing check. I believe there were two

3  actually to Tama USA.

4      The defense heard Inspector Nobis's testimony

5  regarding how there was no reports of security issues to

6  the security specialist from the East Side Annex. I

7  don't know quite what to make of that because the

8  security issues seemed obvious enough that numerous

9  witnesses authored statements respecting those security

10 issues. The issues also just seem fairly patent from

11 Exhibit E, where there's no fence, no gate, no cameras,

12 people are loitering, anyone can park there, sometimes

13 doors are open even; and even if the doors are

14 technically closed, they're still unlocked and the space

15 is shared by at least one other company and/or

16 organization. The fact is, is that the East Side Annex

17 location was accessible to not only USPS employees but

18 contractors, including these star route drivers, who also

19 had access to the interior of the space. The agent

20 acknowledged that, in addition to a common denominator of

21 Ms. Jurisic, every other employee, contractor, et cetera,

22 people who would be just moonlighting there also had

23 access to the Flexsteel checks.

24      There's also just a complete lack of direct evidence

25 between the defendant and the remaining Flexsteel checks

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 98 of 139

1  that are not photographed in the government's exhibits.

2  There's no eyewitness to say that they saw her stealing

3  any checks.  There's no admission from the defendant.

4  The anonymous tip says, yes, the defendant is stealing

5  something.  We don't know how many checks, how, why,

6  where, anything else, so there's really nothing to base,

7  at least by a preponderance of the evidence, between the

8  defendant and the remaining nonpictured checks from

9  Flexsteel.

10      There could be circumstantial evidence, but there's

11  not.  There's no search warrant at the defendant's

12  residence.  There's no recovery of empty envelopes in her

13  possession.  The Flexsteel checks that were found in Rock

14  Falls, there's even issues there as the checks apparently

15  weren't found in the possession of anyone in particular;

16  and to the extent they were, they weren't found in the

17  possession of either of the Blandins, who appear to have

18  a connection to the defendant.  Regardless, there's

19  nothing in the Facebook messages between the defendant

20  and the Blandins talking about stealing checks.  And the

21  agent acknowledged that those checks could have gone

22  through Illinois before they even reached Dubuque,

23  assuming that they ever actually reached Dubuque.

24      There's also no corroboration in the form of the

25  defendant endorsing a check in her own name or some sort

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 99 of 139

of exemplar analysis between the endorsement signatures
and the defendant's handwriting.  She doesn't appear in
any of the video recordings of the persons depositing
those checks.  And, of course, none of those persons who
deposited the checks -- I understand why not, but the
fact is that none of those persons were interviewed and
had any connection to the defendant based on any
interviews, which, of course, did not take place.

There's also issues as to where exactly the thefts
would have taken place.  I heard the Court's questioning,
but the postmaster was interviewed in January of 2018.
The Flexsteel checks were stolen after that, and there's
no sufficient evidence saying when Ms. Jurisic would have
worked at Dubuque Main, if at all, after January of 2018.
There's also no information regarding how or why the
defendant would have targeted Flexsteel, whether it was
at the behest of Davey Hines or not.

Ultimately, it's clear that, in general, USPS
employees across the nation steal.  And I get that 12 to
16 is a much lower rate than the numbers I was talking
about nationwide, but even 12 to 16 statewide is still
enough to, I believe, undermine any confidence by a
preponderance of the evidence that the defendant has a
connection to the remaining nonpictured Flexsteel checks.
Thank you.

Contact Patrice Murray at PAMurrayReporting@gmail.com
for a complete copy of the transcript.
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 100 of 139

```
 1            THE COURT:  Thank you.  It is the government's
 2   burden, as I noted earlier, to prove loss amount by a
 3   preponderance of the evidence.  Here, I find the
 4   government has established the loss amount of more than
 5   $550,000 by a preponderance of the evidence.  I
 6   understand that it is possible that some of these other
 7   Flexsteel checks were stolen by somebody else other than
 8   the defendant.  I find it unlikely.  The question is not
 9   whether it's possible.  The question is whether it's
10   probable.  Given that she stole many Flexsteel checks as
11   shown in her communication with Hines and in the
12   photographs that she sent him, I have to say what's the
13   odds, what's the likelihood, that at about the same time
14   that she's committing this theft, it just happens that
15   somebody else is also stealing checks from Flexsteel and
16   fraudulently attempting to cash them.  And I just find
17   that to be so unlikely that it's not at all probable.
18        I also note that although in the photographs in
19   Exhibit 2 there are eleven checks, those numbers, whose
20   amounts have been calculated as part of the loss here, if
21   you look at the photographs of them, there are another
22   seven checks that are shown in the background of these.
23   So, for example, if you look at page 1, Exhibit 2, three
24   checks are made out to Flexsteel, and you can see the
25   amounts of those checks; but if you look in the upper
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 101 of 139

     1   right-hand corner, it's visible to me that there are
     2   three additional checks that are barely shown on the
     3   corners.  And so I went through each of these pages and I
     4   was able to count seven more checks that are reflected in
     5   the background that are not counted here, all of which
     6   appear to be Flexsteel checks.  Because of the nature of
     7   the communication between them, I checked the account
     8   numbers -- or check numbers against the -- what can be
     9   shown, and it doesn't look like there's any overlap.  And
    10   so while these reflect eleven checks that have been
    11   counted in the loss amount, there's another seven checks
    12   that are visible here, all of which increases the
    13   likelihood, again, that the defendant is responsible for
    14   all the Flexsteel checks accounted for here in Exhibit 1
    15   and then the loss amount.  And so I do find the defendant
    16   responsible by a preponderance of the evidence for all
    17   the Flexsteel Industry checks.  The intended loss amount
    18   is $649,767.27.  That's greater than the $550,000 floor
    19   necessary for a level 14-enhancement for loss amount, so
    20   I do find that the guidelines have been properly
    21   calculated.  Defendant's total offense level is 19, the
    22   criminal history category is II, and the advisory
    23   guideline range of imprisonment is 33 to 41 months.
    24        As far as the other losses, I think it -- there's a
    25   pretty good chance, and my gut tells me that it's true,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 102 of 139

the defendant stole these other checks, but I don't find
the evidence sufficient by a preponderance of the
evidence to hold her accountable for either the intended
or actual losses tied to Kendall Hunt Publishing, Tama
USA, Incorporated, Nord Gear Corporation, and so she will
not be held accountable for that.  Obviously, she pled
guilty to the Truck Country check of $2,280, so that will
also be counted as part of the intended loss amount as
well.

    What I don't have now is the actual loss amount for
purposes of restitution that should be determined given
my ruling here.  And, Mr. Morfitt, you indicated you had
some alternative calculations.  I hope you have that
alternative calculation.

        MR. MORFITT:  I can very quickly, Your Honor.
There's only two checks that actually factor into the
actual loss that the Court did not find defendant
responsible for, and those were one to Kendall Hunt
Publishing and one to Tama USA, and both of those were
Bank of America losses, so we should just be able to
deduct those two checks from the amount calculated due to
Bank of America in paragraph 18 of the presentence
report, and then the rest of that chart should be
accurate.

            THE COURT:  All right.  So let's do that

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 103 of 139

1  calculation here and make sure we're on the same page.

2  So give me the -- we've got a total loss amount right now

3  of 61,463.03 from Bank of America, minus which checks in

4  what amount?

5          MR. MORFITT:  Your Honor, they are the two

6  checks reflected on page 3 in the Dubuque Checks Other

7  Than Flexsteel portion.

8          THE COURT:  Page 3 of Exhibit 1?

9          MR. MORFITT:  Yes, Your Honor, excuse me.  And

10 they're in the amounts -- the loss amounts of $2,268.60

11 and $12,265.05.  And subtracting those from the amount in

12 the chart due Bank of America, the government calculates

13 46,929.38, is the proper amount of restitution towards

14 Bank of America.

15         THE COURT:  Redo that calculation again.  I

16 came up with a slightly different figure of 46,929.48.  I

17 could very well be wrong.

18         MR. MORFITT:  I think, Your Honor, the only

19 difference was in the cents in our calculations.  Is that

20 correct?

21         THE COURT:  Correct.

22         MR. MORFITT:  I still came up with 38 cents.

23         THE COURT:  Mr. Nathan?

24         MR. NATHAN:  I have 38 cents too.

25         THE COURT:  I do too on the second go-around.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 104 of 139

1   So -- all right.  So the for purposes of restitution,

2   then, Bank of America will be 46,929.38.  And then the

3   10,000 plus change to US Bank, is that also from a

4   Flexsteel check?

5         MR. MORFITT:  Yes, Your Honor, multiple checks.

6         THE COURT:  All right.  And to Fidelity Bank,

7   was that also losses tied to Flexsteel?

8         MR. MORFITT:  Yes, Your Honor.

9         THE COURT:  And the same with Chase?

10         MR. MORFITT:  Yes, Your Honor.

11         THE COURT:  And the same with TCF?

12         MR. MORFITT:  Yes, Your Honor.

13         THE COURT:  And so the total restitution

14   amount, Mr. Morfitt, what did you come up with?

15         MR. MORFITT:  One second, Your Honor.

16     Your Honor, I calculate $62,456.33:

17         THE COURT:  Mr. Nathan?

18         MR. NATHAN:  Did I hear 62,456.33?

19         THE COURT:  Yes.

20         MR. NATHAN:  Yeah, that looks approximately

21   correct.

22         THE COURT:  All right.  I understand that the

23   defendant's objecting to my finding here, but given my

24   finding, you're agreeing that that's a correct

25   calculation of the restitution given my ruling?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 105 of 139

1    MR. NATHAN:  Yes, Your Honor.

2    THE COURT:  All right.  Thank you.  Then

3  regarding paragraph 10, as far as identifying the victims

4  here, I've identified the victims here as Flexsteel

5  Industries, I do not find Kendall Hunt Publishing, I do

6  not find Tama USA, Incorporated, I do not find Nord Gear

7  Corporation, I do find Truck Country, Bank of America,

8  US Bank, Fidelity Bank, Chase, and TCF Bank as victims

9  here.  And again, given my ruling, do you agree that

10  that's correct, Mr. Morfitt?

11    MR. MORFITT:  Yes, Your Honor.

12    THE COURT:  And Mr. Nathan?

13    MR. NATHAN:  Yes, Your Honor.

14    THE COURT:  All right.  All right.  I believe

15  that handles all of the contested sentencing issues then.

16  At this point, then, we're down to the disposition on the

17  case.  Let's go ahead and finish up then.  I'll hear

18  first from the government on the sentence the government

19  believes is appropriate, and then I'll hear from

20  Mr. Nathan, and then I'll hear from Ms. Jurisic if she

21  wishes to say anything to me, and then I will impose

22  sentence.

23    So, Mr. Morfitt, I'm happy to hear from you now.

24    MR. MORFITT:  Briefly, Your Honor.  The Court

25  has heard all the evidence obviously and is familiar with

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 106 of 139

the presentence report.  The government recommends a
sentence at the bottom of the guideline range of
33 months as calculated by the Court.  This is a
significant sentence, nearly 3 years in prison, for
stealing a large number of checks, to take advantage of
her access to those checks for personal benefit.

It's unclear exactly what she was getting for
stealing these checks and giving them to Mr. Hines, but
she certainly wasn't doing it out of the kindness of her
heart for Mr. Hines.  Most likely there was some sort of
financial benefit to herself that was coming, and so it
was motivated by selfish desires, to get money or to
please an individual.

As the Court noted, she does have some criminal
history, only a category II, and that's properly taken
into account in the scoring of the advisory guideline
range.

Looking at her history and characteristics
otherwise, this is a defendant who had a good job at the
Post Office.  She had the ability to make a good living
in Dubuque, Iowa, making between 30 and $40,000 a year --
or making $40,000 a year the two years she was fully
employed at the Post Office and making 30-some thousand
dollars a couple years before that.  So there doesn't
seem to be any reason that she needs to supplement her

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 107 of 139

1   income by stealing checks and sending them to a

2   check-cashing ring, so there's certainly no excuse in her

3   finances for why she did this.  Based upon the facts and

4   circumstances and all her history and characteristics,

5   the government believes a guidelines sentence is

6   appropriate and recommends a sentence at the bottom of

7   the range.

8           THE COURT:  All right.  Thank you.

9      Mr. Nathan.

10          MR. NATHAN:  Thank you, Your Honor.  Based on

11  the loss amount, the defense concurs with the government

12  that a bottom of the range sentence is certainly

13  sufficient but not greater than necessary to achieve the

14  factors in 3553(a).  Prior to this incident,

15  Ms. Jurisic's criminal history was minor and limited.

16  After the offense conduct, there was one fairly moderate

17  incident that appears to be the outlier other than this

18  case in terms of the severity of criminal behavior and

19  her background.

20     She's never actually been to jail, and every

21  sentence that she received to jail has been suspended, so

22  a nearly 3-year sentence here would represent a

23  significant increase to what she's previously received in

24  state court.  For that reason, even a short jail sentence

25  would deter her, but certainly 33 months is sufficient.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 108 of 139

1    She did get pregnant at a very young age.  She was

2  15 years old.  The PSR reflects how she struggled as a

3  primary caregiver through her youth, which is not a

4  critique.  She was so young that struggles are

5  inevitable.  To her credit, she did eventually earn her

6  high school diploma, and she even attended community

7  college.

8    The government's correct that she did have a good

9  job with the USPS.  2017, 2018, she was making nearly

10  $50,000 a year.  And as -- I think I asked the agent

11  toward the end of the cross-examination, you know,

12  exactly who reached out to who, it's unclear.  Davey

13  Hines seems to be slightly higher up the fraud ladder

14  than Ms. Jurisic.  It's also unclear why Flexsteel was

15  targeted.  So there's certainly an argument that this was

16  done, as the agent sort of indicated, for some sort of

17  thrill.  I will state that there is evidence, of course,

18  that she returned from Chicago to Dubuque with black

19  eyes, and the communications between the defendant and

20  Davey Hines, of course, are consistent with verbal abuse

21  and physical abuse, so it really is unclear what she got

22  out of it except the thrill I suppose, but that still

23  suggests that a sentence of 33 months is sufficient but

24  not greater than necessary.  Thank you.

25    THE COURT:  Thank you.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 109 of 139

1    Ms. Jurisic, this is the time in the hearing when
2  you have an opportunity to speak to me directly to tell
3  me anything you would like me to take into account in
4  determining your sentence.  You don't have to say
5  anything.  And if you choose not to say anything, I will
6  not hold that against you in any way.  But if there is
7  anything you would like to say, now is the time to do so.
8  Is there anything you would like to say?

9              THE DEFENDANT:  No, Your Honor.

10             THE COURT:  All right.  All right.  In arriving
11 at a sentence that is sufficient but not greater than
12 necessary to achieve the goals of sentencing, I have
13 considered the factors at Title 18 United States Code
14 Section 3553(a) even if I do not mention each of them in
15 my comments here.

16    We've talked at length about the offense conduct.  I
17 don't think it bears getting a whole lot more into it.
18 As far as Mr. Hines's role in it, I have very little
19 evidence to work with here, other than I reject the idea
20 that he somehow is behind the targeting of Flexsteel.
21 It's clear from their communication that he was asking
22 why she stole checks from the same place, and she
23 explained that that's the only one she had access to or
24 that's who she had access to.  So that certainly suggests
25 that it wasn't Hines who was behind targeting Flexsteel.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 110 of 139

1   It looks more like a crime of opportunity by her on what

2   she could steal and -- now, whether he pressured her to

3   steal in the first place, whether he threatened, what he

4   got out of it versus her, I just don't know, and there's

5   no evidence in front of me.  I have to assume here -- and

6   I think there's inference to do so -- that she did this

7   out of greed to some degree.  Whether she was getting

8   some or all of the money or whether she was doing it

9   because she was getting something from Mr. Hines, she did

10  it for her own gain, and so, at base, involved in this is

11  the base motivation of greed.

12      The defendant has a limited criminal history.

13  Noteworthy is it is violent.  She's got a conviction for

14  disorderly conduct, fighting; disorderly conduct,

15  fighting again.  The first was in 2002 at the age of 18.

16  Even though she's almost double the age, again, in 2016,

17  she gets convicted of the same crime.  And then in 2019

18  after the offense conduct here, she's convicted of

19  assault causing injury.  And so I'm not sure --

20  Ms. Jurisic, violence by women is rare.  And whatever the

21  issues are that you've got that's dealing with violence,

22  you better get on top of it because if you come out on

23  supervised release with this court and you engage in more

24  violence while you are under this court's supervision,

25  it's very likely you are going to find yourself back in

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 111 of 139

1  prison. The defendant grew up in a family where her

2  parents were divorced. She was pregnant at a young age

3  and gave birth at a young age and struggled, as one would

4  naturally expect as a teenage mother, a single mother.

5  It was noteworthy to me as well, that Mr. Nathan noted

6  she did nevertheless complete school and attended some

7  college.

8      She's in good health both physically and mentally.

9  Her substance abuse is limited to alcohol underage and

10  marijuana, and then some methamphetamine and other

11  controlled substances. She's not received any treatment.

12  I am going to recommend drug treatment while she's in

13  prison.

14      Again, Ms. Jurisic, when you come out on supervised

15  release, we will be monitoring your drug use. And if you

16  use illegal drugs while under supervision of the court,

17  obviously, that will -- or it could result in you going

18  back to prison.

19      I will note that the defendant has been on pretrial

20  release since her arrest in this case and -- which was in

21  January of 2021, and we have no reported violations from

22  her. And so I'm reassured to some degree that whatever

23  addiction issues or substance abuse issues she has,

24  they're not serious and she will be able to keep them

25  under control.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 112 of 139

 1          Defendant got a good paying job with the Postal

 2    Service, and it's the best paying job she ever had in her

 3    history, and her response is to steal from that employer.

 4    It's too bad, Ms. Jurisic, you had an opportunity to live

 5    a law-abiding life with a decent income, and your choice

 6    to abuse your position of trust, to steal from your

 7    employer, who also happens to be the government, was a

 8    really poor choice.  And I'm hoping when you come back

 9    out on supervised release, that going to prison for a

10    number of years will deter you from ever doing anything

11    that stupid again in the future.  You have potential, it

12    looks to me, to do well.  Somebody who can raise a child

13    at your age and finish their -- or their education and

14    have some college tells me you have enough drive to do

15    well, if you want to, and so you don't have to live this

16    kind of life.  You can do well.  You just have to turn

17    your life in a different direction.

18          I do find that a sentence at the bottom of the

19    advisory guideline range will be sufficient but not more

20    than necessary to achieve the goals of sentencing here.

21    And so it is the judgment of this Court, Ms. Jurisic,

22    that you are hereby committed to the custody of the

23    Bureau of Prisons to be imprisoned for a term of

24    33 months.  I order that term of imprisonment to be

25    served consecutive to any term of imprisonment that may

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 113 of 139

be imposed in the case set out in paragraph 39 of the
presentence report. It is recommended that you be
designated to a Bureau of Prisons facility in close
proximity to your family commensurate with your security
and custody classification needs.

Upon release from imprisonment, you will be placed
on supervised release for a term of 3 years. While on
supervised release, you must comply with the following
mandatory conditions: You must not commit another
federal, state, or local crime; you must not unlawfully
use or possess a controlled substance; and you must
cooperate in the collection of a DNA sample as directed
by your probation officer.

In addition, you must comply with the standard
conditions of supervision set out in my judgment order,
together with all the special conditions at paragraphs 71
through 74 of the presentence report.

It is ordered that you must pay to the United States
a special assessment of $100, which is due immediately.
I find you do not have the ability to pay a fine, and so
no fine will be imposed. It is ordered that you make
restitution in the amount of $62,456.33, of which
$46,929.38 is ordered payable to the Bank of America;
$10,724.88 is made payable to US Bank; $2,232.34 is made
payable to Fidelity Bank; $2,292.73 is made payable to

Contact Patrice Murray at PAMurrayReporting@gmail.com
for a complete copy of the transcript.
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 114 of 139

```
 1   Chase; and $277 is made payable to TCF Bank, all of which
 2   is due immediately and payable immediately.  The payments
 3   will be made in accordance with the payment plan that
 4   I'll explain in a minute.  Payments must be made to the
 5   United States Clerk of Court for the Northern District of
 6   Iowa for distribution to the victims in this case.  It is
 7   ordered that restitution in this case be distributed on a
 8   pro rata basis.  If any of your court-ordered financial
 9   obligations are still owed while you are incarcerated,
10   you must make monthly payments in accordance with the
11   Bureau of Prisons Financial Responsibility Program.  The
12   amount of the monthly payments will not exceed 50 percent
13   of the funds available to you through institution or
14   noninstitution resources and will be at least $25 per
15   quarter.  If you still owe any portion of the financial
16   obligations at the time of release from imprisonment, you
17   must pay it as a condition of supervision, and the United
18   States Probation Office will pursue collection of the
19   amount due pursuant to a payment schedule approved by me.
20   You must notify the United States Attorney for the
21   Northern District of Iowa within 30 days of any change of
22   your mailing or residence address that occurs while any
23   portion of the financial obligation remains unpaid.  I
24   find you do not have any ability to pay interest and will
25   waive the interest requirement in this case.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 115 of 139

1    I am going to grant you the privilege of

2 self-surrender, Ms. Jurisic. It is a privilege. I could

3 order your immediate incarceration, so this is a

4 privilege that is extended to a few offenders from time

5 to time. It is a real benefit. I want to talk to you

6 about the benefits, but I also want to talk to you about

7 the risks associated with it.

8    One of the primary benefits of self-surrender, other

9 than you have more time to be free and get your affairs

10 in order, is that if I allow an inmate to -- or an

11 offender to self-surrender and she does so as ordered,

12 when ordered to do so, the Bureau of Prisons sees that as

13 an indication that you pose a low security risk and will

14 automatically decrease your security classification

15 rating, which means that they will send you to a facility

16 that will be of lower security. It will be a nicer

17 facility for you to do your time than if you have a

18 higher classification setting.

19    Here's the risk, and that is, if you violate the

20 terms of your pretrial release that I have previously

21 imposed, you could be arrested and then you would lose

22 that privilege of self-surrender, or if you failed to

23 show up when you are ordered to show up at that time and

24 date, then you will lose that lower security

25 classification rating. Not only that, your security

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 116 of 139

1   classification rating will be increased, which means it's

2   going to be more likely you will do harder time for your

3   33 months.

4        Also, if you fail to show up when I order you to

5   show up, that can be a separate federal offense for which

6   you could be prosecuted and a new sentence of time in

7   prison or a fine could be imposed.  And I will tell you

8   that this U.S. Attorney's Office has prosecuted several

9   people who have failed to surrender to the facility when

10  ordered to do so, and so it is likely that if you fail to

11  show up, this office will likely prosecute you for that

12  offense.

13       You have two option.  One is to surrender directly

14  to the Bureau of Prisons facility that the -- that they

15  designate for you to show up at.  If you do so, you have

16  to get to that location at the date and time I order --

17  or they order you to, at your own expense.  The other

18  alternative is I can order you to show up here in about

19  two weeks, surrender to the United States Marshal, and

20  then the marshals will be responsible for transporting

21  you to the location designated by the Bureau of Prisons

22  instead of you having to get there at your own expense.

23       I have requested that you be designated to a

24  location in close proximity to your family, but where you

25  get designated is completely up to the Bureau of Prisons.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 117 of 139

```
 1   I have no influence on that, and they could designate you
 2   anywhere in the country, and so that's something to think
 3   about as well.
 4        Mr. Nathan, I am confident you've spoken with your
 5   client about this.  Why don't you take a few minutes just
 6   to confirm what her wishes are.
 7        (Whereupon, counsel conferred with the defendant.)
 8             MR. NATHAN:  Your Honor, Ms. Jurisic asks to
 9   surrender at the institution that she's assigned to by
10   the US Marshals with the Bureau of Prisons.
11             THE COURT:  Very good.  All right.  So,
12   Ms. Jurisic, you must surrender to the -- to -- for
13   service of this sentence at the institution designated by
14   the Bureau of Prisons as notified by the United States
15   Marshal.  You must keep the United States Marshal
16   informed of your current address and telephone number
17   until you have reported to the Bureau of Prisons to serve
18   your sentence.  I am ordering you that immediately
19   following this hearing, that you report into the United
20   States Marshal's Service in this building on the seventh
21   floor and provide them with your address, phone number,
22   and any other contact information they request so that
23   they can do that.  Your failure to report to the
24   institution as directed may subject you to additional
25   criminal charges.  You will remain on release under the
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 118 of 139

1 supervision of the United States Probation Office under

2 the same terms and conditions previously imposed until

3 you have reported to the Bureau of Prisons to serve your

4 sentence.

5     Mr. Morfitt, there remains outstanding Count 2.

6         MR. MORFITT:  Yes, Your Honor.  The government

7 moves to dismiss Count 2.

8         THE COURT:  The Court grants that motion, so

9 Count 2 of the indictment will be dismissed against the

10 defendant.

11     Before I advise Ms. Jurisic of her right to appeal,

12 Mr. Morfitt, is there anything else on behalf of the

13 United States?

14         MR. MORFITT:  No, Your Honor.

15         THE COURT:  Officer Freese?

16         PROBATION OFFICER:  One question, Your Honor.

17 Did you order her to participate in drug treatment in the

18 BOP?

19         THE COURT:  I did not, so I am going to

20 recommend that you participate in the residential drug

21 abuse treatment program or a similar program within the

22 Bureau of Prisons.

23     What else, Officer Freese?

24         PROBATION OFFICER:  Nothing further.  Thank

25 you.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 119 of 139

 1          THE COURT:  Thank you.

 2      Mr. Nathan?

 3          MR. NATHAN:  Nothing, Your Honor.  Thank you.

 4          THE COURT:  All right.  Thank you.

 5      All right.  Ms. Jurisic, let me talk to you about

 6  your right to appeal.  If you disagree with the sentence

 7  I've just imposed, you have the right to appeal that

 8  sentence to a higher court.  That court is called the

 9  Eighth Circuit Court of Appeals.  To appeal to that

10  court, you would have to file a written notice of appeal

11  with the Clerk of Court for the Northern District of Iowa

12  here in Cedar Rapids within the next 14 days.  If you

13  fail to file a written notice of appeal in the next

14  14 days, you give up forever your right to appeal the

15  sentence I've just imposed.  If you would like to appeal

16  but you cannot afford the services of an attorney to do

17  so, I would appoint an attorney to represent you on

18  appeal at no expense to you.  Do you understand your

19  right to appeal?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you have any questions about

22  anything we've done here today?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  All right.  Mr. Nathan, anything

25  further?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 120 of 139

1          MR. NATHAN:  No, Your Honor.  Thank you.

2          THE COURT:  Mr. Morfitt?

3          MR. MORFITT:  No, Your Honor.

4          THE COURT:  All right.  Thank you.  That

5    concludes this hearing.

6        (Proceedings concluded at 12:04 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*

```
1                    C E R T I F I C A T E

2           I, Patrice A. Murray, a Certified Shorthand
   Reporter of the State of Iowa, do hereby certify that at
3  the time and place heretofore indicated, a hearing was
   held before the Honorable C.J. Williams; that I reported
4  in shorthand and transcribed to the best of my ability
   the proceedings of said hearing; and that the foregoing
5  transcript is a true record of all proceedings had on the
   taking of said hearing at the above time and place.

6
            I further certify that I am not related to or
7  employed by any of the parties to this action, and
   further, that I am not a relative or employee of any
8  attorney or counsel employed by the parties hereto or
   financially interested in the action.

9
         IN WITNESS WHEREOF, I have set my hand this 19th day
10 of January, 2022.

11
                  /s/ Patrice A. Murray
12                Patrice A. Murray, CSR, RMR, FCRR
                  Court Reporter
13                PO Box 10541
                  Cedar Rapids, Iowa 52410

14

15

16

17

18

19

20

21

22

23

24

25
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 122 of 139

## $

**$1,009.50** [1] - 36:13
**$10,724.88** [1] - 114:24
**$100** [2] - 3:24, 114:19
**$12,265.05** [1] - 104:11
**$2,232.34** [1] - 114:24
**$2,268.60** [1] - 104:10
**$2,280** [2] - 27:14, 103:7
**$2,292.73** [1] - 114:25
**$2,602.80** [1] - 36:3
**$20,000** [1] - 33:14
**$25** [1] - 115:14
**$250,000** [1] - 3:23
**$277** [1] - 115:1
**$40,000** [2] - 107:21, 107:22
**$46,929.38** [1] - 114:23
**$50,000** [1] - 109:10
**$550,000** [4] - 7:10, 97:3, 101:5, 102:18
**$6,672.32** [1] - 37:1
**$62,456.33** [1] - 105:16, 114:22
**$649,767.27** [1] - 102:18
**$825,781.45** [1] - 7:9

## '

**'19** [1] - 70:3
**'21** [1] - 69:22
**'em** [1] - 32:21

## /

**/s** [1] - 122:11

## 1

**1** [46] - 1:10, 2:11, 3:14, 3:22, 9:3, 9:4, 9:5, 9:8, 9:12, 9:13, 21:4, 21:7, 21:17, 22:7, 22:16, 24:4, 29:5, 30:8, 30:24, 31:13, 34:19, 35:4, 35:22, 36:5, 36:9, 36:17, 36:24, 37:19, 38:1, 39:4, 41:12, 76:13, 77:20, 77:22, 78:13, 95:25, 97:3, 101:23, 102:14, 104:8
**1-level** [1] - 7:22
**1.5** [1] - 7:10
**1/19/22** [1] - 1:21
**10** [4] - 2:3, 5:4, 77:4, 106:3
**10,000** [1] - 33:14
**10541** [2] - 1:24, 122:13
**10:52:40** [1] - 32:11
**11** [1] - 7:2
**1100** [1] - 70:4
**111** [2] - 1:10, 1:17
**11:30** [1] - 52:9

## 12

**12** [4] - 5:4, 36:2, 100:19, 100:21
**12-month** [1] - 69:15
**12/27/21** [1] - 1:21
**1200** [2] - 69:8
**12:04** [1] - 121:6
**13th** [1] - 1:17
**14** [5] - 3:12, 70:11, 70:15, 120:12, 120:14
**14-enhancement** [1] - 102:19
**14-level** [4] - 7:6, 7:11, 97:16, 97:17
**14th** [2] - 30:16, 32:11
**15** [4] - 11:3, 11:9, 81:10, 109:2
**16** [3] - 81:25, 100:20, 100:21
**16th** [1] - 27:10
**17** [1] - 5:4
**1709** [1] - 3:16
**18** [5] - 3:15, 5:4, 103:22, 110:13, 111:15
**19** [5] - 5:6, 8:3, 8:10, 90:7, 102:21
**19-and-a-half** [1] - 10:20
**19th** [1] - 122:9

## 2

**2** [36] - 8:7, 9:4, 9:5, 22:10, 30:15, 30:23, 31:9, 32:10, 33:14, 34:17, 34:19, 35:3, 35:22, 36:5, 36:8, 36:17, 36:23, 38:1, 41:4, 49:21, 76:12, 76:17, 76:18, 76:24, 77:16, 95:25, 97:5, 97:7, 101:19, 101:23, 119:5, 119:7, 119:9
**2-level** [2] - 7:13, 7:18
**20** [1] - 33:11
**20-CR-1042** [2] - 1:5, 3:4
**2002** [1] - 111:15
**2007** [1] - 90:14
**2016** [4] - 55:7, 55:10, 75:11, 111:16
**2017** [14] - 13:23, 14:2, 14:6, 15:19, 21:24, 26:19, 27:5, 27:11, 70:18, 75:14, 79:25, 91:1, 91:21, 109:9
**2018** [37] - 13:23, 16:3, 16:8, 17:7, 18:25, 19:1, 19:2, 19:6, 19:7, 27:23, 34:20, 34:25, 36:2, 36:13, 36:25, 37:23, 37:24, 42:7, 42:23, 45:23, 46:19, 52:7, 70:18, 72:13, 75:20, 76:22, 77:4, 77:10, 89:2, 89:6, 89:11, 91:1, 91:21, 100:11, 100:14, 109:9
**2019** [8] - 69:7, 73:13, 75:17, 75:23, 75:8, 76:8, 76:13,

## 2020

**2020** [3] - 69:7, 69:22, 70:3
**2021** [3] - 1:17, 3:12, 112:21
**2022** [1] - 122:10
**21** [1] - 7:2
**22** [3] - 5:8, 7:5, 7:16
**222** [1] - 1:12
**24** [1] - 7:12
**28th** [1] - 42:23
**290** [1] - 1:12
**2B1.1** [1] - 97:14
**2B1.1(a)(2)** [1] - 7:4
**2B1.1(b)(1)(H)** [1] - 7:7

## 3

**3** [31] - 2:11, 3:21, 8:2, 9:3, 9:4, 9:6, 9:8, 9:12, 9:13, 21:17, 22:11, 29:5, 29:8, 30:8, 31:9, 31:13, 36:22, 37:5, 41:11, 41:12, 49:21, 50:6, 76:15, 76:24, 77:16, 96:1, 97:2, 104:6, 104:8, 107:4, 114:7
**3-and-a-half** [1] - 46:18
**3-year** [1] - 108:22
**30** [3] - 11:16, 107:21, 115:21
**30-some** [1] - 107:23
**31** [2] - 3:11, 8:6
**33** [7] - 8:11, 102:23, 107:3, 108:25, 109:23, 113:24, 117:3
**34** [1] - 5:9
**35** [2] - 5:9, 8:16
**3553(a** [1] - 110:14
**3553(a)** [1] - 108:14
**36** [2] - 9:2, 9:6
**37** [2] - 8:6, 9:7
**38** [3] - 8:17, 104:22, 104:24
**39** [2] - 5:10, 114:1
**3B1.3** [1] - 7:15
**3E1.1(a** [1] - 7:20
**3E1.1(b** [1] - 7:23

## 4

**4** [4] - 31:9, 50:6, 77:9, 77:16
**4-19-19** [1] - 53:7
**41** [2] - 8:11, 102:23
**425** [1] - 70:16
**43** [1] - 2:4
**46** [1] - 5:11
**46,929.38** [2] - 104:13, 105:2
**46,929.48** [1] - 104:16
**4th** [1] - 76:21

## 5

**5** [9] - 3:17, 3:22, 31:2, 33:13, 34:22, 34:20, 52:8, 76:13,

## 6

**6** [8] - 5:4, 31:6, 34:24, 36:22, 37:4, 76:12, 76:13, 76:14
**6-level** [1] - 97:15
**61,463.03** [1] - 104:3
**62,456.33** [1] - 105:18
**630** [2] - 29:19, 30:1
**651,000** [1] - 97:2

## 7

**7** [1] - 5:4
**71** [1] - 114:16
**74** [1] - 114:17
**75** [1] - 2:4
**750** [2] - 46:25, 47:6
**76** [1] - 56:15

## 8

**8** [1] - 2:11
**81** [1] - 5:12
**82** [1] - 2:5
**88** [1] - 2:5

## 9

**9** [4] - 2:11, 5:4, 36:13, 36:19
**90** [1] - 2:6
**92** [1] - 2:7
**9:25** [1] - 1:18
**9:30** [1] - 52:8
**9th** [1] - 36:25

## A

**a.m** [1] - 1:18
**abiding** [1] - 113:5
**ability** [4] - 107:20, 114:20, 115:24, 122:4
**able** [13] - 6:10, 6:18, 15:3, 15:19, 28:7, 28:23, 35:16, 60:20, 69:17, 78:6, 102:4, 103:20, 112:24
**absolutely** [2] - 72:18, 86:8
**abuse** [12] - 7:13, 74:1, 74:13, 74:17, 74:19, 74:25, 109:20, 109:21, 112:9,

76:14
**50** [2] - 36:18, 115:12
**52401** [2] - 1:10, 1:13
**52410** [2] - 1:24, 122:13
**55,000** [2] - 97:8, 97:14
**563** [2] - 29:23, 30:4
**5th** [1] - 77:9

*Contact Patrice Murray at PAMurrayReporting@gmail.com for a complete copy of the transcript.*

112:23, 113:6, 119:21
**acceptance** [3] - 7:19, 7:22, 8:2
**access** [18] - 48:17, 49:12, 49:17, 49:18, 52:1, 54:8, 60:18, 61:3, 61:6, 61:19, 62:3, 87:16, 96:20, 98:19, 98:23, 107:6, 110:23, 110:24
**accessed** [1] - 51:18
**accessible** [1] - 98:17
**accessing** [1] - 96:18
**accordance** [2] - 115:3, 115:10
**according** [2] - 47:7, 84:12
**account** [12] - 25:25, 26:1, 31:25, 38:5, 39:1, 40:23, 42:11, 79:4, 79:10, 102:7, 107:16, 110:3
**accountable** [2] - 103:3, 103:6
**accounted** [1] - 102:14
**accountholder** [2] - 28:6, 40:20
**accounts** [6] - 38:10, 38:23, 40:17, 79:5, 79:11, 79:15
**accurate** [4] - 62:20, 69:13, 70:14, 103:24
**accuse** [2] - 65:24, 66:5
**achieve** [3] - 108:13, 110:12, 113:20
**acknowledged** [3] - 72:14, 98:20, 99:21
**act** [1] - 74:18
**action** [3] - 74:19, 122:7, 122:8
**actual** [17] - 17:18, 23:21, 24:12, 38:20, 38:21, 39:5, 39:6, 39:8, 39:23, 50:17, 51:12, 51:13, 61:21, 96:23, 103:4, 103:10, 103:17
**Ad** [2] - 41:5, 42:11
**add** [1] - 31:18
**added** [2] - 40:9, 40:10
**addiction** [1] - 112:23
**adding** [2] - 21:11, 21:12
**addition** [8] - 40:9, 40:11, 47:8, 50:9, 51:24, 52:23, 98:20, 114:14
**additional** [7] - 7:22, 7:25, 17:8, 26:15, 52:1, 61:10, 102:2, 118:24
**address** [8] - 4:9, 14:10, 27:22, 65:15, 86:17, 115:22, 118:16, 118:21
**addressed** [2] - 86:14, 86:16
**adjust** [1] - 10:6
**adjusted** [1] - 7:15
**administrative** [3] - 45:1, 91:25, 95:2
**administratively** [1] - 76:4
**admission** [1] - 99:3

**admitted** [4] - 21:3, 63:11, 63:19, 95:2
**advantage** [1] - 107:5
**advertisements** [1] - 81:1
**advise** [1] - 119:11
**advised** [1] - 66:22
**advisory** [4] - 4:5, 6:25, 8:10, 102:22, 107:16, 113:19
**affairs** [1] - 116:9
**affirmed** [2] - 10:2, 89:20
**afford** [1] - 120:17
**age** [6] - 109:1, 111:15, 111:16, 112:2, 112:3, 113:13
**agencies** [1] - 10:23
**agency** [1] - 91:9
**Agent** [3] - 43:19, 89:15, 94:17
**agent** [7] - 10:16, 75:10, 83:24, 98:19, 99:21, 109:10, 109:16
**agent's** [1] - 92:14
**agents** [6] - 79:6, 81:15, 81:16, 81:24, 87:6
**agree** [12] - 34:12, 49:20, 52:12, 56:19, 57:5, 64:23, 69:14, 73:25, 74:11, 74:15, 74:21, 106:9
**agreeing** [1] - 105:24
**agrees** [1] - 34:15
**ahead** [3] - 14:19, 95:17, 106:17
**Alabama** [1] - 57:15
**alcohol** [1] - 112:9
**allegation** [3] - 14:5, 14:20, 65:19
**allegations** [1] - 82:6
**allow** [1] - 116:10
**allowing** [1] - 31:25
**alluded** [1] - 54:19
**almost** [2] - 57:6, 111:16
**alone** [2] - 18:15, 88:15
**altered** [1] - 19:13
**alternative** [4] - 95:21, 103:13, 103:14, 117:18
**AMERICA** [1] - 1:3
**America** [13] - 3:3, 42:11, 42:15, 78:16, 79:3, 103:20, 103:22, 104:3, 104:12, 104:14, 105:2, 106:7, 114:23
**amount** [34] - 5:8, 5:13, 7:7, 7:9, 9:19, 36:2, 36:13, 36:25, 37:8, 38:24, 39:6, 39:8, 95:13, 96:24, 97:21, 97:25, 101:2, 101:4, 102:11, 102:15, 102:17, 102:19, 103:8, 103:10, 103:21, 104:2, 104:4, 104:11, 104:13, 105:14, 108:11, 114:22, 115:12, 115:19
**amounts** [5] - 32:22, 101:20, 101:24

**AMY** [1] - 1:6
**Amy** [22] - 3:3, 12:6, 16:8, 25:12, 25:16, 25:18, 25:20, 25:21, 26:4, 26:5, 28:23, 61:7, 61:13, 62:14, 62:23, 63:3, 64:15, 64:16, 64:17, 64:18, 73:7, 87:3
**Amy's** [4] - 29:25, 45:8, 64:24, 87:15
**analysis** [2] - 65:1, 100:1
**Annex** [38] - 12:3, 12:17, 12:21, 13:1, 13:4, 13:12, 17:11, 17:19, 18:14, 27:21, 43:25, 44:3, 45:7, 50:11, 51:6, 52:2, 55:14, 56:7, 58:22, 59:5, 59:15, 60:25, 61:11, 61:15, 71:23, 72:12, 75:19, 80:19, 80:21, 82:3, 83:1, 83:9, 91:13, 92:15, 92:19, 98:6, 98:16
**annex** [6] - 18:11, 53:23, 72:10, 75:20, 76:1, 81:4
**annexes** [1] - 12:9
**anonymous** [9] - 16:13, 65:10, 65:11, 72:15, 72:18, 87:18, 87:22, 99:4
**answer** [4] - 6:18, 63:4, 86:20, 94:3
**answered** [2] - 86:24
**ANTHONY** [1] - 1:10
**anyway** [1] - 37:8
**apologize** [1] - 53:4
**appeal** [10] - 119:11, 120:6, 120:7, 120:9, 120:10, 120:13, 120:14, 120:15, 120:18, 120:19
**Appeals** [1] - 120:9
**appear** [8] - 36:5, 36:19, 36:21, 37:3, 77:6, 99:17, 100:2, 102:6
**APPEARANCES** [1] - 1:9
**appeared** [3] - 1:11, 1:13, 35:4
**appoint** [1] - 120:17
**appreciate** [1] - 75:5
**appropriate** [2] - 106:19, 108:6
**appropriately** [1] - 96:22
**approved** [1] - 115:19
**approximate** [1] - 34:25
**April** [2] - 37:23, 89:6
**area** [16] - 17:21, 29:20, 29:24, 62:15, 67:21, 78:10, 78:14, 78:17, 79:6, 79:9, 83:9, 84:17, 86:21, 87:2, 87:4
**areas** [2] - 51:8, 51:21
**argument** [5] - 72:25, 95:12, 95:17, 95:19, 109:15
**Arizona** [1] - 57:15
**arranged** [1] - 6:3
**arrangement** [1] - 48:1
**arrest** [1] - 112:20

**arrested** [5] - 24:16, 24:21, 25:13, 70:17, 116:21
**arrests** [2] - 23:13, 23:14
**arrived** [2] - 52:10, 58:17
**arriving** [2] - 67:13, 110:10
**ASLL** [1] - 33:20
**aspect** [1] - 60:9
**aspects** [1] - 14:22
**ass** [2] - 74:20, 74:23
**assault** [1] - 111:19
**assessed** [3] - 7:2, 7:5, 7:12
**assessment** [2] - 3:24, 114:19
**assigned** [3] - 17:1, 18:21, 118:9
**assignment** [1] - 55:19
**Assistant** [2] - 3:5, 3:7
**associated** [5] - 65:18, 79:11, 86:17, 88:6, 116:7
**assume** [7] - 44:17, 44:20, 44:22, 54:25, 84:13, 93:24, 111:5
**assuming** [3] - 73:8, 73:15, 99:23
**assumption** [2] - 93:5, 93:13
**ATMs** [1] - 64:13
**attached** [3] - 8:16, 9:2, 16:16
**attachment** [2] - 30:9, 31:14
**attempt** [3] - 24:2, 31:20, 71:1
**attempted** [5] - 24:8, 41:22, 78:4, 78:13, 86:23
**attempting** [1] - 101:16
**attended** [2] - 109:6, 112:6
**attention** [3] - 48:22, 51:15, 70:9
**attest** [2] - 47:21, 69:17
**attorney** [3] - 120:16, 120:17, 122:8
**ATTORNEY** [3] - 1:10, 1:12
**Attorney** [2] - 3:6, 115:20
**Attorney's** [2] - 1:10, 117:8
**August** [2] - 19:7, 42:23
**authored** [5] - 3:10, 46:11, 52:6, 53:20, 98:9
**automatically** [1] - 116:14
**available** [1] - 115:13
**Avenue** [3] - 1:10, 1:12, 1:17
**awarded** [1] - 7:18
**aware** [9] - 14:2, 27:24, 28:3, 44:25, 48:6, 48:24, 55:10, 55:11, 63:19

**B**

**background** [3] - 101:22, 102:5, 108:19
**backs** [1] - 77:25
**bad** [1] - 113:4

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 124 of 139

**Bank** [23] - 14:8, 14:9, 42:11, 42:15, 78:15, 79:3, 103:20, 103:22, 104:3, 104:12, 104:14, 105:2, 105:3, 105:6, 106:7, 106:8, 114:23, 114:24, 114:25, 115:1

**bank** [8] - 15:7, 28:6, 38:9, 38:23, 39:25, 40:22, 78:3, 78:15

**banking** [1] - 14:7

**banks** [11] - 28:5, 38:4, 39:20, 39:22, 39:25, 64:13, 78:7, 78:9, 78:14, 78:17, 79:2

**barely** [1] - 102:2

**base** [4] - 7:3, 99:6, 111:10, 111:11

**based** [15] - 11:6, 14:7, 16:18, 19:8, 19:16, 20:8, 22:1, 36:16, 70:11, 70:15, 93:20, 97:25, 100:7, 108:3, 108:10

**basis** [1] - 115:8

**bears** [1] - 110:17

**beat** [2] - 74:20, 74:23

**became** [3] - 13:21, 14:2, 75:14

**become** [4] - 27:24, 28:3, 90:15, 90:22

**BEFORE** [1] - 1:16

**beforehand** [1] - 73:8

**beginning** [2] - 8:5, 16:8

**begins** [1] - 7:1

**behalf** [5] - 1:11, 1:13, 3:25, 4:24, 119:12

**behavior** [1] - 108:18

**behest** [1] - 100:17

**behind** [7] - 74:3, 74:8, 77:7, 91:24, 96:19, 110:20, 110:25

**believes** [3] - 95:23, 106:19, 108:5

**belong** [2] - 23:19, 47:1

**belonged** [3] - 23:17, 29:1, 29:20

**belonging** [1] - 66:14

**belongs** [1] - 80:17

**below** [7] - 29:23, 31:13, 32:2, 32:7, 41:15, 42:17, 42:25

**benefit** [4] - 72:22, 107:6, 107:11, 116:5

**benefits** [2] - 116:6, 116:8

**best** [2] - 113:2, 122:4

**better** [2] - 69:17, 111:22

**between** [42] - 15:24, 25:11, 26:3, 26:5, 27:5, 29:10, 31:11, 45:23, 46:2, 46:5, 46:7, 48:13, 53:9, 62:12, 62:22, 63:6, 63:10, 63:22, 67:6, 68:11, 68:23, 68:25, 69:7, 69:21, 70:3, 70:17, 73:3, 73:7, 73:23, 75:2, 81:19, 87:11, 87:16, 88:24, 89:6, 98:25, 99:7,

99:19, 100:1, 102:7, 107:21, 109:19

**big** [1] - 50:2

**bill** [1] - 19:11

**birth** [1] - 112:3

**bit** [4] - 15:5, 37:10, 38:18, 80:4

**Black** [2] - 48:23, 52:7

**black** [3] - 48:24, 71:15, 109:18

**Blackstone** [1] - 36:24

**blame** [1] - 92:6

**Blandin** [17] - 25:4, 25:14, 25:15, 26:4, 26:7, 26:10, 26:17, 67:4, 67:7, 68:12, 68:18, 68:22, 68:23, 69:1, 69:2

**Blandin's** [1] - 26:2

**Blandins** [5] - 67:19, 68:2, 68:4, 99:17, 99:20

**blown** [1] - 81:25

**blue** [5] - 39:19, 53:9, 53:10, 53:13, 53:16

**bogus** [2] - 65:14, 65:15

**bold** [1] - 78:2

**bolded** [1] - 78:3

**books** [1] - 20:4

**BOP** [1] - 119:18

**borrow** [1] - 44:23

**bottom** [11] - 21:17, 36:17, 38:1, 51:17, 52:5, 54:18, 95:25, 107:2, 108:6, 108:12, 113:18

**Box** [16] - 1:10, 1:24, 12:15, 14:11, 14:14, 17:3, 19:9, 19:17, 20:15, 27:22, 42:4, 42:21, 84:15, 85:22, 86:8, 122:13

**box** [6] - 53:9, 53:10, 53:14, 53:16, 71:9, 85:15

**Boxes** [9] - 34:10, 84:6, 84:10, 84:16, 85:23, 86:2, 86:14, 86:16, 96:19

**boxes** [1] - 53:13

**boy** [1] - 89:25

**branch** [2] - 78:6, 78:9

**branches** [1] - 10:24

**breaches** [2] - 91:12, 91:14

**brief** [2] - 5:17, 5:22

**briefing** [1] - 97:23

**briefly** [4] - 11:24, 12:9, 21:4, 106:24

**bring** [2] - 34:15, 97:13

**broken** [2] - 46:22, 47:2

**brothers** [3] - 25:14, 25:15, 26:17

**building** [9] - 43:22, 44:3, 44:10, 44:15, 48:7, 48:8, 48:21, 51:18, 118:20

**bulk** [3] - 80:10, 80:11, 80:25

**bullet** [10] - 45:21, 45:22,

46:21, 48:5, 49:1, 51:16, 52:6, 54:4, 54:13, 54:18

**burden** [2] - 9:19, 101:2

**Bureau** [12] - 113:23, 114:3, 115:11, 116:12, 117:14, 117:21, 117:25, 118:10, 118:14, 118:17, 119:3, 119:22

**business** [5] - 27:2, 27:16, 42:20, 44:23

**business's** [1] - 48:20

**business-to-business** [1] - 27:2

**businesses** [1] - 44:7

**BY** [17] - 2:3, 2:4, 2:4, 2:5, 2:5, 2:6, 2:7, 10:14, 43:18, 59:21, 71:7, 72:5, 75:9, 82:18, 88:13, 90:4, 92:13

**C**

**C.J** [2] - 1:16, 122:3

**calculate** [1] - 105:16

**calculated** [4] - 101:20, 102:21, 103:21, 107:3

**calculates** [1] - 104:12

**calculation** [7] - 4:5, 6:25, 7:1, 103:14, 104:1, 104:15, 105:25

**calculations** [2] - 103:13, 104:19

**calendar** [1] - 16:2

**California** [2] - 57:9, 57:13

**call** [6] - 9:21, 12:18, 81:3, 89:17, 94:21, 94:24

**called** [12] - 10:2, 10:25, 14:6, 14:16, 19:8, 22:8, 22:17, 41:15, 80:10, 88:6, 89:20, 120:8

**caller** [4] - 87:18, 87:19, 87:22, 88:3

**calls** [2] - 9:22, 89:18

**cameras** [4] - 52:20, 52:24, 54:20, 98:11

**cannot** [2] - 78:18, 120:16

**car** [1] - 49:23

**card** [2] - 62:24, 62:25

**cards** [5] - 26:25, 62:23, 68:13, 73:5, 86:15

**career** [1] - 90:21

**caregiver** [1] - 109:3

**Carolina** [2] - 57:16, 57:17

**Carpet** [1] - 35:25

**carrier** [3] - 72:10, 75:20, 75:25

**Carrier** [4] - 12:3, 12:21, 13:4, 83:9

**carriers** [3] - 12:22, 13:16

**carrying** [1] - 8:6

**cars** [1] - 55:1

**case** [17] - 3:4, 4:8, 39:6,

41:22, 67:3, 80:6, 82:9, 83:20, 83:21, 90:16, 106:17, 108:18, 112:20, 114:1, 115:6, 115:7, 115:25

**cases** [4] - 79:6, 81:19, 82:7, 82:8

**cash** [2] - 31:25, 101:16

**cashed** [3] - 19:13, 64:6, 65:6

**cashing** [9] - 28:13, 62:16, 64:21, 78:21, 86:22, 87:2, 87:5, 96:5, 108:2

**castigated** [1] - 96:14

**category** [7] - 8:9, 8:10, 43:10, 96:24, 97:3, 102:22, 107:15

**catwalk** [1] - 84:20

**caused** [1] - 19:5

**causing** [1] - 111:19

**Cedar** [16] - 1:10, 1:12, 1:18, 1:24, 51:9, 59:18, 67:7, 67:11, 82:10, 90:8, 90:9, 90:12, 90:14, 92:25, 120:12, 122:13

**cents** [4] - 36:18, 104:19, 104:22, 104:24

**certainly** [8] - 67:18, 96:1, 107:9, 108:2, 108:12, 108:25, 109:15, 110:24

**Certified** [1] - 1:19, 122:2

**certify** [2] - 122:2, 122:6

**cetera** [2] - 73:5, 98:21

**chair** [2] - 10:5

**chance** [1] - 102:25

**change** [4] - 97:2, 97:8, 105:3, 115:21

**changes** [1] - 83:15

**characteristics** [2] - 107:18, 108:4

**charge** [1] - 5:10

**charged** [1] - 3:14

**charges** [1] - 118:25

**chart** [2] - 103:23, 104:12

**Chase** [3] - 105:9, 106:8, 115:1

**check** [60] - 24:2, 27:8, 28:13, 31:17, 31:19, 31:21, 31:25, 33:13, 33:14, 34:22, 35:24, 36:6, 36:9, 36:16, 36:20, 36:21, 36:23, 37:4, 37:7, 38:21, 38:24, 39:6, 39:13, 39:14, 40:1, 40:7, 40:8, 40:14, 40:19, 41:25, 42:8, 42:17, 42:23, 43:9, 43:10, 43:12, 62:9, 63:13, 63:18, 64:21, 67:25, 68:5, 77:3, 77:6, 77:9, 78:21, 79:19, 79:21, 80:2, 87:5, 96:5, 98:1, 98:2, 99:25, 102:8, 103:7, 105:4, 108:2

**check-cashing** [5] - 28:13, 64:21, 87:5, 96:5, 108:2

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 125 of 139

checked [2] - 27:13, 102:7
Checks [7] - 21:19, 22:8, 22:17, 41:16, 42:1, 43:9, 104:6
checks [189] - 15:10, 15:16, 15:22, 16:6, 16:10, 16:11, 19:12, 19:18, 19:25, 20:23, 21:9, 21:12, 21:22, 22:3, 22:11, 22:25, 23:10, 23:11, 23:14, 23:16, 23:20, 23:21, 24:8, 25:20, 26:21, 26:25, 27:2, 27:20, 27:25, 28:5, 32:15, 33:13, 34:9, 34:17, 34:19, 34:24, 35:2, 35:3, 35:5, 35:12, 35:15, 35:19, 35:23, 37:11, 37:16, 37:21, 37:24, 38:2, 38:4, 38:6, 38:7, 38:9, 38:23, 39:24, 40:25, 41:12, 41:16, 41:19, 42:5, 43:6, 56:15, 56:19, 56:24, 56:25, 57:2, 57:5, 57:8, 57:20, 58:5, 58:17, 58:21, 59:3, 60:13, 61:4, 61:8, 61:19, 62:6, 62:11, 62:16, 63:3, 63:8, 63:9, 63:12, 63:17, 63:21, 64:4, 64:6, 64:9, 64:14, 64:16, 64:18, 65:2, 65:6, 65:17, 65:20, 67:12, 67:16, 68:13, 68:16, 73:5, 73:21, 77:17, 77:19, 77:24, 78:1, 78:3, 78:7, 78:12, 78:13, 79:4, 79:5, 79:8, 79:9, 79:15, 79:16, 80:5, 80:6, 86:14, 86:17, 86:22, 87:2, 87:20, 88:1, 89:5, 95:23, 95:24, 96:3, 96:6, 96:7, 96:8, 96:11, 96:14, 96:15, 96:17, 96:18, 96:20, 96:22, 96:23, 96:25, 97:1, 97:5, 97:7, 97:10, 97:12, 97:24, 98:1, 98:23, 98:25, 99:3, 99:5, 99:8, 99:13, 99:14, 99:20, 99:21, 100:4, 100:5, 100:12, 100:24, 101:7, 101:10, 101:15, 101:19, 101:22, 101:24, 101:25, 102:2, 102:4, 102:6, 102:10, 102:11, 102:14, 102:17, 103:1, 103:16, 103:21, 104:3, 104:6, 105:5, 107:5, 107:6, 107:8, 108:1, 110:22
Chicago [20] - 16:11, 24:22, 28:12, 62:15, 64:19, 67:18, 67:20, 67:21, 78:10, 78:17, 79:6, 79:9, 86:21, 87:2, 87:4, 87:6, 88:2, 96:5, 96:15, 109:18
Chicagoland [2] - 67:23, 78:14
child [1] - 113:12
choice [2] - 113:5, 113:8
choose [1] - 110:5
Chris [1] - 3:8
CHRISTOPHER [1] - 1:12

Circuit [1] - 120:9
circumstances [1] - 108:4
circumstantial [1] - 99:10
citing [1] - 92:7
City [1] - 91:10
city [1] - 12:22
clarification [1] - 59:12
clarify [1] - 79:18
Class [15] - 57:22, 57:23, 57:25, 80:5, 80:7, 80:9, 80:11, 80:15, 80:18, 80:20, 82:19, 82:25, 83:2, 83:3, 83:6
classification [5] - 114:5, 116:14, 116:18, 116:25, 117:1
clear [3] - 55:12, 100:18, 110:21
clearly [1] - 97:12
Clerk [2] - 115:5, 120:11
client [3] - 4:24, 5:24, 118:5
climbing [1] - 49:17
close [7] - 45:25, 46:6, 72:12, 93:20, 94:25, 114:3, 117:24
closed [10] - 15:4, 46:14, 46:15, 72:10, 75:19, 93:4, 93:7, 94:8, 94:9, 98:14
closer [1] - 24:22
co [2] - 91:18, 91:23
co-worker [2] - 91:18, 91:23
code [2] - 29:20, 29:24
Code [3] - 3:16, 58:18, 110:13
coded [4] - 24:5, 24:7, 39:4, 39:11
coding [4] - 21:12, 21:18, 38:14, 38:16
collection [5] - 53:10, 80:13, 114:12, 115:18
college [3] - 109:7, 112:7, 113:14
color [8] - 21:12, 21:18, 24:5, 24:7, 38:14, 38:16, 39:4, 39:11
column [2] - 39:8, 40:3
comfortable [2] - 10:7, 89:23
coming [5] - 12:18, 12:24, 67:16, 80:14, 107:11
commencing [1] - 1:18
commensurate [1] - 114:4
comments [1] - 110:15
commit [1] - 114:9
committed [1] - 113:22
committee [1] - 93:8
committing [1] - 101:14
common [6] - 61:7, 61:10, 81:9, 92:5, 92:9, 98:20
commonly [1] - 82:9
communicated [2] - 79:21, 79:23
communicating [1] - 29:1
communication [4] - 77:14,

101:11, 102:7, 110:21
communications [8] - 26:16, 26:20, 29:10, 29:16, 68:12, 73:23, 74:22, 109:19
community [1] - 109:6
companies [5] - 20:5, 41:19, 44:14, 44:16, 96:9
company [10] - 14:6, 14:16, 19:8, 19:22, 32:25, 34:4, 47:19, 47:24, 96:16, 98:15
Company [4] - 46:7, 47:11, 47:12, 47:16
compare [1] - 35:2
complained [1] - 15:8
complaint [4] - 15:6, 16:7, 16:12, 16:16
complaints [2] - 16:1, 17:8
complete [2] - 98:24, 112:6
Completed [1] - 1:21
completely [1] - 117:25
completes [1] - 95:11
comply [2] - 114:8, 114:14
components [1] - 16:24
compromise [2] - 15:2, 15:23, 17:5
compromised [2] - 15:22, 21:10
concede [1] - 97:21
concerned [2] - 16:5, 79:7
concluded [1] - 121:6
concludes [1] - 121:5
concurs [1] - 108:11
condition [1] - 115:17
conditions [4] - 114:9, 114:15, 114:16, 119:2
conduct [6] - 5:5, 108:16, 110:16, 111:14, 111:18
conducted [1] - 22:21
conference [1] - 6:3
conferred [1] - 118:7
confers [1] - 93:19
confidence [1] - 100:22
confident [1] - 118:4
confirm [1] - 118:6
connect [2] - 28:7, 28:23
connected [14] - 25:16, 25:17, 27:25, 38:21, 48:7, 62:14, 78:20, 78:25, 79:6, 86:21, 87:1, 87:4, 96:6, 96:9
connection [2] - 24:15, 26:14, 67:6, 68:23, 68:24, 68:25, 79:13, 87:7, 87:9, 99:18, 100:7, 100:24
connections [5] - 25:11, 61:12, 67:19, 78:23, 79:2
consecutive [1] - 113:25
considered [1] - 110:13
consistent [6] - 54:7, 74:12, 74:16, 74:23, 74:24, 109:20
consolidate [1] - 92:23
conspiracy [1] -

constant [1] - 20:18
contact [4] - 20:18, 39:22, 65:13, 118:22
contacted [3] - 19:7, 73:4, 80:1
contacts [1] - 67:19
contained [3] - 38:7, 78:12, 95:24
contested [1] - 106:15
context [1] - 75:1
continue [2] - 37:11, 37:15
continued [1] - 73:12
continuing [2] - 20:19, 33:10
contract [8] - 50:12, 50:13, 50:16, 50:20, 50:21, 51:5, 51:12, 52:1
contracted [1] - 51:14
contractor [3] - 50:18, 50:23, 98:21
contractors [2] - 56:6, 98:18
control [1] - 112:25
controlled [2] - 112:11, 114:11
conversation [4] - 26:24, 73:8, 73:20, 89:1
conversations [3] - 27:4, 87:16, 88:24
convicted [3] - 111:17, 111:18
conviction [1] - 111:13
convictions [1] - 8:7
cooperate [1] - 114:12
copy [2] - 6:1, 62:9
corner [1] - 102:1
corners [1] - 102:3
Corporation [2] - 103:5, 106:7
correct [147] - 13:5, 13:24, 14:15, 15:11, 15:17, 15:21, 17:12, 19:19, 21:1, 23:5, 23:23, 23:24, 24:9, 24:11, 25:10, 26:18, 27:11, 29:17, 30:2, 30:3, 30:13, 30:17, 31:11, 31:21, 31:22, 31:24, 32:8, 32:18, 33:1, 33:2, 33:6, 33:15, 34:20, 34:21, 35:6, 35:10, 35:18, 36:11, 38:11, 39:9, 39:16, 40:2, 40:12, 40:18, 40:24, 41:13, 41:17, 41:23, 41:24, 42:2, 42:3, 42:12, 42:18, 42:19, 43:1, 43:4, 43:7, 43:8, 43:11, 44:1, 44:4, 44:5, 44:7, 44:10, 46:9, 47:6, 47:11, 48:4, 48:17, 49:9, 49:10, 51:1, 52:2, 52:18, 52:19, 54:2, 54:3, 55:6, 59:9, 59:11, 60:2, 60:9, 60:15, 60:22, 60:23, 60:25, 61:4, 61:19, 61:20, 62:12, 63:12, 63:17, 63:22, 63:23, 64:4, 64:5, 64:9, 64:10, 64:17,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 126 of 139

64:25, 65:21, 65:22, 66:9,
66:13, 66:17, 66:19, 67:2,
68:2, 68:15, 69:24, 70:12,
72:17, 73:13, 75:12, 75:17,
76:15, 76:16, 76:19, 76:20,
76:22, 76:23, 77:1, 77:2,
77:21, 77:24, 78:4, 78:5,
78:14, 79:23, 79:24, 80:3,
80:24, 82:19, 84:6, 85:13,
86:10, 88:16, 88:22, 88:23,
92:17, 93:4, 104:20, 104:21,
105:21, 105:24, 106:10, 109:8
  **correctly** [2] - 6:8, 12:23
  **corresponded** [2] - 25:19,
69:2
  **corroboration** [1] - 99:24
  **counsel** [2] - 118:7, 122:8
  **count** [3] - 3:13, 102:4
  **Count** [4] - 3:14, 119:5,
119:7, 119:9
  **counted** [3] - 102:5, 102:11,
103:8
  **counterfeit** [1] - 24:2, 67:25,
68:6
  **counterfeited** [2] - 19:13,
32:6
  **country** [4] - 57:6, 67:17,
81:7, 118:2
  **Country** [10] - 27:13, 27:16,
43:12, 57:3, 63:13, 63:18,
79:19, 80:2, 103:7, 106:7
  **couple** [4] - 32:2, 32:20,
41:5, 107:24
  **courier** [1] - 14:23
  **course** [22] - 4:9, 8:13, 22:2,
22:11, 25:23, 37:12, 41:20,
47:8, 58:2, 62:6, 62:21, 68:4,
71:14, 73:9, 74:24, 83:19,
89:5, 90:21, 100:4, 100:8,
109:17, 109:20
  **Court** [28] - 1:23, 3:2, 3:19,
3:21, 3:24, 4:9, 8:1, 11:24,
95:4, 95:7, 95:20, 95:21,
95:22, 95:23, 96:21, 97:6,
97:9, 97:10, 103:17, 106:24,
107:3, 107:14, 113:21, 115:5,
119:8, 120:9, 120:11, 122:12
  **COURT** [95] - 1:1, 3:2, 4:4,
4:8, 4:12, 4:16, 4:23, 5:3,
5:17, 5:22, 6:6, 6:10, 6:13,
6:17, 6:21, 6:24, 8:1, 8:22,
8:24, 9:1, 9:7, 9:10, 9:12,
9:14, 9:17, 9:24, 10:4, 10:11,
43:15, 59:12, 59:20, 71:5,
72:4, 75:6, 82:13, 82:16,
83:24, 84:2, 84:8, 84:17,
84:23, 85:5, 85:13, 85:17,
86:9, 86:11, 86:19, 87:8,
87:12, 87:18, 88:3, 88:7,
88:10, 89:15, 89:22, 90:1,
92:11, 94:15, 94:17, 94:20,
94:23, 95:4, 95:7, 95:10

97:18, 101:1, 103:25, 104:8,
104:15, 104:21, 104:23,
104:25, 105:6, 105:9, 105:11,
105:13, 105:17, 105:19,
105:22, 106:2, 106:12,
106:14, 108:8, 109:25,
110:10, 118:11, 119:8,
119:15, 119:19, 120:1, 120:4,
120:21, 120:24, 121:2, 121:4
  **court** [11] - 3:1, 3:23, 10:8,
57:10, 108:24, 111:23,
112:16, 115:8, 120:8, 120:10
  **court's** [2] - 3:11, 111:24
  **Court's** [1] - 100:10
  **court-ordered** [1] - 115:8
  **courtroom** [1] - 4:17
  **cover** [5] - 11:11, 11:13,
11:15, 56:2, 81:16
  **covers** [1] - 91:10
  **created** [1] - 68:7
  **credit** [7] - 26:25, 62:23,
62:24, 68:13, 86:15, 97:11,
109:5
  **crime** [5] - 3:14, 3:17, 111:1,
111:17, 114:10
  **criminal** [12] - 3:3, 5:9, 8:4,
8:7, 8:8, 8:10, 102:22, 107:14,
108:15, 108:18, 111:12,
118:25
  **critique** [1] - 109:4
  **cross** [5] - 13:8, 43:15,
58:25, 76:11, 78:19, 83:8,
86:20, 92:11, 109:11
  **CROSS** [4] - 2:4, 2:7, 43:17,
92:12
  **cross-docked** [1] - 13:8
  **cross-examination** [5] -
43:15, 78:19, 86:20, 92:11,
109:11
  **CROSS-EXAMINATION** [4] -
2:4, 2:7, 43:17, 92:12
  **CSR** [2] - 1:23, 122:12
  **current** [1] - 118:16
  **custody** [2] - 113:22, 114:5
  **customer** [2] - 12:13, 12:14
  **customers** [3] - 19:12,
19:17, 27:21
  **cuz** [1] - 31:15
  **Cuz** [1] - 34:6

### D

  **D.V** [2] - 27:6, 27:10
  **D1** [1] - 53:7
  **D2** [1] - 53:19
  **Darrell** [2] - 79:22, 80:1
  **dashed** [1] - 53:8
  **data** [2] - 28:21, 28:22
  **date** [4] - 37:8, 42:7, 116:24,
117:16

**dated** [9] - 34:18, 34:19,
36:2, 36:13, 42:23, 53:7,
76:21, 77:4, 77:9
  **dates** [2] - 89:9, 89:12
  **Davey** [33] - 28:14, 28:16,
28:24, 29:21, 62:14, 62:18,
62:23, 63:4, 63:10, 63:14,
63:22, 73:3, 73:7, 73:9, 73:24,
73:25, 74:11, 74:16, 74:22,
76:19, 76:25, 77:11, 78:21,
78:25, 79:11, 79:13, 79:21,
87:17, 96:4, 97:8, 100:17,
109:12, 109:20
  **DAVEY** [1] - 28:16
  **days** [5] - 18:18, 88:19,
115:21, 120:12, 120:14
  **dealing** [2] - 62:13, 111:21
  **dealt** [1] - 17:21
  **Dean** [1] - 91:10
  **debit** [1] - 62:24
  **decent** [1] - 113:5
  **decide** [1] - 93:10
  **decision** [2] - 76:3, 93:22
  **decrease** [1] - 116:14
  **deduct** [1] - 103:21
  **defendant** [75] - 3:6, 3:12,
3:19, 4:19, 5:15, 6:1, 7:3, 7:6,
7:13, 7:17, 7:21, 8:4, 8:8,
8:15, 8:18, 12:6, 17:10, 19:1,
24:15, 26:16, 26:20, 27:5,
27:8, 27:10, 28:1, 55:7, 62:18,
63:10, 66:11, 68:11, 68:24,
68:25, 72:6, 72:16, 73:3,
73:18, 73:24, 75:10, 76:19,
76:25, 77:11, 78:20, 79:19,
84:24, 85:6, 85:14, 86:21,
87:1, 88:15, 90:16, 96:2,
96:13, 98:25, 99:3, 99:4, 99:8,
99:18, 99:19, 99:25, 100:7,
100:16, 100:23, 101:8,
102:13, 102:15, 103:1,
103:17, 107:19, 109:19,
111:12, 112:1, 112:19, 113:1,
118:7, 119:10
  **DEFENDANT** [8] - 6:9, 6:12,
6:16, 6:20, 6:23, 110:9,
120:20, 120:23
  **Defendant** [2] - 1:7, 1:13
  **defendant's** [11] - 8:3, 8:7,
64:7, 66:15, 70:21, 84:3,
85:22, 99:11, 100:2, 102:21,
105:23
  **Defender** [1] - 3:8
  **Defender's** [1] - 1:12
  **defense** [5] - 91:22, 97:21,
97:24, 98:4, 108:11
  **Defense** [2] - 43:21, 48:22
  **deficiencies** [2] - 91:14,
101:20

**deflect** [1] - 92:6
  **degree** [2] - 111:7, 112:22
  **delete** [1] - 31:20
  **deliver** [1] - 18:17
  **delivered** [1] - 12:24
  **delivery** [3] - 13:15, 59:6,
93:15
  **denominator** [2] - 61:7,
98:20
  **denominators** [1] - 61:10
  **Department** [1] - 22:22
  **depending** [2] - 95:21, 95:22
  **deposit** [2] - 32:1, 64:21
  **deposited** [21] - 24:10, 28:5,
38:6, 38:9, 38:23, 39:24,
40:17, 41:22, 42:11, 43:3,
43:6, 64:14, 78:4, 78:7, 78:14,
79:9, 79:10, 79:15, 79:16,
100:5
  **depositing** [1] - 100:3
  **DEPUTY** [1] - 5:21
  **Des** [5] - 11:7, 11:8, 11:12,
11:13, 82:10
  **describe** [3] - 11:24, 12:9,
14:1
  **described** [2] - 19:16, 21:22
  **description** [1] - 13:20
  **designate** [2] - 117:15, 118:1
  **designated** [6] - 53:12,
114:3, 117:21, 117:23,
117:25, 118:13
  **designed** [1] - 12:17
  **desires** [1] - 107:12
  **destination** [1] - 80:23
  **detail** [2] - 8:13, 37:11
  **detailed** [1] - 97:6
  **details** [1] - 87:21
  **deter** [2] - 108:25, 113:10
  **determination** [1] - 76:2
  **determine** [4] - 15:3, 39:22,
59:24, 93:20
  **determined** [6] - 6:25, 7:8,
38:5, 60:5, 93:3, 103:11
  **determining** [1] - 110:4
  **Dewey** [1] - 35:25
  **DHS** [1] - 5:11
  **difference** [1] - 104:19
  **different** [14] - 12:9, 29:18,
31:23, 32:21, 39:7, 41:5,
55:22, 67:16, 69:4, 76:18,
76:25, 93:9, 104:16, 113:17
  **digital** [1] - 39:15
  **diploma** [1] - 109:6
  **DIRECT** [4] - 2:3, 2:6, 10:13,
90:3
  **direct** [8] - 48:22, 51:15,
58:11, 58:12, 59:23, 68:10,
88:14, 98:24
  **directed** [5] - 38:7, 85:15,
85:21, 114:12, 118:24
  **direction** [1] - 113:17

**directly** [2] - 110:2, 117:13
**directs** [1] - 34:14
**disagree** [1] - 120:6
**disbursed** [2] - 13:9, 83:7
**discover** [3] - 24:19, 25:11, 28:18
**discovery** [1] - 63:5
**discussed** [2] - 53:15, 56:6
**discussing** [1] - 56:20
**discussions** [1] - 73:5
**disgruntled** [1] - 72:24
**dismiss** [1] - 119:7
**dismissed** [1] - 119:9
**disorderly** [2] - 111:14
**dispatching** [2] - 17:22, 17:24
**displaying** [2] - 21:3, 43:21
**disposition** [2] - 95:15, 106:16
**disputed** [1] - 95:14
**distributed** [3] - 80:17, 83:16, 115:7
**distribution** [1] - 115:6
**Distribution** [1] - 93:1
**District** [4] - 73:10, 115:5, 115:21, 120:11
**DISTRICT** [2] - 1:1, 1:1
**divorced** [1] - 112:2
**DNA** [1] - 114:12
**dock** [25] - 17:20, 44:23, 45:24, 46:2, 46:21, 47:2, 47:5, 47:13, 47:14, 47:15, 47:17, 47:19, 47:20, 47:24, 48:2, 49:4, 49:8, 49:11, 49:14, 49:18, 49:19, 49:23, 50:3, 50:5
**Dock** [1] - 54:11
**docked** [3] - 13:8, 58:25, 83:8
**docket** [2] - 9:6, 9:7
**docks** [6] - 44:9, 44:12, 44:14, 45:18, 46:25, 47:11
**document** [5] - 3:11, 8:15, 8:17, 9:2, 47:7
**dollar** [1] - 32:22
**dollars** [3] - 36:18, 36:19, 107:24
**domestic** [1] - 72:25
**done** [6] - 20:20, 65:1, 78:10, 91:4, 109:16, 120:22
**Donita** [2] - 48:23, 52:7
**door** [3] - 45:23, 46:2, 46:5, 46:9, 46:12, 48:6, 48:12, 49:18, 50:3, 54:1, 54:5, 54:16
**door's** [1] - 50:1
**doors** [16] - 46:21, 47:2, 47:5, 48:2, 49:4, 49:8, 49:11, 49:14, 49:19, 49:24, 50:5, 52:10, 52:25, 54:11, 98:13
**double** [1] - 111:16
**doubt** [1] - 72:23

**down** [15] - 15:2, 21:17, 33:10, 33:19, 33:25, 34:12, 38:18, 39:2, 46:21, 49:1, 54:4, 54:11, 89:16, 94:18, 106:16
**draft** [2] - 6:1, 6:4
**drive** [1] - 113:14
**driver** [4] - 51:4, 51:5, 51:11
**drivers** [10] - 50:14, 50:21, 50:22, 50:24, 51:18, 52:3, 54:5, 54:8, 62:3, 98:18
**drop** [1] - 50:24
**drug** [6] - 23:14, 66:9, 112:12, 112:15, 119:17, 119:20
**drug-related** [1] - 23:14
**drugs** [1] - 112:16
**Dubuque** [72] - 11:18, 11:21, 11:25, 12:1, 12:18, 12:19, 12:24, 12:25, 13:22, 14:4, 14:10, 14:11, 14:14, 16:6, 16:10, 19:8, 19:17, 22:13, 25:22, 27:17, 29:24, 41:15, 42:1, 42:4, 42:20, 42:21, 43:9, 45:7, 51:6, 51:7, 51:9, 51:10, 58:15, 58:18, 58:20, 59:4, 59:14, 59:16, 60:14, 67:8, 67:13, 71:19, 75:11, 79:8, 80:7, 80:15, 82:4, 82:5, 82:7, 82:8, 83:9, 83:19, 87:25, 89:1, 89:2, 89:10, 90:10, 90:13, 90:22, 91:13, 91:20, 92:24, 93:2, 96:9, 96:25, 99:22, 99:23, 100:14, 104:6, 107:21, 109:18
**due** [6] - 49:5, 103:21, 104:12, 114:19, 115:2, 115:19
**duly** [2] - 10:2, 89:20
**dump** [1] - 28:22
**during** [25] - 6:3, 18:13, 20:12, 20:24, 22:2, 22:4, 22:11, 23:12, 23:15, 25:23, 37:22, 41:20, 49:5, 49:9, 49:11, 59:22, 66:15, 68:10, 68:16, 70:22, 71:14, 84:23, 88:14, 92:14
**duties** [10] - 11:20, 17:18, 84:5, 84:9, 84:14, 84:24

**E**

**earliest** [1] - 37:23
**early** [3] - 21:24, 37:22, 76:8
**earn** [1] - 109:5
**East** [4] - 92:15, 93:2, 98:6, 98:16
**education** [1] - 113:13
**efficiency** [2] - 93:12, 93:14
**efficient** [1] - 93:11
**eight** [1] - 81:19
**Eighth** [1] - 120:9
**either** [10] - 13:4, 29:3, 38:8,

40:7, 40:10, 55:13, 86:9, 92:6, 99:17, 103:3
**eleven** [3] - 56:25, 101:19, 102:10
**eliminate** [2] - 14:24, 92:21
**eliminated** [1] - 93:10
**employed** [11] - 10:15, 15:9, 17:10, 48:24, 75:16, 75:22, 90:5, 90:6, 107:23, 122:7, 122:8
**employee** [22] - 3:15, 14:23, 14:25, 25:21, 27:3, 48:25, 51:12, 61:5, 65:24, 69:6, 69:16, 69:23, 70:5, 72:21, 72:22, 72:23, 87:25, 98:21, 122:7
**employees** [46] - 18:14, 18:21, 20:14, 45:7, 45:9, 47:9, 47:10, 47:12, 47:15, 48:16, 48:19, 50:9, 50:11, 50:12, 50:14, 50:16, 50:18, 50:20, 51:13, 51:24, 52:1, 55:1, 55:13, 55:18, 55:20, 55:24, 60:14, 60:17, 60:21, 60:25, 61:3, 61:11, 61:12, 61:14, 61:16, 61:18, 61:21, 61:25, 62:1, 69:9, 81:10, 92:5, 92:7, 98:17, 100:19
**employer** [2] - 113:3, 113:7
**employment** [2] - 75:11, 84:3
**Emporium** [1] - 36:24
**empty** [1] - 99:12
**end** [8] - 4:18, 21:11, 26:15, 28:11, 36:17, 36:18, 75:19, 109:11
**ended** [1] - 42:10
**endorse** [3] - 64:8, 64:16, 64:18
**endorsed** [9] - 40:13, 40:20, 40:21, 41:1, 42:10, 64:11, 65:2, 77:23, 96:7
**endorsement** [1] - 100:1
**endorsements** [1] - 64:23
**endorsing** [1] - 99:25
**ends** [1] - 83:2
**enforced** [1] - 63:24
**enforcement** [12] - 10:19, 10:24, 23:7, 28:12, 30:20, 59:23, 60:12, 64:2, 64:12, 68:10, 71:18, 85:5
**engage** [1] - 111:23
**enhancement** [6] - 7:6, 7:11, 7:13, 97:15, 97:16, 97:17
**ensure** [1] - 18:4
**entire** [1] - 85:4
**entirety** [1] - 11:8
**entrance** [2] - 53:9, 60:22
**envelope** [1] - 63:1
**envelopes** [2] - 64:3, 99:12
**equipment** [3] - 51:19, 54:6,

82:24
**escapes** [1] - 25:5
**essentially** [4] - 13:18, 19:22, 21:15, 22:9
**establish** [2] - 9:19, 95:13
**established** [1] - 101:4
**estimate** [3] - 55:15, 55:17, 81:19
**estimated** [1] - 55:21
**et** [2] - 73:5, 98:21
**eventually** [2] - 34:12, 109:5
**evidence** [27] - 8:20, 9:8, 9:15, 9:20, 45:3, 58:11, 58:12, 58:14, 95:11, 95:20, 96:2, 96:11, 98:24, 99:7, 99:10, 100:13, 100:23, 101:3, 101:5, 102:16, 103:2, 103:3, 106:25, 109:17, 110:19, 111:5
**exact** [4] - 19:24, 55:15, 56:18, 61:23
**exactly** [5] - 82:22, 93:4, 100:9, 107:7, 109:12
**examination** [9] - 43:15, 75:6, 78:19, 82:13, 86:20, 92:11, 93:12, 94:15, 109:11
**EXAMINATION** [14] - 2:3, 2:4, 2:4, 2:5, 2:5, 2:6, 2:7, 10:13, 43:17, 75:8, 82:17, 88:12, 90:3, 92:12
**examined** [2] - 10:3, 89:21
**example** [8] - 40:19, 41:4, 50:12, 51:11, 55:25, 80:12, 83:1, 101:23
**exceed** [1] - 115:12
**Excel** [1] - 64:7
**except** [3] - 11:15, 56:21, 109:22
**exclude** [2] - 60:21, 60:24
**excluded** [1] - 15:12
**excuse** [5] - 46:8, 51:17, 58:12, 104:9, 108:2
**excused** [1] - 89:16
**execution** [1] - 66:16
**exemplar** [1] - 100:1
**exhausted** [1] - 60:9
**Exhibit** [51] - 8:18, 21:4, 21:7, 21:17, 22:7, 24:4, 29:5, 29:8, 30:8, 30:23, 31:9, 31:13, 33:14, 34:17, 34:19, 35:3, 35:4, 35:22, 36:5, 36:9, 36:17, 36:22, 36:24, 37:5, 37:19, 41:12, 43:21, 45:11, 48:23, 51:15, 52:5, 52:12, 53:7, 53:19, 76:12, 76:15, 76:18, 76:24, 77:20, 77:22, 78:13, 97:3, 97:5, 97:7, 98:11, 101:19, 101:23, 102:14, 104:8
**exhibit** [3] - 29:5, 45:10, 63:8
**EXHIBITS** [1] - 2:10
**exhibits** [9] - 9:16, 62:19, 63:5, 91:19, 91:22, 95:1,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR    Document 50    Filed 01/19/22    Page 128 of 139

97:23, 99:1
**Exhibits** [8] - 2:11, 2:11, 8:16, 8:19, 8:25, 9:3, 9:8, 9:13
**existed** [1] - 91:14
**expect** [2] - 60:12, 112:4
**expense** [3] - 117:17, 117:22, 120:18
**experience** [4] - 70:12, 70:15, 81:9, 92:5
**explain** [1] - 115:4
**explained** [2] - 84:14, 110:23
**explanation** [1] - 96:13
**explanations** [1] - 96:10
**Express** [3] - 18:17, 88:16, 88:21
**extended** [1] - 116:4
**extension** [1] - 30:9
**extent** [2] - 90:15, 99:16
**exterior** [1] - 46:1
**external** [5] - 10:24, 14:22, 60:6, 60:9, 90:18
**externally** [1] - 20:12
**extra** [1] - 65:11
**extreme** [1] - 49:5
**eyes** [2] - 71:16, 109:19
**eyewitness** [1] - 99:2

**F**

**Facebook** [17] - 25:18, 25:24, 25:25, 26:1, 26:8, 26:11, 26:14, 26:16, 29:2, 29:3, 68:11, 69:3, 73:2, 73:7, 77:13, 87:13, 99:19
**facilities** [12] - 11:13, 11:14, 11:18, 11:21, 12:2, 12:10, 13:7, 13:10, 51:20, 58:16, 92:22, 93:10
**facility** [22] - 12:20, 13:2, 13:18, 18:15, 52:23, 58:23, 59:4, 59:8, 59:14, 59:16, 59:17, 60:15, 60:22, 84:21, 88:20, 91:13, 93:1, 114:3, 116:15, 116:17, 117:9, 117:14
**fact** [11] - 26:3, 33:3, 33:13, 45:19, 46:13, 46:17, 52:23, 81:15, 95:1, 98:16, 100:6
**factor** [1] - 103:16
**factors** [5] - 93:14, 93:22, 93:25, 108:14, 110:13
**facts** [1] - 108:3
**factual** [1] - 95:19
**fail** [3] - 117:4, 117:10, 120:13
**failed** [2] - 116:22, 117:9
**failure** [1] - 118:23
**fair** [5] - 4:1, 4:25, 15:20, 62:7, 93:13
**fairly** [4] - 20:18, 71:25, 98:10, 108:16

**fall** [2] - 19:6, 21:24
**Falls** [10] - 20:25, 22:21, 23:2, 23:11, 24:17, 66:8, 67:14, 68:1, 97:1, 99:14
**falls** [1] - 7:9
**false** [1] - 73:1
**familiar** [7] - 11:20, 45:3, 45:6, 48:25, 90:22, 91:24, 106:25
**family** [3] - 112:1, 114:4, 117:24
**far** [7] - 39:8, 40:3, 53:15, 62:8, 102:24, 106:3, 110:18
**Fargo** [1] - 79:3
**FCRR** [2] - 1:23, 122:12
**February** [3] - 69:22, 70:3, 76:10
**federal** [3] - 10:18, 114:10, 117:5
**Federal** [2] - 1:12, 3:7
**feel** [1] - 6:13
**feet** [4] - 46:18, 49:21, 50:6, 50:8
**female** [2] - 88:3, 88:5
**fence** [4] - 52:16, 52:24, 54:25, 98:11
**fences** [2] - 52:14, 54:19
**festivals** [1] - 54:21
**few** [15] - 20:4, 26:24, 38:3, 38:12, 39:22, 45:9, 56:4, 58:19, 81:15, 81:22, 83:24, 85:3, 88:11, 116:4, 118:5
**fictitious** [1] - 65:12
**Fidelity** [3] - 105:6, 106:8, 114:25
**fighting** [2] - 111:14, 111:15
**figure** [3] - 17:4, 20:13, 104:16
**file** [4] - 3:11, 30:9, 120:10, 120:13
**filed** [6] - 3:11, 8:15, 8:18, 9:1, 9:6
**finally** [2] - 52:5, 77:9
**finances** [1] - 108:3
**Financial** [5] - 14:9, 14:10, 14:17, 15:10, 115:11
**financial** [4] - 107:11, 115:8, 115:15, 115:23
**financially** [1] - 122:8
**find** [18] - 20:6, 20:10, 26:20, 101:3, 101:8, 101:16, 102:15, 102:20, 103:1, 103:17, 106:5, 106:6, 106:7, 111:25, 113:18, 114:20, 115:24
**finding** [3] - 5:12, 105:23, 105:24
**finds** [1] - 96:21
**fine** [4] - 3:23, 114:20, 114:21, 117:7
**finish** [2] - 106:17, 113:13
**fired** [3] - 71:20, 70:23, 92:2

**firm** [1] - 50:16
**First** [14] - 57:22, 57:23, 57:25, 80:5, 80:7, 80:9, 80:15, 80:18, 80:20, 82:19, 82:25, 83:2, 83:3, 83:6
**first** [27] - 5:14, 6:7, 9:21, 10:2, 10:9, 12:25, 14:2, 15:6, 15:8, 17:9, 22:10, 22:15, 23:21, 31:14, 39:4, 41:11, 41:23, 41:25, 45:22, 53:8, 73:4, 84:2, 89:20, 106:18, 111:3, 111:15
**First-Class** [14] - 57:22, 57:23, 57:25, 80:5, 80:7, 80:9, 80:15, 80:18, 80:20, 82:19, 82:25, 83:2, 83:3, 83:6
**Fischer** [17] - 45:23, 46:3, 46:5, 46:7, 46:13, 46:22, 47:1, 47:2, 47:5, 47:11, 47:12, 47:16, 48:2, 48:7, 48:13, 48:16, 48:19
**five** [5] - 17:3, 17:11, 17:15, 18:23, 56:1
**fixed** [1] - 48:3
**Flexsteel** [75] - 19:8, 19:16, 19:22, 19:24, 20:13, 20:18, 20:21, 20:23, 21:8, 22:8, 22:12, 23:4, 23:17, 23:18, 23:19, 23:22, 27:17, 33:5, 33:15, 35:4, 35:9, 35:25, 36:11, 36:25, 37:13, 37:21, 38:3, 38:7, 38:8, 40:8, 40:9, 40:11, 41:13, 41:16, 41:20, 42:1, 43:7, 43:10, 56:16, 56:20, 56:24, 63:17, 63:21, 68:16, 73:19, 78:13, 79:7, 79:16, 89:5, 95:24, 96:18, 96:22, 96:25, 98:23, 98:25, 99:9, 99:13, 100:12, 100:16, 100:24, 101:7, 101:10, 101:15, 101:24, 102:6, 102:14, 102:17, 104:7, 105:4, 105:7, 106:4, 109:14, 110:20, 110:25
**Flexsteel's** [1] - 97:11
**floor** [5] - 97:9, 97:15, 97:21, 102:18, 118:21
**Florida** [2] - 57:8, 57:13
**focus** [2] - 20:4, 85:19
**focused** [1] - 76:13
**follow** [2] - 23:8, 86:23
**follow-up** [2] - 23:8, 86:23
**followed** [1] - 81:9
**following** [5] - 3:1, 12:23, 32:20, 114:8, 118:19
**follows** [2] - 10:3, 89:21
**FOR** [1] - 1:1
**force** [1] - 22:23
**foregoing** [1] - 122:4
**forever** [1] - 120:14
**form** [3] - 61:10, 77:13,

99:24
**former** [1] - 72:22
**forth** [2] - 60:4, 74:4
**forward** [1] - 27:23
**four** [5] - 11:1, 23:13, 24:16, 41:16, 56:23
**fourth** [2] - 24:21, 43:9
**frame** [5] - 22:4, 34:25, 81:12, 85:1, 91:21
**fraud** [3] - 31:19, 39:1, 109:13
**fraudulent** [4] - 38:5, 38:10, 79:4, 79:14
**fraudulently** [2] - 41:22, 101:16
**free** [2] - 51:20, 116:9
**Freese** [3] - 3:9, 119:15, 119:23
**frequently** [1] - 49:4
**friends** [4] - 26:8, 26:10, 26:12, 87:3
**front** [6] - 10:6, 43:22, 45:11, 53:19, 77:3, 111:5
**full** [9] - 4:1, 4:25, 38:24, 50:9, 55:13, 61:24, 61:25, 75:14, 81:25
**full-blown** [1] - 81:25
**full-time** [5] - 50:9, 55:13, 61:24, 61:25, 75:14
**fully** [1] - 107:22
**funds** [1] - 115:13
**furniture** [1] - 19:22
**Furniture** [4] - 24:1, 35:25, 36:10
**FURTHER** [2] - 2:5, 88:12
**future** [1] - 113:11

**G**

**Gabrielle** [2] - 41:8, 43:3
**gain** [1] - 111:10
**gallery** [1] - 84:20
**gate** [3] - 52:24, 54:25, 98:11
**gates** [2] - 52:18, 54:20
**gather** [1] - 61:2
**Gear** [26] - 14:7, 14:11, 14:13, 14:23, 15:7, 15:9, 15:22, 15:25, 19:16, 20:11, 21:19, 21:23, 22:3, 22:5, 27:17, 56:21, 56:25, 60:1, 60:2, 60:7, 60:13, 61:3, 97:24, 97:25, 103:5, 106:6
**general** [3] - 72:18, 81:13, 100:18
**General** [4] - 10:17, 10:22, 11:2, 91:6
**generally** [2] - 69:5, 80:21
**gentlemen** [1] - 5:19
**Georgia** [3] - 6:2, 57:9, 57:13
**get** [19] - 28:5, 49:15, 51:18,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*

51:21, 54:6, 59:12, 64:12, 69:19, 72:20, 82:9, 96:17, 100:19, 107:12, 109:1, 111:22, 116:9, 117:16, 117:22, 117:25
**gets** [1] - 111:17
**getting** [8] - 32:7, 34:7, 55:3, 70:6, 107:7, 110:17, 111:7, 111:9
**give** [4] - 72:22, 85:11, 104:2, 120:14
**given** [5] - 101:10, 103:11, 105:23, 105:25, 106:9
**gives** [1] - 7:15
**giving** [1] - 107:8
**Globe** [2] - 24:1
**go-around** [1] - 104:25
**goals** [2] - 110:12, 113:20
**gold** [2] - 38:15, 38:22
**government** [17] - 4:4, 4:21, 7:24, 9:1, 63:5, 95:18, 97:16, 97:22, 101:4, 104:12, 106:18, 107:1, 108:5, 108:11, 113:7, 119:6
**government's** [8] - 4:18, 7:21, 9:19, 62:19, 97:23, 99:1, 101:1, 109:8
**grant** [1] - 116:1
**granted** [1] - 4:20
**grants** [2] - 8:1, 119:8
**gray** [1] - 39:12
**great** [1] - 64:12
**greater** [5] - 67:23, 102:18, 108:13, 109:24, 110:11
**greed** [2] - 111:7, 111:11
**green** [3] - 24:5, 24:7, 38:14
**grew** [1] - 112:1
**ground** [5] - 46:18, 49:16, 49:20, 49:21, 50:6
**guess** [6] - 5:7, 58:18, 71:1, 76:6, 96:15
**guesstimated** [1] - 17:15
**guesstimating** [1] - 55:14
**guideline** [10] - 7:4, 7:7, 7:15, 7:20, 7:23, 8:10, 102:23, 107:2, 107:16, 113:19
**guidelines** [4] - 4:5, 6:25, 102:20, 108:5
**guilty** [8] - 3:12, 3:13, 7:17, 27:8, 43:11, 66:4, 79:19, 103:7
**gut** [1] - 102:25
**guys** [1] - 28:9

**H**

**Hampshire** [1] - 57:14
**hand** [3] - 9:25, 102:1, 122:9
**handful** [2] - 18:21, 55:20
**handfuls** [2] - 62:19, 63:6

**handle** [1] - 90:10
**handled** [1] - 15:6
**handles** [1] - 106:15
**handling** [5] - 18:8, 18:9, 83:2, 90:13, 91:3
**handwriting** [4] - 65:1, 65:2, 65:3, 100:2
**hang** [1] - 95:15
**happen** [2] - 17:6, 83:15
**happened** [7] - 13:6, 13:17, 15:23, 15:24, 20:22, 86:6, 86:7
**happening** [2] - 17:5, 86:5
**happens** [2] - 101:14, 113:7
**happy** [1] - 106:23
**hard** [3] - 29:6, 67:15, 74:18
**harder** [2] - 36:15, 117:2
**head** [1] - 86:25
**heading** [2] - 21:19, 22:8, 22:16
**health** [1] - 112:8
**hear** [8] - 15:25, 95:12, 95:17, 105:18, 106:17, 106:19, 106:20, 106:23
**heard** [7] - 83:11, 91:19, 92:14, 95:20, 98:4, 100:10, 106:25
**hearing** [13] - 3:5, 4:10, 4:18, 5:20, 8:12, 45:4, 95:2, 110:1, 118:19, 121:5, 122:3, 122:4, 122:5
**HEARING** [1] - 1:15
**hearings** [1] - 91:25
**heart** [1] - 107:10
**Heartland** [4] - 14:8, 14:9, 14:17, 15:10
**heat** [3] - 17:7, 19:5, 49:5
**heated** [1] - 19:3
**held** [3] - 3:1, 103:6, 122:3
**HELD** [1] - 1:16
**help** [2] - 84:13, 85:2
**hereby** [2] - 113:22, 122:2
**hereto** [1] - 122:8
**heretofore** [1] - 122:3
**herself** [2] - 18:16, 107:11
**hide** [1] - 65:24
**high** [3] - 32:23, 49:19, 109:6
**higher** [3] - 109:13, 116:18, 120:8
**highlight** [1] - 38:16
**highlighted** [1] - 38:22
**Highway** [1] - 11:16
**highway** [2] - 50:21, 50:23
**Hines** [49] - 28:14, 28:16, 28:19, 28:24, 29:2, 29:11, 29:21, 30:2, 31:11, 32:14, 32:20, 33:22, 34:3, 34:14, 62:14, 62:18, 62:23, 63:4, 63:11, 63:14, 63:22, 73:3, 73:9, 73:24, 74:1, 74:11, 74:16, 74:22, 76:19, 76:25,

77:11, 78:21, 78:25, 79:11, 79:13, 79:21, 87:2, 87:17, 96:4, 97:8, 97:13, 100:17, 101:11, 107:8, 107:10, 109:13, 109:20, 110:25, 111:9
**HINES** [1] - 28:16
**Hines's** [2] - 30:21, 110:18
**history** [12] - 5:9, 8:4, 8:8, 8:9, 8:10, 102:22, 107:15, 107:18, 108:4, 108:15, 111:12, 113:3
**hit** [1] - 85:12
**hold** [2] - 103:3, 110:6
**holder** [1] - 40:22
**hole** [1] - 37:3
**home** [1] - 63:25
**HON** [1] - 1:16
**Honor** [61] - 4:3, 4:7, 4:11, 4:14, 4:22, 5:2, 5:16, 5:25, 6:5, 6:9, 6:12, 6:16, 6:20, 6:23, 7:25, 8:21, 8:23, 9:5, 9:9, 9:11, 9:16, 43:14, 43:16, 71:4, 72:3, 75:7, 82:12, 82:15, 88:9, 92:10, 94:16, 94:22, 95:6, 95:9, 95:18, 97:20, 103:15, 104:5, 104:9, 104:18, 105:5, 105:8, 105:10, 105:12, 105:15, 105:16, 106:1, 106:11, 106:13, 106:24, 108:10, 110:9, 118:8, 119:6, 119:14, 119:16, 120:3, 120:20, 120:23, 121:1, 121:3
**Honorable** [1] - 122:3
**hood** [2] - 50:3, 50:5
**hope** [1] - 103:13
**hoping** [1] - 113:8
**hotline** [1] - 16:7
**hours** [1] - 85:3
**house** [2] - 20:14, 20:24
**houses** [1] - 12:22
**hub** [6] - 12:18, 12:19, 13:7, 51:7, 80:15, 85:20
**hunch** [2] - 85:17, 85:19
**Hunt** [6] - 42:2, 57:3, 98:2, 103:4, 103:18, 106:5
**Huss** [1] - 53:7
**hyphened** [1] - 53:8

**I**

**Idaho** [2] - 57:8, 57:13
**idea** [3] - 44:16, 66:6, 110:19
**identification** [1] - 5:7
**identified** [10] - 5:14, 16:8, 22:12, 25:21, 28:25, 63:20, 65:9, 87:24, 88:1, 106:4
**identifies** [1] - 34:9
**identify** [8] - 15:19, 19:25, 33:5, 35:16, 35:22, 36:15, 59:15, 78:6

**identifying** [2] - 38:9, 106:3
**II** [4] - 8:9, 8:10, 102:22, 107:15
**illegal** [1] - 112:16
**illegally** [1] - 54:22
**Illinois** [14] - 20:22, 21:1, 22:17, 22:21, 22:24, 23:5, 23:7, 27:24, 30:20, 57:15, 67:13, 73:10, 97:1, 99:22
**image** [3] - 33:16, 39:14, 39:15
**images** [8] - 30:16, 32:18, 33:3, 62:22, 63:7, 76:14, 86:15
**immediate** [1] - 116:3
**immediately** [5] - 91:17, 114:19, 115:2, 118:18
**impact** [1] - 5:7
**implication** [1] - 58:3
**impose** [4] - 3:22, 3:23, 3:24, 106:21
**imposed** [7] - 114:1, 114:21, 116:21, 117:7, 119:2, 120:7, 120:15
**imprinted** [1] - 31:15
**imprisoned** [1] - 113:23
**imprisonment** [7] - 4:19, 8:11, 102:23, 113:24, 113:25, 114:6, 115:16
**IN** [2] - 1:1, 122:9
**in-house** [1] - 20:14
**inadvertently** [1] - 79:20
**Inc** [1] - 36:24
**incarcerated** [3] - 24:23, 66:20, 115:9
**incarceration** [1] - 116:3
**incident** [3] - 23:13, 108:14, 108:17
**incidents** [1] - 90:10
**include** [1] - 11:17
**included** [1] - 77:19
**including** [3] - 96:3, 97:1, 98:18
**income** [2] - 108:1, 113:5
**incoming** [12] - 18:9, 19:10, 27:20, 29:23, 30:4, 30:8, 30:16, 32:2, 32:11, 51:7, 80:12, 80:14
**Incorporated** [5] - 36:10, 42:18, 43:1, 103:5, 106:6
**incorrect** [1] - 70:19
**increase** [1] - 108:23
**increased** [1] - 117:1
**increases** [1] - 102:12
**INDEX** [1] - 2:1
**Indiana** [2] - 57:16, 67:21
**indicated** [8] - 59:22, 73:20, 80:5, 91:21, 97:13, 103:12, 109:16, 122:3
**indicates** [2] - 30:12, 46:12
**indicating** [1] - 58:13

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 130 of 139

**indication** [2] - 88:21, 116:13
**indicted** [1] - 73:9
**indictment** [2] - 3:13, 119:9
**individual** [6] - 26:21, 27:5, 28:13, 49:17, 79:22, 107:13
**individuals** [8] - 24:16, 24:24, 24:25, 25:12, 26:13, 62:15, 78:20, 87:11
**Industries** [1] - 106:5
**Industry** [1] - 102:17
**inefficient** [1] - 93:16
**inevitable** [1] - 109:5
**inference** [1] - 111:6
**influence** [1] - 118:1
**information** [28] - 16:3, 20:8, 21:11, 22:1, 22:5, 23:16, 28:6, 35:8, 37:16, 37:19, 37:20, 54:7, 54:24, 58:4, 58:6, 64:2, 65:13, 67:6, 71:14, 73:1, 73:15, 73:18, 78:8, 93:6, 94:7, 97:12, 100:15, 118:22
**informed** [5] - 19:9, 20:21, 28:20, 71:25, 118:16
**initial** [2] - 15:1, 15:3
**initials** [3] - 25:6, 25:8, 27:6
**initiated** [2] - 73:4, 73:6
**injury** [1] - 111:19
**ink** [1] - 31:16
**inmate** [1] - 116:10
**innuendo** [1] - 75:2
**inside** [6] - 14:25, 46:1, 46:2, 51:18, 52:2, 83:3
**Inspection** [1] - 14:21, 91:8
**Inspector** [5] - 10:17, 10:21, 11:2, 91:5, 98:4
**inspector** [2] - 11:1, 90:6
**inspectors** [7] - 10:25, 15:8, 15:13, 60:5, 87:6, 91:5, 91:16
**instance** [2] - 56:2, 71:17
**instances** [2] - 83:13, 83:18
**instead** [3] - 52:8, 54:2, 117:22
**institution** [5] - 14:8, 115:13, 118:9, 118:13, 118:24
**intend** [1] - 9:14
**intended** [4] - 7:8, 102:17, 103:3, 103:8
**intent** [2] - 74:8, 88:18
**interest** [2] - 115:24, 115:25
**interested** [1] - 122:8
**interior** [4] - 46:5, 49:12, 54:9, 98:19
**internal** [6] - 11:2, 60:10, 60:13, 60:16, 60:20, 69:6
**internally** [1] - 20:12
**interpret** [1] - 47:1
**interpreted** [1] - 74:12
**interrupted** [1] - 14:19
**Interruption** [1] - 57:10
**interview** [2] - 67:4, 75:25

**interviewed** [12] - 24:20, 24:22, 24:24, 25:8, 65:8, 66:19, 71:19, 75:24, 75:25, 76:5, 100:6, 100:11
**interviews** [1] - 100:8
**introduced** [1] - 45:4
**inventing** [1] - 65:11
**investigate** [3] - 15:14, 69:15, 69:18, 81:14
**investigated** [2] - 69:8, 87:6
**investigating** [3] - 16:19, 28:12, 28:19
**investigation** [32] - 3:10, 8:13, 12:1, 12:4, 12:5, 12:11, 13:21, 15:1, 15:4, 16:4, 17:7, 19:2, 19:5, 22:2, 22:12, 23:5, 24:14, 25:15, 25:23, 27:24, 37:12, 41:21, 60:10, 60:13, 60:16, 60:20, 71:14, 82:2, 82:3, 85:7, 90:16, 95:14
**investigations** [6] - 28:10, 69:23, 70:4, 81:20, 81:21, 82:1
**investigators** [3] - 28:7, 28:8, 28:19
**invoices** [2] - 19:11, 19:20
**involved** [12] - 13:21, 16:19, 17:25, 18:8, 22:24, 29:19, 64:22, 78:20, 85:22, 87:9, 90:15, 111:10
**involvement** [1] - 65:25
**involving** [4] - 12:6, 13:22, 28:13, 90:16
**IOWA** [1] - 1:1
**Iowa** [24] - 1:10, 1:13, 1:18, 1:24, 11:12, 11:18, 11:21, 19:14, 27:18, 42:4, 59:7, 59:8, 59:17, 69:18, 69:19, 81:8, 81:16, 91:10, 107:21, 115:6, 115:21, 120:11, 122:2, 122:13
**IS** [1] - 89:25
**issue** [3] - 20:11, 60:11, 95:20
**issues** [15] - 55:10, 91:11, 94:10, 95:12, 95:14, 98:5, 98:8, 98:10, 99:14, 100:9, 106:15, 111:21, 112:23
**item** [1] - 12:14

## J

**Jackson** [1] - 54:21
**jail** [3] - 108:20, 108:21, 108:24
**January** [10] - 16:2, 16:8, 19:1, 70:17, 89:2, 89:11, 100:11, 100:14, 112:21, 122:10
**Jill** [1] - 3:9
**JoAnn** [1] - 53:6
**Joanne** [1] - 91:10

**job** [8] - 18:4, 71:2, 85:22, 92:2, 107:19, 109:9, 113:1, 113:2
**joking** [2] - 74:4, 74:8
**Joshua** [1] - 40:20
**jpeg** [3] - 30:9, 30:16, 31:14
**Judge** [3] - 5:21, 86:12, 88:24
**judgment** [2] - 113:21, 114:15
**July** [1] - 15:24
**June** [5] - 3:12, 26:19, 27:4, 27:10, 79:25
**junk** [1] - 81:1
**Jurisic** [51] - 3:3, 4:25, 6:7, 12:6, 16:9, 16:19, 25:12, 26:4, 28:24, 29:1, 29:11, 30:2, 31:11, 32:12, 32:17, 33:11, 33:19, 33:24, 43:11, 45:1, 58:3, 59:9, 62:12, 63:3, 63:11, 63:22, 64:3, 65:17, 66:11, 71:8, 71:15, 74:1, 74:12, 74:16, 88:25, 89:10, 94:13, 98:21, 100:13, 106:20, 109:14, 110:1, 111:20, 112:14, 113:4, 113:21, 116:2, 118:8, 118:12, 119:11, 120:5
**JURISIC** [1] - 1:6
**Jurisic's** [6] - 25:24, 32:3, 63:25, 65:3, 95:2, 108:15

## K

**Kansas** [1] - 91:10
**keep** [2] - 112:24, 118:15
**Kendall** [6] - 42:2, 57:3, 98:2, 103:4, 103:18, 106:5
**Kentucky** [1] - 57:14
**key** [1] - 24:6
**keypad** [1] - 54:5
**Keys** [1] - 40:20
**kind** [8] - 16:3, 19:15, 24:5, 36:17, 37:25, 42:14, 50:1, 113:16
**kindness** [1] - 107:9
**knowledge** [6] - 4:11, 44:17, 44:19, 50:17, 53:11, 56:3

## L

**lack** [1] - 98:24
**ladder** [1] - 109:13
**lady** [1] - 88:5
**lapse** [1] - 92:2
**large** [1] - 107:5
**last** [7] - 10:10, 25:5, 36:8, 36:22, 52:6, 58:7, 81:10
**late** [2] - 15:19, 20:5
**law** [13] - 10:18, 10:24, 23:7, 28:12, 30:20, 59:23, 60:12,

64:2, 64:12, 68:10, 71:18, 85:5, 113:5
**law-abiding** [1] - 113:5
**learn** [2] - 23:10, 70:16
**learned** [4] - 38:4, 38:8, 39:1, 41:21
**lease** [1] - 48:1
**leases** [1] - 92:23
**least** [12] - 16:4, 34:18, 61:21, 64:10, 67:3, 72:15, 74:24, 93:25, 97:15, 98:15, 99:7, 115:14
**Leave** [1] - 32:21
**leave** [3] - 18:1, 18:5, 58:25
**leaving** [1] - 18:10
**left** [19] - 49:5, 49:9, 49:11, 52:25, 53:2, 53:9, 54:5, 54:11, 83:3
**legend** [1] - 24:6
**legitimate** [1] - 23:21
**length** [1] - 110:16
**less** [6] - 7:10, 18:23, 18:24, 37:18, 62:18
**letter** [7] - 46:11, 46:17, 48:2, 48:10, 48:12, 52:6, 53:20
**level** [7] - 7:3, 7:16, 7:25, 8:3, 8:9, 102:19, 102:21
**levels** [1] - 8:2
**life** [3] - 113:5, 113:16, 113:17
**light** [1] - 88:8
**likelihood** [2] - 101:13, 102:13
**likely** [11] - 47:4, 59:18, 71:22, 85:25, 92:20, 96:13, 107:10, 111:25, 117:2, 117:10, 117:11
**limited** [3] - 108:15, 111:12, 112:9
**line** [2] - 36:8, 40:10
**lines** [3] - 22:11, 41:11, 96:1
**list** [2] - 64:6, 64:8
**listed** [6] - 23:20, 35:2, 35:12, 38:2, 56:17, 62:8
**listing** [1] - 89:12
**literally** [2] - 57:2, 57:6
**live** [3] - 9:15, 113:4, 113:15
**lived** [2] - 67:8, 67:10
**living** [1] - 107:20
**loaded** [1] - 18:4
**local** [1] - 114:10
**located** [4] - 11:18, 27:17, 42:20, 59:17
**location** [25] - 45:19, 50:24, 52:13, 52:15, 54:22, 55:18, 55:25, 58:22, 59:10, 71:22, 72:7, 85:20, 89:1, 92:15, 93:3, 93:7, 93:20, 94:1, 94:8, 94:13, 98:17, 117:16, 117:21, 117:24
**locations** [5] - 41:6, 58:20, 78:6, 83:19, 90:9

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 131 of 139

**lock** [3] - 48:3, 48:14, 52:16
**locked** [2] - 52:10, 54:2
**loitering** [2] - 55:5, 98:12
**look** [20] - 23:20, 24:14, 29:18, 30:7, 30:15, 37:7, 38:6, 39:4, 45:22, 49:19, 49:22, 77:22, 81:17, 86:4, 93:9, 93:22, 101:21, 101:23, 101:25, 102:9
**looked** [6] - 14:22, 15:18, 16:24, 35:5, 60:14, 85:8
**looking** [21] - 15:9, 20:14, 21:17, 21:20, 22:18, 26:15, 31:2, 34:17, 35:22, 36:5, 41:4, 41:11, 45:11, 60:17, 76:11, 79:12, 90:18, 91:1, 97:5, 107:18
**lookout** [1] - 84:20
**looks** [4] - 50:1, 105:20, 111:1, 113:12
**loop** [1] - 94:25
**Lori** [2] - 9:22, 10:9
**LORI** [3] - 2:3, 10:1, 10:10
**lose** [2] - 116:21, 116:24
**loss** [29] - 5:8, 7:6, 7:9, 9:19, 24:12, 38:20, 38:21, 39:5, 39:8, 39:21, 39:23, 62:8, 95:12, 96:22, 96:24, 97:25, 101:2, 101:4, 101:20, 102:11, 102:15, 102:17, 102:19, 103:8, 103:10, 103:17, 104:2, 104:10, 108:11
**losses** [4] - 102:24, 103:4, 103:20, 105:7
**lost** [2] - 38:25, 58:4
**low** [3] - 32:21, 32:22, 116:13
**lower** [4] - 33:10, 100:20, 116:16, 116:24
**Lux** [1] - 53:20

## M

**M.B** [1] - 25:8
**ma'am** [1] - 10:15
**machine** [1] - 1:20
**mad** [2] - 33:11, 33:20
**made** [30] - 16:4, 16:15, 27:13, 31:21, 33:5, 33:8, 33:14, 35:24, 36:10, 36:24, 40:10, 41:12, 41:19, 42:2, 42:10, 42:17, 43:6, 64:20, 76:1, 76:2, 77:17, 79:2, 93:22, 101:24, 114:24, 114:25, 115:1, 115:3, 115:4
**magazines** [1] - 80:25
**Mail** [18] - 18:17, 57:22, 57:23, 57:25, 80:5, 80:7, 80:9, 80:11, 80:15, 80:18, 80:20, 82:19, 82:25, 83:2, 83:3, 83:6, 88:16, 88:21

**mail** [78] - 3:14, 12:14, 12:18, 12:24, 13:8, 13:15, 13:22, 14:3, 16:9, 16:20, 17:4, 17:8, 17:22, 17:24, 18:3, 18:4, 18:9, 20:15, 27:20, 50:25, 51:3, 51:7, 51:21, 53:14, 53:15, 53:16, 57:21, 57:23, 58:4, 58:10, 59:24, 60:18, 65:25, 66:7, 69:9, 69:23, 70:17, 71:9, 80:10, 80:11, 80:13, 80:14, 80:25, 81:1, 81:7, 81:8, 81:10, 81:14, 81:17, 81:18, 81:24, 81:25, 82:3, 82:8, 83:16, 83:19, 84:15, 84:16, 85:14, 85:21, 85:23, 85:24, 86:1, 86:8, 86:13, 88:2, 90:19, 92:1, 92:24, 93:11, 93:15, 94:1, 94:12
**mailed** [4] - 5:25, 42:5, 58:7, 58:9
**mailers** [1] - 80:25
**mailing** [3] - 14:10, 27:22, 115:22
**main** [3] - 60:21, 67:15, 71:22
**Main** [27] - 12:2, 12:8, 12:12, 12:15, 13:4, 17:2, 17:6, 17:12, 17:14, 20:15, 60:14, 60:19, 60:22, 61:6, 61:16, 84:4, 84:9, 84:13, 85:2, 85:10, 85:23, 86:1, 86:7, 89:1, 89:10, 92:19, 100:14
**maintained** [2] - 14:16, 19:17
**maintaining** [1] - 71:2
**maintenance** [1] - 45:16
**majority** [3] - 37:6, 56:19, 78:12
**make** [11] - 5:17, 5:22, 18:2, 20:20, 93:11, 93:15, 98:7, 104:1, 107:20, 114:21, 115:10
**makes** [2] - 46:24, 93:25
**making** [6] - 20:5, 24:2, 107:21, 107:22, 107:23, 109:9
**male** [2] - 88:3, 88:6
**management** [1] - 76:1
**mandatory** [1] - 114:9
**March** [3] - 69:22, 70:3, 76:10
**marijuana** [1] - 112:10
**marked** [1] - 53:7
**MARSHAL** [1] - 5:21
**Marshal** [3] - 117:19, 118:15
**Marshal's** [1] - 118:20
**marshals** [2] - 4:17, 117:20
**Marshals** [1] - 118:10
**Maryland** [1] - 57:15
**matched** [1] - 65:2
**math** [1] - 97:6
**matter** [5] - 3:2, 3:4, 12:6, 27:9, 96:24

**mean** [18] - 18:18, 24:7, 31:16, 32:4, 32:22, 39:12, 39:19, 40:14, 58:23, 58:24, 61:14, 62:10, 66:23, 66:25, 70:6, 71:8, 71:9, 74:9
**meaning** [1] - 60:6
**means** [13] - 31:17, 32:5, 39:13, 39:20, 45:25, 46:1, 47:4, 47:8, 54:1, 57:23, 71:10, 116:15, 117:1
**meant** [2] - 17:21, 68:8
**memorandum** [2] - 8:15, 9:2
**men's** [1] - 51:22
**mentally** [1] - 112:8
**mention** [1] - 110:14
**mentioned** [3] - 26:25, 97:22
**message** [9] - 26:5, 29:4, 30:8, 30:13, 31:14, 32:11, 76:18, 76:25, 77:11
**messages** [14] - 26:3, 26:6, 32:2, 32:21, 73:2, 73:6, 73:7, 74:2, 87:10, 87:12, 87:14, 87:15, 99:19
**Messenger** [6] - 26:1, 26:15, 29:2, 29:3, 73:7, 77:13
**met** [1] - 18:2
**methamphetamine** [1] - 112:10
**Michael** [11] - 25:4, 25:14, 25:18, 26:2, 26:3, 26:5, 67:3, 67:6, 68:12, 68:18, 68:25
**microphone** [1] - 10:6
**mid** [1] - 17:7
**middle** [2] - 30:7, 37:25
**might** [7] - 16:5, 28:8, 38:25, 50:6, 62:25, 81:3, 81:25
**million** [1] - 7:10
**minor** [1] - 108:15
**minus** [1] - 104:3
**minute** [1] - 115:4
**minutes** [1] - 118:5
**misplaced** [1] - 85:20
**miss** [1] - 85:12
**missing** [16] - 13:22, 14:3, 20:1, 21:9, 21:23, 22:13, 35:13, 35:15, 35:17, 37:12, 37:17, 37:21, 41:13, 58:13, 58:14, 96:11
**moderate** [1] - 108:16
**Moines** [5] - 11:7, 11:8, 11:12, 11:14, 82:10
**moment** [3] - 71:3, 72:2, 82:14
**money** [4] - 12:15, 92:22, 107:12, 111:8
**monitoring** [1] - 112:15
**Montana** [1] - 57:16
**month** [4] - 17:3, 17:12, 17:15, 56:1
**monthly** [3] - 54:21, 115:10, 115:12

**mean** [18] - 18:18, 24:7,
**months** [9] - 8:11, 15:23, 49:6, 102:23, 107:3, 108:25, 109:23, 113:24, 117:3
**moonlighted** [1] - 62:2
**moonlighting** [1] - 98:22
**Morfitt** [21] - 3:6, 3:25, 7:20, 9:3, 9:18, 9:21, 10:12, 86:22, 88:7, 89:17, 90:2, 94:21, 95:5, 97:18, 103:12, 105:14, 106:10, 106:23, 119:5, 119:12, 121:2
**MORFITT** [42] - 1:10, 2:3, 2:4, 2:6, 4:3, 4:7, 4:11, 4:14, 4:21, 7:24, 8:23, 9:5, 9:9, 9:22, 10:14, 43:14, 75:7, 75:9, 82:12, 88:9, 89:18, 90:4, 92:10, 94:16, 94:22, 95:6, 95:18, 103:15, 104:5, 104:9, 104:18, 104:22, 105:5, 105:8, 105:10, 105:12, 105:15, 106:11, 106:24, 119:6, 119:14, 121:3
**morning** [7] - 9:24, 43:19, 43:20, 80:14, 80:16, 83:7, 83:16
**most** [8] - 13:7, 59:2, 69:3, 72:9, 78:9, 85:25, 96:12, 107:10
**mostly** [1] - 78:2
**mother** [2] - 112:4
**motion** [2] - 8:1, 119:8
**motivated** [1] - 107:12
**motivation** [1] - 111:11
**move** [4] - 7:24, 44:23, 92:19, 95:15
**moved** [5] - 46:19, 48:4, 75:20, 83:8, 92:19
**moves** [1] - 119:7
**moving** [5] - 8:19, 9:8, 27:23, 33:20, 47:22
**MR** [81] - 2:3, 2:4, 2:4, 2:5, 2:5, 2:6, 2:7, 4:3, 4:7, 4:11, 4:14, 4:21, 5:2, 5:16, 5:25, 7:24, 8:21, 8:23, 9:5, 9:9, 9:11, 9:16, 9:22, 10:14, 43:14, 43:16, 43:18, 57:11, 59:21, 71:3, 71:6, 71:7, 72:2, 72:5, 75:4, 75:7, 75:9, 82:12, 82:14, 82:18, 83:23, 88:9, 88:11, 88:13, 89:14, 89:18, 90:4, 92:10, 92:13, 94:14, 94:16, 94:22, 94:25, 95:6, 95:9, 95:18, 97:20, 103:15, 104:5, 104:9, 104:18, 104:22, 104:24, 105:5, 105:8, 105:10, 105:12, 105:15, 105:18, 105:20, 106:1, 106:11, 106:13, 106:24, 108:10, 118:8, 119:6, 119:14, 120:3, 121:1, 121:3
**multiple** [5] - 41:2, 41:8,

64:22, 81:14, 105:5
**Murray** [5] - 1:19, 1:23, 122:2, 122:11, 122:12
**must** [13] - 3:24, 114:8, 114:9, 114:10, 114:11, 114:14, 114:18, 115:4, 115:10, 115:17, 115:20, 118:12, 118:15

## N

**name** [38] - 6:8, 10:7, 10:8, 10:9, 10:10, 16:9, 16:16, 16:17, 31:18, 31:23, 36:16, 37:6, 40:8, 40:9, 40:13, 40:15, 40:21, 40:22, 41:5, 41:8, 45:9, 45:10, 64:7, 64:10, 64:11, 64:17, 64:24, 65:12, 65:13, 66:15, 69:3, 78:3, 88:1, 88:6, 89:23, 89:24, 91:9, 99:25
**named** [3] - 28:13, 66:12, 79:22
**names** [20] - 25:1, 25:3, 40:4, 40:6, 40:7, 40:18, 41:1, 43:5, 45:6, 50:17, 64:23, 69:4, 77:23, 77:25, 96:5, 96:6, 96:9
**naming** [1] - 19:1
**narrative** [2] - 5:9, 5:11
**Nathan** [21] - 3:8, 4:24, 5:22, 6:6, 6:15, 6:17, 8:19, 9:14, 88:10, 94:23, 95:8, 97:19, 104:23, 105:17, 106:12, 106:20, 108:9, 112:5, 118:4, 120:2, 120:24
**NATHAN** [41] - 1:12, 2:4, 2:5, 2:5, 2:7, 5:2, 5:16, 5:25, 8:21, 9:11, 9:16, 43:16, 43:18, 57:11, 59:21, 71:3, 71:6, 71:7, 72:2, 72:5, 75:4, 82:14, 82:18, 83:23, 88:11, 88:13, 89:14, 92:13, 94:14, 94:25, 95:9, 97:20, 104:24, 105:18, 105:20, 106:1, 106:13, 108:10, 118:8, 120:3, 121:1
**nation** [1] - 100:19
**national** [2] - 69:11, 70:10
**nationwide** [6] - 69:8, 69:25, 70:4, 70:17, 92:21, 100:21
**naturally** [1] - 112:4
**nature** [3] - 73:23, 80:6, 102:6
**near** [2] - 32:10, 75:19
**nearby** [1] - 54:22
**nearly** [2] - 107:4, 108:22, 109:9
**necessarily** [3] - 35:20, 96:23, 97:11
**necessary** [5] - 102:19, 108:13, 109:24, 110:12, 113:20
**need** [3] - 5:19, 19:24, 29:7

**needed** [6] - 17:16, 18:5, 20:10, 51:19, 54:6, 85:2
**needs** [3] - 83:16, 107:25, 114:5
**negotiated** [1] - 24:8
**Nevada** [1] - 57:14
**never** [13] - 15:3, 22:3, 24:8, 24:10, 25:19, 25:20, 39:15, 39:20, 59:9, 63:24, 65:14, 74:3, 108:20
**nevertheless** [1] - 112:6
**New** [2] - 57:14
**new** [2] - 16:4, 117:6
**next** [10] - 16:2, 22:9, 33:25, 46:21, 49:23, 54:4, 78:11, 89:17, 120:12, 120:13
**nicer** [1] - 116:16
**Nicholas** [5] - 25:14, 26:7, 26:10, 67:7, 68:18
**Nick** [3] - 68:21, 68:23, 69:2
**nine** [1] - 15:21
**NOB** [1] - 89:24
**NOBIS** [2] - 2:6, 89:19
**Nobis** [2] - 89:18, 89:24
**Nobis's** [1] - 98:4
**none** [10] - 52:9, 63:11, 63:17, 64:15, 64:17, 64:23, 65:9, 94:11, 100:4, 100:6
**noninstitution** [1] - 115:14
**nonpictured** [2] - 99:8, 100:24
**Nord** [26] - 14:7, 14:10, 14:13, 14:23, 15:7, 15:9, 15:22, 15:25, 19:16, 20:11, 21:19, 21:23, 22:3, 22:5, 27:17, 56:21, 56:25, 60:1, 60:2, 60:7, 60:13, 61:3, 97:24, 97:25, 103:5, 106:6
**normal** [1] - 52:9
**normally** [1] - 74:7
**north** [1] - 11:16
**North** [1] - 57:17
**NORTHERN** [1] - 1:1
**Northern** [4] - 73:10, 115:5, 115:21, 120:11
**note** [3] - 96:21, 101:18, 112:19
**noted** [5] - 5:3, 91:20, 101:2, 107:14, 112:5
**noteworthy** [2] - 111:13, 112:5
**nothing** [10] - 15:24, 43:14, 66:14, 82:12, 92:10, 99:6, 99:19, 119:24, 120:3
**notice** [2] - 120:10, 120:13
**notified** [3] - 38:3, 79:2, 118:14
**notify** [1] - 115:20
**November** [2] - 46:19, 72:13
**nowhere** [1] - 64:8
**Nathan** [3] - 3:11, 5:3, 8:16,

9:2, 19:25, 20:2, 28:25, 29:20, 29:23, 29:25, 32:3, 38:15, 44:9, 55:16, 56:17, 56:18, 61:23, 61:25, 62:1, 62:5, 62:6, 62:11, 65:15, 65:16, 65:18, 87:20, 93:22, 107:5, 113:10, 118:16, 118:21
**numbers** [8] - 29:18, 69:11, 70:12, 95:22, 100:20, 101:19, 102:8
**numerous** [4] - 44:6, 61:2, 74:21, 98:8

## O

**object** [1] - 97:25
**objecting** [1] - 105:23
**objection** [5] - 4:22, 5:6, 8:22, 9:10, 95:4
**objections** [5] - 4:5, 5:3, 5:4, 5:14, 6:5
**obligation** [1] - 115:23
**obligations** [2] - 115:9, 115:16
**obscured** [1] - 37:7
**obtain** [1] - 25:24
**obtained** [2] - 28:21, 68:11
**obvious** [1] - 99:8
**obviously** [7] - 44:25, 63:11, 64:7, 66:12, 103:6, 106:25, 112:17
**occasionally** [1] - 62:1
**occasions** [1] - 85:25
**occupied** [2] - 44:3, 44:6
**occur** [1] - 85:25
**occurred** [6] - 15:2, 20:25, 71:22, 83:20, 85:24, 89:2
**occurs** [1] - 115:22
**October** [10] - 14:6, 30:16, 32:11, 34:19, 34:25, 36:2, 36:13, 36:25, 37:24, 69:7
**odds** [1] - 101:13
**OF** [2] - 1:1, 1:3
**offender** [1] - 116:11
**offenders** [1] - 116:4
**offense** [13] - 5:5, 7:3, 7:16, 7:17, 8:3, 8:9, 102:21, 108:16, 110:16, 111:18, 117:5, 117:12
**office** [11] - 5:25, 7:1, 7:2, 7:5, 7:8, 7:12, 7:18, 8:5, 15:14, 20:9, 117:11
**Office** [59] - 1:10, 1:12, 10:16, 10:21, 11:2, 11:17, 11:21, 11:25, 12:2, 12:8, 12:12, 13:4, 14:4, 15:15, 15:20, 16:6, 16:10, 17:2, 17:3, 17:6, 17:12, 17:14, 20:16, 22:13, 42:21, 45:8, 48:4, 48:13, 49:17, 60:19, 61:6, 61:16, 75:11, 75:16, 83:4, 84:5, 84:6, 84:9, 84:16,

85:2, 85:10, 85:15, 85:22, 85:23, 86:1, 86:2, 87:25, 90:22, 91:4, 91:5, 93:19, 95:3, 107:20, 107:23, 115:18, 117:8, 119:1
**OFFICER** [2] - 119:16, 119:24
**Officer** [3] - 3:10, 119:15, 119:23
**officer** [1] - 114:13
**officers** [1] - 85:6
**offices** [4] - 13:10, 80:17, 81:11, 83:10
**often** [3] - 18:14, 47:21, 74:1
**oftentimes** [1] - 66:4
**Ohio** [1] - 57:17
**OIG** [12] - 11:3, 15:14, 60:20, 60:24, 65:23, 69:8, 69:12, 69:15, 70:12, 70:15, 71:13, 81:15
**old** [1] - 109:2
**older** [1] - 88:5
**Olinger** [2] - 45:14, 46:11
**once** [6] - 17:7, 56:2, 72:9, 75:24, 79:1, 95:13
**one** [54] - 3:12, 4:14, 23:25, 24:1, 24:21, 24:23, 25:5, 26:6, 30:24, 31:2, 31:6, 31:19, 33:11, 33:13, 33:25, 34:6, 36:22, 37:3, 39:4, 42:25, 52:10, 55:2, 57:2, 58:23, 62:8, 63:6, 63:19, 63:20, 65:23, 67:10, 71:3, 71:17, 72:2, 74:2, 74:9, 77:22, 78:16, 81:6, 82:14, 86:4, 90:9, 91:23, 93:13, 93:25, 98:15, 103:18, 103:19, 105:15, 108:16, 110:23, 112:3, 116:8, 117:13, 119:16
**one's** [1] - 36:15
**ones** [11] - 22:16, 23:1, 34:4, 35:12, 38:22, 56:21, 67:13, 73:21, 93:10, 97:1, 97:12
**open** [16] - 3:1, 45:25, 46:15, 46:16, 46:18, 49:5, 49:9, 49:11, 49:14, 53:23, 54:2, 54:6, 54:12, 54:14, 54:15, 98:13
**opened** [2] - 53:2, 92:22
**opening** [2] - 46:7, 54:16
**operation** [3] - 11:22, 12:20, 92:16
**opinion** [2] - 71:21, 73:3
**opportunity** [5] - 4:1, 4:25, 110:2, 111:1, 113:4
**option** [2] - 3:21, 117:13
**orange** [4] - 38:15, 38:20, 38:22, 39:5
**order** [12] - 4:19, 12:15, 31:18, 113:24, 114:15, 116:3, 116:10, 117:4, 117:16,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 133 of 139

117:17, 117:18, 119:17
**ordered** [9] - 114:18, 114:21, 114:23, 115:7, 115:8, 116:11, 116:12, 116:23, 117:10
**Ordered** [1] - 1:21
**ordering** [1] - 118:18
**organization** [1] - 98:16
**organizations** [2] - 44:6, 44:14
**otherwise** [1] - 107:19
**outgoing** [4] - 29:19, 30:1, 31:14, 80:13
**outlier** [1] - 108:17
**outside** [4] - 14:24, 19:14, 62:25, 92:7
**outstanding** [1] - 119:5
**overhead** [1] - 45:23
**overlap** [1] - 102:9
**overnight** [4] - 53:1, 53:3, 80:18, 81:4
**overseen** [1] - 91:7
**owe** [1] - 115:15
**owed** [1] - 115:9
**own** [6] - 6:11, 65:24, 99:25, 111:10, 117:17, 117:22

**P**

**p.m** [1] - 121:6
**P.O** [16] - 12:15, 14:11, 14:14, 19:9, 19:17, 20:15, 27:22, 34:10, 42:4, 42:21, 84:15, 84:16, 86:8, 86:14, 86:16, 96:19
**PACER** [1] - 73:16
**page** [49] - 7:1, 21:4, 21:17, 22:7, 22:10, 22:11, 22:16, 29:5, 30:8, 30:15, 30:24, 31:2, 31:6, 31:13, 32:10, 33:13, 34:18, 34:19, 34:22, 34:24, 35:22, 36:5, 36:6, 36:8, 36:17, 36:22, 36:23, 37:4, 38:1, 39:4, 41:4, 41:11, 41:12, 76:17, 76:24, 77:9, 95:25, 96:1, 97:2, 101:23, 104:1, 104:6, 104:8
**PAGE** [1] - 2:2
**pages** [8] - 29:8, 31:9, 37:25, 76:12, 76:13, 77:16, 102:3
**paid** [3] - 19:11, 31:21, 39:25
**PAMurrayReporting@ gmail.com** [1] - 1:25
**paper** [1] - 31:15
**paragraph** [15] - 5:6, 5:8, 5:10, 5:11, 5:12, 6:4, 7:2, 7:5, 7:12, 8:6, 103:22, 106:3, 114:1
**paragraphs** [3] - 5:5, 5:8, 114:16
**parallel** [1] - 28:9
**parents** [1] - 112:2

**park** [3] - 54:22, 55:1, 98:12
**parked** [1] - 49:23
**parking** [1] - 55:4
**parole** [1] - 3:18
**part** [16] - 11:20, 15:1, 24:14, 30:19, 44:4, 45:20, 47:25, 61:24, 75:12, 85:1, 85:7, 87:5, 93:12, 96:5, 101:20, 103:8
**part-time** [2] - 61:24, 75:12
**partially** [1] - 46:16
**participate** [2] - 119:17, 119:20
**participating** [1] - 3:8
**particular** [7] - 23:11, 78:23, 93:6, 93:20, 94:7, 94:8, 99:15
**particularly** [4] - 11:17, 12:5, 49:19, 90:25
**parties** [3] - 8:14, 122:7, 122:8
**parts** [1] - 67:16
**pass** [1] - 51:20
**past** [1] - 90:7
**patent** [1] - 98:10
**Patrice** [5] - 1:19, 1:23, 122:2, 122:11, 122:12
**pay** [6] - 19:20, 70:9, 114:18, 114:20, 115:17, 115:24
**payable** [7] - 27:13, 33:14, 35:25, 36:10, 36:24, 40:10, 41:13, 41:19, 42:2, 42:17, 68:1, 77:17, 114:23, 114:24, 114:25, 115:1, 115:2
**paying** [4] - 27:20, 92:22, 113:1, 113:2
**payment** [2] - 115:3, 115:19
**payments** [7] - 14:13, 19:11, 20:6, 115:2, 115:4, 115:10, 115:12
**payor** [2] - 58:8, 58:9
**PD** [2] - 22:17, 23:1
**pending** [1] - 5:10
**Pennsylvania** [1] - 57:17
**people** [24] - 14:12, 24:21, 25:8, 25:13, 26:17, 28:9, 52:16, 54:22, 64:22, 65:6, 65:9, 66:4, 66:18, 74:4, 74:5, 74:7, 77:23, 79:1, 87:4, 87:9, 96:7, 98:12, 98:22, 117:9
**per** [1] - 115:14
**percent** [1] - 115:12
**perform** [4] - 84:5, 84:24, 85:6, 85:8
**performed** [1] - 92:18
**perhaps** [1] - 4:14
**period** [3] - 69:15, 70:22, 84:23
**periodically** [1] - 17:14
**permanent** [1] - 55:19
**permanently** [1] - 55:24
**person** [6] - 16:9, 20:15, 62:12, 64:14, 66:5, 83:1

**personal** [1] - 107:6
**personally** [1] - 3:7
**persons** [4] - 65:8, 100:3, 100:4, 100:6
**phone** [8] - 6:3, 28:22, 28:25, 29:25, 30:21, 65:14, 87:15, 118:21
**phonetic** [1] - 25:4
**phonetic)** [1] - 25:7
**photograph** [1] - 30:12
**photographed** [7] - 62:7, 62:11, 62:17, 63:3, 63:10, 63:21, 99:1
**photographs** [4] - 62:17, 101:12, 101:18, 101:21
**photos** [3] - 30:19, 30:24, 35:24
**physical** [5] - 74:17, 74:19, 74:24, 84:21, 109:21
**physically** [2] - 64:19, 112:8
**pick** [1] - 51:3
**picked** [2] - 20:15, 53:14
**picture** [4] - 27:10, 39:17, 77:10, 80:1
**pictures** [5] - 35:5, 35:20, 62:24, 96:2, 97:8
**piece** [2] - 12:24, 85:13
**pieces** [5] - 53:16, 58:1, 58:4, 59:24, 86:14
**place** [7] - 3:20, 100:8, 100:10, 110:22, 111:3, 122:3, 122:5
**placed** [1] - 114:6
**places** [2] - 8:8, 17:1
**placing** [1] - 84:16
**Plaintiff** [1] - 1:4
**plan** [1] - 115:3
**pleadings** [1] - 8:14
**pled** [8] - 3:12, 3:13, 7:17, 27:8, 43:11, 63:18, 79:19, 103:6
**plus** [1] - 105:3
**PNDC** [1] - 92:25
**PO** [2] - 1:24, 122:13
**point** [21] - 10:22, 20:1, 45:21, 45:22, 46:21, 48:5, 49:1, 51:16, 52:6, 53:8, 54:4, 54:11, 54:13, 54:18, 59:6, 59:24, 64:12, 71:18, 76:1, 81:6, 106:16
**points** [1] - 8:8
**Police** [1] - 22:22
**police** [1] - 22:24
**poor** [1] - 113:8
**popping** [1] - 41:2
**portion** [13] - 11:16, 29:10, 29:15, 31:3, 33:4, 38:25, 42:1, 59:22, 62:14, 62:25, 104:7, 115:15, 115:23
**portions** [2] - 31:10, 90:17
**pose** [1] - 116:13

**position** [4] - 4:18, 7:14, 7:21, 113:6
**possess** [1] - 114:11
**possession** [4] - 64:3, 99:13, 99:15, 99:17
**possibility** [4] - 3:18, 15:13, 72:20, 93:14
**possible** [4] - 35:15, 47:4, 101:6, 101:9
**possibly** [1] - 83:12
**Post** [49] - 11:17, 11:21, 11:25, 12:2, 12:8, 12:12, 13:4, 14:4, 15:15, 15:20, 16:6, 16:10, 17:2, 17:3, 17:6, 17:12, 17:14, 20:16, 22:13, 42:21, 45:8, 48:4, 48:13, 49:17, 60:19, 61:6, 61:16, 75:11, 75:16, 83:3, 84:4, 84:6, 84:9, 84:13, 85:2, 85:10, 85:15, 85:21, 85:23, 86:2, 87:25, 90:22, 91:3, 93:19, 95:3, 107:20, 107:23
**postal** [32] - 3:15, 10:25, 11:1, 12:2, 12:13, 13:23, 14:25, 15:8, 15:13, 25:21, 27:3, 45:6, 45:24, 51:13, 51:20, 55:1, 60:5, 60:17, 70:16, 72:21, 72:22, 72:23, 76:1, 81:10, 84:20, 87:6, 87:25, 90:6, 91:4, 91:12, 91:15
**Postal** [19] - 10:16, 10:23, 11:11, 14:1, 14:21, 15:7, 44:4, 44:13, 44:18, 44:21, 47:9, 50:10, 50:20, 70:24, 91:4, 91:7, 91:8, 92:20, 113:1
**posted** [1] - 53:13
**postmaster** [10] - 17:14, 71:19, 71:21, 71:24, 72:1, 84:12, 85:10, 88:25, 89:2, 100:11
**potential** [2] - 14:3, 113:11
**potentially** [2] - 77:6, 92:1
**pregnant** [2] - 109:1, 112:2
**prep** [1] - 71:8
**preparation** [1] - 8:12
**preponderance** [10] - 9:20, 96:1, 96:12, 99:7, 100:23, 101:3, 101:5, 102:16, 103:2
**present** [3] - 3:7, 9:15, 18:14
**presentence** [11] - 3:10, 4:2, 5:1, 5:6, 5:15, 8:13, 95:14, 103:22, 107:1, 114:2, 114:17
**pressured** [1] - 111:2
**pretrial** [2] - 112:19, 116:20
**pretty** [4] - 11:14, 50:2, 74:9, 102:25
**previously** [4] - 72:14, 108:23, 116:20, 119:2
**primarily** [1] - 76:13
**primary** [2] - 109:3, 116:8

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 134 of 139

**prison** [8] - 3:18, 3:19, 107:4, 112:1, 112:13, 112:18, 113:9, 117:7
**Prisons** [12] - 113:23, 114:3, 115:11, 116:12, 117:14, 117:21, 117:25, 118:10, 118:14, 118:17, 119:3, 119:22
**private** [1] - 7:14
**privilege** [5] - 4:20, 116:1, 116:2, 116:4, 116:22
**pro** [1] - 115:8
**probable** [2] - 101:10, 101:17
**PROBATION** [2] - 119:16, 119:24
**Probation** [3] - 3:9, 115:18, 119:1
**probation** [10] - 3:21, 3:22, 7:1, 7:2, 7:5, 7:8, 7:12, 7:18, 8:5, 114:13
**problem** [1] - 92:8
**proceed** [2] - 10:12, 90:2
**proceeding** [1] - 45:1
**proceedings** [3] - 3:1, 122:4, 122:5
**Proceedings** [1] - 121:6
**process** [2] - 20:16, 91:24
**processed** [2] - 58:24, 92:25
**processing** [16] - 11:13, 11:14, 13:2, 13:7, 16:25, 58:23, 59:3, 59:7, 59:8, 59:10, 59:14, 59:16, 67:15, 93:11, 93:16
**Processing** [1] - 92:25
**produced** [1] - 21:15
**product** [1] - 21:15
**profanity** [2] - 73:25, 74:10
**proffer** [2] - 94:25, 95:5
**program** [2] - 119:21
**Program** [1] - 115:11
**pronouncing** [1] - 6:7
**proper** [3] - 18:3, 18:5, 104:13
**properly** [3] - 97:17, 102:20, 107:15
**prosecute** [1] - 117:11
**prosecuted** [2] - 117:6, 117:8
**prove** [1] - 101:2
**proven** [2] - 96:1, 96:11
**provide** [4] - 20:2, 37:15, 95:22, 118:21
**provided** [3] - 21:9, 22:5, 35:9
**providing** [1] - 73:1
**proximity** [2] - 114:4, 117:24
**PSR** [4] - 6:1, 6:4, 97:4, 109:2
**Public** [2] - 1:12, 3:8
**public** [1] - 7:14
**Publishing** [6] - 42:2, 57:3,

98:2, 103:4, 103:19, 106:5
**pull** [2] - 10:5, 38:18
**punishable** [1] - 3:17
**purchase** [2] - 12:14, 12:15
**purchased** [1] - 14:13
**purpose** [1] - 47:17
**purposes** [2] - 103:11, 105:1
**pursuant** [1] - 115:19
**pursue** [1] - 115:18
**put** [8] - 13:9, 17:3, 53:19, 58:9, 59:6, 69:11, 76:2, 93:9
**putting** [5] - 18:10, 84:15, 85:22, 86:1, 86:8

## Q

**quantified** [1] - 65:16
**quarter** [1] - 115:15
**questioning** [1] - 100:10
**questions** [7] - 6:18, 6:21, 83:24, 88:7, 88:8, 88:11, 120:21
**quick** [1] - 33:20, 77:22
**quickly** [1] - 103:15
**quite** [5] - 20:3, 86:23, 92:9, 93:17, 98:7

## R

**rails** [1] - 45:24
**raise** [2] - 9:24, 113:12
**range** [8] - 7:9, 8:11, 102:23, 107:2, 107:17, 108:7, 108:12, 113:19
**Rapids** [11] - 1:10, 1:12, 1:18, 1:24, 51:9, 59:18, 67:7, 67:11, 82:10, 90:8, 90:9, 90:12, 90:14, 92:25, 120:12, 122:13
**rare** [1] - 111:20
**rata** [1] - 115:8
**rate** [1] - 100:20
**rather** [1] - 97:15
**rating** [3] - 116:15, 116:25, 117:1
**reach** [3] - 20:5, 23:7, 28:9
**reached** [6] - 20:17, 28:4, 28:18, 99:22, 99:23, 109:12
**reaching** [1] - 28:11
**read** [5] - 29:6, 46:3, 46:4, 46:24, 69:12
**real** [1] - 116:5
**really** [5] - 21:18, 96:23, 99:6, 109:21, 113:8
**rear** [7] - 43:22, 43:25, 44:9, 46:25, 47:5, 52:13, 52:14
**reason** [9] - 44:19, 44:24, 47:18, 47:23, 47:25, 48:20, 55:3, 107:25, 108:24
**reassured** [1] - 112:22

**receive** [2] - 7:22, 16:3
**received** [19] - 8:24, 8:25, 9:12, 9:13, 14:5, 14:20, 16:22, 19:1, 22:1, 22:4, 37:20, 39:15, 59:7, 71:13, 82:6, 83:18, 108:21, 108:23, 112:11
**receiving** [1] - 95:5
**recognize** [3] - 21:5, 29:8, 45:10
**recommend** [2] - 112:12, 119:20
**recommended** [1] - 114:2
**recommends** [2] - 107:1, 108:6
**record** [3] - 5:17, 5:23, 122:5
**recorded** [1] - 67:4
**recordings** [2] - 64:13, 100:3
**records** [4] - 25:24, 26:4, 26:16, 68:11
**Recovered** [1] - 22:17
**recovered** [14] - 22:25, 23:1, 23:11, 23:12, 23:15, 24:12, 29:13, 30:19, 30:25, 31:3, 31:6, 31:10, 33:4, 67:13
**recovery** [1] - 99:12
**recross** [1] - 82:13
**RECROSS** [4] - 2:5, 2:5, 82:17, 88:12
**recross-examination** [1] - 82:13
**red** [3] - 40:4, 40:6, 77:23
**redirect** [2] - 75:6, 94:15
**REDIRECT** [2] - 2:4, 75:8
**redo** [1] - 104:15
**reduction** [2] - 7:19, 7:22
**refer** [2] - 42:15
**referred** [1] - 80:11
**reflect** [4] - 37:20, 40:22, 41:12, 102:10
**reflected** [11] - 27:9, 35:6, 36:6, 37:19, 37:24, 38:13, 41:17, 63:4, 97:7, 102:4, 104:6
**reflects** [2] - 38:20, 109:2
**regarding** [10] - 58:5, 58:6, 73:5, 73:18, 83:19, 91:25, 95:12, 98:5, 100:15, 106:3
**regardless** [1] - 99:18
**region** [1] - 11:11
**regular** [2] - 18:20, 57:21
**reject** [1] - 110:19
**related** [4] - 23:14, 26:21, 27:24, 122:6
**relates** [1] - 90:25
**relating** [2] - 69:23, 70:4
**relationship** [1] - 73:1
**relative** [3] - 26:7, 67:8, 122:7
**release** [11] - 3:20, 111:23, 112:15, 112:20, 113:9, 114:6, 114:7, 114:8, 115:16, 116:20,

118:25
**released** [1] - 24:23
**remain** [2] - 46:17, 118:25
**remained** [1] - 75:22
**remaining** [8] - 63:9, 63:12, 63:21, 64:4, 97:24, 98:25, 99:8, 100:24
**remains** [2] - 115:23, 119:5
**remember** [3] - 20:2, 24:25, 78:16
**removed** [1] - 40:8
**reorganization** [1] - 92:21
**rephrase** [2] - 62:10, 66:14
**replacement** [1] - 40:11
**replies** [1] - 33:24
**report** [20] - 3:10, 4:2, 4:6, 5:1, 5:6, 5:15, 5:23, 6:11, 6:14, 6:18, 6:22, 8:14, 69:6, 95:15, 103:23, 107:1, 114:2, 114:17, 118:19, 118:23
**reported** [9] - 1:19, 91:15, 91:17, 91:23, 94:11, 112:21, 118:17, 119:3, 122:3
**Reporter** [4] - 1:20, 1:23, 122:2, 122:12
**reporter** [2] - 10:8, 57:10
**reports** [4] - 69:16, 83:18, 94:12, 98:5
**represent** [4] - 38:16, 40:6, 108:22, 120:17
**represented** [2] - 3:5, 3:7
**reprimanded** [1] - 70:25
**request** [1] - 118:22
**requested** [1] - 117:23
**requirement** [1] - 115:25
**residence** [2] - 99:12, 115:22
**residential** [1] - 119:20
**resolution** [1] - 81:23
**resolved** [2] - 81:21, 81:22
**resources** [1] - 115:14
**respecting** [4] - 72:15, 73:23, 97:23, 98:9
**respective** [1] - 23:22
**responded** [1] - 39:21
**responds** [3] - 32:14, 33:22, 34:2
**response** [2] - 34:6, 113:3
**responsibility** [2] - 7:19, 8:2
**Responsibility** [1] - 115:11
**responsible** [7] - 14:25, 58:3, 60:7, 102:13, 102:16, 103:18, 117:20
**rest** [2] - 22:9, 103:23
**restitution** [9] - 5:13, 9:20, 103:11, 104:13, 105:1, 105:13, 105:25, 114:22, 115:7
**restroom** [1] - 52:4
**result** [1] - 112:17
**resulted** [1] - 8:7
**returned** [3] - 23:18, 23:25, 109:18

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR    Document 50    Filed 01/19/22    Page 135 of 139

**review** [3] - 4:1, 5:1, 73:2
**reviewed** [2] - 8:12, 8:14
**reviewing** [1] - 28:23
**right-hand** [1] - 102:1
**rights** [1] - 66:23
**ring** [6] - 28:13, 64:21, 87:5, 87:9, 96:5, 108:2
**risk** [2] - 116:13, 116:19
**risks** [1] - 116:7
**RMR** [2] - 1:23, 122:12
**roam** [1] - 51:20
**Rock** [10] - 20:25, 22:20, 23:2, 23:11, 24:16, 66:8, 67:14, 68:1, 97:1, 99:13
**role** [2] - 12:10, 110:18
**room** [5] - 51:22, 68:17, 68:19, 68:21, 68:22
**rooms** [1] - 68:18
**route** [9] - 50:22, 51:4, 51:5, 51:11, 51:18, 52:3, 54:8, 62:3, 98:18
**routes** [4] - 51:14, 51:19, 56:10, 62:5
**Rucker's** [3] - 36:9, 36:10, 36:16
**rule** [1] - 95:13
**rules** [1] - 95:21
**ruling** [3] - 103:12, 105:25, 106:9
**run** [1] - 51:14
**rural** [1] - 12:22
**RUSSELL** [1] - 1:10

### S

**S.E** [3] - 1:10, 1:12, 1:18
**S.T** [2] - 25:6, 25:9
**Sam** [1] - 89:25
**sample** [1] - 114:12
**saw** [8] - 5:4, 40:25, 46:25, 64:6, 69:6, 69:21, 73:21, 99:2
**schedule** [3] - 18:20, 85:11, 115:19
**school** [2] - 109:6, 112:6
**scored** [4] - 8:5, 96:22, 97:4, 97:17
**scoring** [1] - 107:16
**scratched** [2] - 32:4, 32:5
**screen** [1] - 43:21, 53:19
**search** [17] - 20:22, 20:24, 20:25, 22:20, 22:21, 22:24, 23:12, 23:13, 23:15, 30:20, 63:24, 66:8, 66:9, 66:12, 66:15, 68:17, 99:11
**seat** [2] - 10:4, 89:22
**second** [9] - 5:18, 17:9, 24:1, 48:5, 69:19, 88:14, 95:16, 104:25, 105:15
**Section** [2] - 3:16, 110:14
**section** [11] - 5:5, 7:4, 7:7,

7:15, 7:20, 7:23, 12:15, 21:18, 37:25, 38:1, 41:15
**secured** [1] - 52:24
**security** [20] - 52:20, 52:24, 54:20, 91:3, 91:7, 91:9, 91:11, 91:12, 91:14, 94:9, 98:5, 98:6, 98:8, 98:9, 114:4, 116:13, 116:14, 116:16, 116:24, 116:25
**see** [36] - 15:9, 21:19, 22:18, 30:8, 30:10, 30:16, 32:12, 32:14, 33:8, 33:10, 33:19, 35:24, 36:23, 40:4, 40:19, 41:1, 41:4, 41:25, 43:23, 44:9, 45:14, 45:18, 46:22, 49:1, 52:5, 52:11, 52:20, 53:13, 53:20, 53:24, 62:18, 65:1, 65:7, 77:3, 77:16, 101:24
**seem** [2] - 98:10, 107:25
**sees** [1] - 116:12
**seized** [1] - 28:20
**self** [6] - 4:20, 4:22, 116:2, 116:8, 116:11, 116:22
**self-surrender** [6] - 4:20, 4:22, 116:2, 116:8, 116:11, 116:22
**selfish** [1] - 107:12
**selling** [2] - 16:11, 88:2
**send** [3] - 14:14, 19:18, 116:15
**sending** [5] - 14:13, 30:2, 30:5, 96:3, 108:1
**sends** [1] - 32:17
**sense** [1] - 93:25
**sent** [21] - 17:13, 21:23, 22:3, 23:22, 27:10, 30:12, 57:6, 57:20, 62:11, 62:18, 63:3, 63:10, 63:14, 63:22, 80:1, 84:12, 85:2, 85:4, 97:7, 97:13, 101:12
**sentence** [22] - 3:19, 106:18, 106:22, 107:2, 107:4, 108:5, 108:6, 108:12, 108:21, 108:22, 108:24, 109:23, 110:4, 110:11, 113:18, 117:6, 118:13, 118:18, 119:4, 120:6, 120:8, 120:15
**SENTENCING** [1] - 1:15
**sentencing** [6] - 3:4, 8:15, 9:2, 106:15, 110:12, 113:20
**separate** [5] - 46:8, 46:12, 59:10, 80:9, 117:5
**separately** [1] - 9:6
**separating** [1] - 46:10
**September** [2] - 42:7, 69:7
**sequence** [3] - 13:15, 13:16, 59:7
**serious** [1] - 112:24
**serve** [2] - 118:17, 119:3
**served** [3] - 3:19, 81:11, 113:25

**service** [1] - 118:13
**Service** [20] - 10:16, 10:23, 11:11, 14:2, 14:21, 15:7, 44:4, 44:13, 44:18, 44:21, 47:10, 50:10, 50:20, 70:24, 91:4, 91:7, 91:8, 92:20, 113:2, 118:20
**services** [1] - 120:16
**set** [5] - 85:9, 90:23, 114:1, 114:15, 122:9
**sets** [2] - 97:9, 97:14
**setting** [1] - 116:18
**setup** [1] - 11:25
**seven** [4] - 23:20, 101:22, 102:4, 102:11
**Seventh** [2] - 1:10, 1:17
**seventh** [4] - 23:25, 51:16, 67:25, 118:20
**several** [1] - 117:8
**severity** [1] - 108:18
**sexual** [1] - 75:2
**shared** [4] - 45:19, 45:20, 46:8, 98:15
**Sharpe** [2] - 41:8, 43:3
**shift** [4] - 52:8, 83:2, 83:15, 85:4
**short** [1] - 108:24
**Shorthand** [2] - 1:19, 122:2
**shorthand** [2] - 1:20, 122:4
**shorthanded** [1] - 84:14
**show** [13] - 30:23, 33:16, 53:6, 71:15, 76:17, 79:4, 116:23, 117:4, 117:5, 117:11, 117:15, 117:18
**showing** [2] - 29:5, 64:13
**shown** [6] - 63:8, 97:2, 101:11, 101:22, 102:2, 102:9
**shows** [2] - 41:5, 52:13
**shut** [1] - 39:1
**sic** [2] - 16:12, 52:25
**side** [14] - 10:25, 11:2, 11:15, 39:3, 45:24, 46:22, 47:2, 48:7, 48:8, 48:13, 48:20, 53:23
**Side** [2] - 12:3, 12:21, 83:9, 92:15, 92:19, 93:2, 98:6, 98:16
**signatures** [1] - 100:1
**signed** [2] - 40:14, 64:20
**significant** [1] - 107:4, 108:23
**similar** [4] - 20:11, 27:16, 96:3, 119:21
**simply** [2] - 35:16, 63:2
**single** [1] - 112:4
**sister** [4] - 45:8, 68:1, 68:3, 70:21
**sit** [2] - 50:17, 83:14
**sits** [1] - 91:10
**situation** [1] - 19:15
**six** [4] - 23:21, 56:1, 67:12, 81:19

**sixth** [1] - 49:1
**sleeved** [1] - 71:12
**slightly** [2] - 104:16, 109:13
**slower** [1] - 57:11
**small** [3] - 11:16, 29:6, 34:13
**someone** [3] - 15:14, 54:15, 64:11
**Sometime** [1] - 45:23
**sometime** [2] - 15:19, 75:17
**sometimes** [7] - 42:14, 46:14, 71:15, 78:2, 81:3, 82:23, 98:12
**Sonja** [1] - 25:7
**sorry** [7] - 5:18, 8:17, 14:19, 56:18, 57:11, 61:9, 68:8
**sort** [13] - 11:22, 37:22, 48:6, 54:7, 54:18, 65:1, 65:12, 81:1, 92:2, 99:25, 107:10, 109:16
**sortation** [1] - 13:6
**sorted** [2] - 13:3, 13:15
**sorting** [2] - 13:11, 13:14
**sound** [7] - 57:17, 69:9, 69:24, 70:12, 70:14, 70:19, 73:13
**sounds** [6] - 52:3, 59:2, 65:10, 70:13, 88:4, 93:2
**source** [3] - 60:6, 90:18, 96:14
**south** [1] - 53:23
**South** [1] - 57:16
**space** [8] - 46:1, 46:13, 48:17, 49:13, 54:9, 98:14, 98:19
**spaces** [2] - 46:8
**sparked** [1] - 16:4
**speaking** [1] - 80:22
**special** [4] - 3:24, 10:16, 114:16, 114:19
**specialist** [2] - 91:9, 98:6
**specific** [2] - 18:1, 84:25
**specifically** [10] - 14:12, 16:10, 26:19, 26:23, 27:4, 28:11, 28:25, 78:17, 81:18, 91:8
**spell** [1] - 10:8
**spoken** [1] - 118:4
**spreadsheet** [24] - 20:3, 21:8, 21:13, 24:4, 35:3, 35:6, 35:9, 35:12, 35:20, 35:23, 37:11, 37:25, 38:13, 38:17, 38:18, 39:3, 39:7, 56:18, 64:7, 77:20, 96:4, 96:8, 97:10, 97:11
**spring** [1] - 37:22
**stamps** [1] - 12:14
**standard** [1] - 114:14
**star** [9] - 51:4, 51:5, 51:11, 52:3, 54:8, 56:10, 62:3, 62:5, 98:18
**Star** [2] - 51:17, 85:19
**start** [4] - 16:18, 34:18, 52:8,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 136 of 139

55:22
**started** [7] - 17:7, 20:3, 20:10, 28:4, 28:22, 55:7, 75:10
**starting** [3] - 20:4, 30:23, 97:24
**state** [10] - 10:7, 11:15, 22:24, 57:6, 81:16, 89:23, 108:24, 109:17, 114:10
**State** [1] - 122:2
**statement** [2] - 48:23, 53:6
**statements** [4] - 66:18, 66:24, 67:1, 98:9
**states** [9] - 45:18, 46:17, 48:2, 49:4, 52:7, 53:8, 53:23, 54:18, 57:12
**STATES** [2] - 1:1, 1:3
**States** [24] - 1:11, 3:3, 3:5, 3:6, 3:9, 3:16, 3:25, 9:22, 44:4, 44:12, 47:9, 50:10, 89:18, 110:13, 114:18, 115:5, 115:18, 115:20, 117:19, 118:14, 118:15, 118:20, 119:1, 119:13
**statewide** [1] - 100:21
**stationed** [1] - 90:8
**statistics** [1] - 70:7
**stats** [1] - 70:10
**statute** [1] - 3:17
**stay** [1] - 81:3
**stayed** [1] - 75:16
**steal** [7] - 66:6, 85:24, 100:19, 111:2, 111:3, 113:3, 113:6
**stealing** [22] - 15:10, 15:15, 16:9, 27:9, 43:11, 63:11, 63:20, 65:20, 79:19, 85:14, 87:22, 87:23, 88:21, 92:1, 96:13, 99:2, 99:4, 99:20, 101:15, 107:5, 107:8, 108:1
**step** [3] - 65:11, 89:16, 94:17
**Sterling** [3] - 22:17, 22:22, 22:25
**sticks** [1] - 78:15
**still** [11] - 16:5, 24:23, 30:15, 34:14, 70:23, 98:14, 100:21, 104:22, 109:22, 115:9, 115:15
**stole** [5] - 65:17, 97:12, 101:10, 103:1, 110:22
**stolen** [21] - 14:3, 16:6, 27:25, 28:12, 35:17, 41:21, 59:25, 62:16, 64:9, 79:9, 85:21, 86:13, 86:22, 87:20, 87:21, 88:21, 89:6, 90:19, 95:23, 100:12, 101:7
**stop** [1] - 55:2
**stopped** [1] - 55:4
**strapped** [1] - 71:12
**stream** [1] - 58:10
**Street** [63] - 12:3, 12:17, 12:20, 13:1, 13:12, 13:17,

17:1, 17:5, 17:11, 17:18, 18:14, 18:22, 27:21, 43:25, 44:3, 45:7, 45:19, 46:25, 47:6, 50:11, 51:6, 52:2, 52:13, 52:15, 53:8, 54:21, 55:13, 55:18, 55:25, 56:7, 58:21, 59:4, 59:15, 60:19, 60:25, 61:5, 61:11, 61:15, 61:17, 61:18, 61:22, 61:24, 62:2, 62:3, 71:23, 72:7, 72:9, 72:10, 72:12, 75:19, 80:16, 80:19, 80:21, 82:3, 83:1, 85:20, 86:6, 91:13, 92:15, 93:3, 93:7, 96:19
**street** [2] - 74:14, 86:17
**string** [6] - 30:25, 31:4, 31:7, 31:10, 33:4, 76:15
**stringent** [1] - 80:12
**struggled** [2] - 109:2, 112:3
**struggles** [1] - 109:4
**stupid** [1] - 113:11
**subject** [3] - 79:12, 84:18, 118:24
**submitted** [1] - 20:6
**substance** [3] - 112:9, 112:23, 114:11
**substances** [1] - 112:11
**substitute** [1] - 31:23
**subtracting** [1] - 104:11
**Suburban** [1] - 50:2
**succeeded** [1] - 71:2
**sufficient** [8] - 6:14, 100:13, 103:2, 108:13, 108:25, 109:23, 110:11, 113:19
**suggest** [2] - 58:14, 68:4
**suggesting** [2] - 48:16, 58:12
**suggests** [4] - 49:8, 54:14, 109:23, 110:24
**Suite** [1] - 1:12
**summarized** [1] - 8:5
**summary** [1] - 21:22
**summer** [4] - 19:6, 21:24, 49:9, 49:12
**Sunday** [1] - 88:20
**Sundays** [3] - 18:17, 88:16, 88:18
**superfluous** [1] - 93:3
**supervised** [7] - 3:20, 6:2, 111:23, 112:14, 113:9, 114:7, 114:8
**supervision** [5] - 111:24, 112:16, 114:15, 115:17, 119:1
**supplement** [1] - 107:25
**supplemental** [1] - 37:15
**supplied** [1] - 65:13
**supplying** [1] - 96:15
**suppose** [2] - 49:16, 109:22
**supposed** [2] - 46:12, 91:15
**surprise** [2] - 70:18, 70:20
**surprised** [1] - 70:16

**surrender** [11] - 4:20, 4:22, 116:2, 116:8, 116:11, 116:22, 117:9, 117:13, 117:19, 118:9, 118:12
**surrounding** [1] - 51:8
**surveillance** [7] - 65:7, 84:18, 84:19, 84:21, 84:22, 85:6, 85:9
**suspected** [3] - 20:1, 69:9, 69:16
**suspects** [1] - 15:20
**suspended** [2] - 70:25, 108:21
**swear** [2] - 66:23, 66:25
**switch** [1] - 10:22
**switched** [2] - 10:23, 11:1
**sworn** [2] - 10:2, 89:20
**system** [1] - 13:23

## T

**Tahoe** [1] - 50:2
**talk** [9] - 22:15, 22:25, 37:10, 38:12, 69:5, 80:4, 116:5, 116:6, 120:5
**talked** [4] - 25:19, 38:14, 43:12, 110:16
**talking** [5] - 12:5, 22:20, 78:24, 99:20, 100:20
**tall** [1] - 49:15
**Tama** [8] - 42:18, 42:25, 57:3, 98:1, 98:3, 103:4, 103:19, 106:6
**targeted** [3] - 73:19, 100:16, 109:15
**targeting** [2] - 110:20, 110:25
**Tarrick** [1] - 25:7
**task** [1] - 22:23
**TCF** [4] - 79:3, 105:11, 106:8, 115:1
**technically** [3] - 49:16, 92:3, 98:14
**teenage** [1] - 112:4
**telephone** [3] - 3:8, 28:20, 118:16
**tell** [7] - 49:22, 67:15, 81:13, 84:8, 85:18, 110:2, 117:7
**tells** [2] - 102:25, 113:14
**ten** [5] - 18:24, 47:9, 51:25, 55:21, 61:21
**term** [7] - 3:20, 3:22, 4:19, 113:23, 113:24, 113:25, 114:7
**terminate** [1] - 71:2
**terms** [9] - 13:13, 21:9, 27:1, 81:13, 83:6, 96:24, 108:18, 116:20, 119:2
**territory** [1] - 82:5
**testified** [5] - 10:3, 78:19, 79:20, 88:15, 89:21

**testify** [1] - 4:13
**testimony** [3] - 84:3, 92:14, 98:4
**Texas** [2] - 57:9, 57:14
**text** [14] - 29:3, 30:25, 31:3, 31:7, 31:10, 33:4, 73:6, 76:15, 76:18, 76:25, 77:11, 87:12, 87:14, 87:15
**THE** [124] - 1:1, 1:1, 1:16, 3:2, 4:4, 4:8, 4:12, 4:16, 4:23, 5:3, 5:17, 5:22, 6:6, 6:9, 6:10, 6:12, 6:13, 6:16, 6:17, 6:20, 6:21, 6:23, 6:24, 8:1, 8:22, 8:24, 9:1, 9:7, 9:10, 9:12, 9:14, 9:17, 9:24, 10:4, 10:9, 10:11, 43:15, 59:12, 59:18, 59:20, 71:5, 72:4, 75:6, 82:13, 82:16, 83:24, 84:1, 84:2, 84:7, 84:8, 84:11, 84:17, 84:19, 84:23, 84:25, 85:5, 85:8, 85:13, 85:16, 85:17, 86:3, 86:9, 86:10, 86:11, 86:12, 86:19, 87:3, 87:8, 87:10, 87:12, 87:14, 87:18, 87:24, 88:3, 88:4, 88:7, 88:10, 89:15, 89:22, 89:24, 90:1, 92:11, 94:15, 94:17, 94:19, 94:20, 94:23, 95:4, 95:7, 95:10, 97:18, 101:1, 103:25, 104:8, 104:15, 104:21, 104:23, 104:25, 105:6, 105:9, 105:11, 105:13, 105:17, 105:19, 105:22, 106:2, 106:12, 106:14, 108:8, 109:25, 110:9, 110:10, 118:11, 119:8, 119:15, 119:19, 120:1, 120:4, 120:20, 120:21, 120:23, 120:24, 121:2, 121:4
**theft** [28] - 3:14, 16:20, 17:8, 20:19, 65:25, 69:6, 69:16, 69:24, 70:5, 70:17, 71:21, 81:7, 81:8, 81:10, 81:14, 81:17, 81:18, 81:24, 81:25, 82:3, 82:6, 82:8, 83:19, 93:15, 94:2, 94:12, 101:14
**thefts** [4] - 60:6, 60:7, 69:9, 100:9
**themselves** [2] - 23:14, 92:6
**therefore** [1] - 92:21
**third** [2] - 31:6, 54:11
**Third** [2] - 1:12, 80:11
**Third-Class** [1] - 80:11
**Thomas** [2] - 41:5, 42:11
**thousand** [3] - 69:15, 69:23, 107:23
**threatened** [1] - 111:3
**three** [20] - 12:2, 12:10, 24:20, 24:24, 25:12, 29:8, 30:24, 31:3, 33:3, 35:4, 35:5, 35:23, 41:23, 62:22, 63:7, 76:14, 96:3, 96:8, 101:23, 102:2

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR    Document 50    Filed 01/19/22    Page 137 of 139

**thrill** [2] - 109:17, 109:22
**thrown** [1] - 96:10
**thrown-out** [1] - 96:10
**tied** [3] - 85:14, 103:4, 105:7
**timeframe** [1] - 90:25
**TINA** [2] - 2:6, 89:19
**Tina** [2] - 89:18, 89:24
**tip** [11] - 16:12, 16:13, 16:15, 16:18, 16:23, 19:1, 65:10, 72:15, 72:16, 72:18, 99:4
**Title** [2] - 3:15, 110:13
**today** [4] - 6:21, 9:15, 91:20, 120:22
**today's** [1] - 8:12
**together** [2] - 93:9, 114:16
**Tom** [2] - 45:14, 46:11
**tone** [1] - 74:3
**Tony** [1] - 3:6
**took** [1] - 33:22
**top** [11] - 22:8, 22:16, 24:6, 32:10, 36:6, 37:4, 41:25, 49:2, 51:17, 95:25, 111:22
**total** [7] - 8:3, 8:9, 62:17, 97:2, 102:21, 104:2, 105:13
**totaling** [1] - 97:6
**touch** [1] - 49:16
**touched** [1] - 31:15
**toward** [1] - 109:11
**towards** [1] - 104:13
**track** [1] - 15:2
**tracked** [1] - 57:24
**tracking** [1] - 57:25
**trafficking** [1] - 66:9
**transcribed** [1] - 122:4
**Transcript** [2] - 1:21, 1:21
**transcript** [1] - 122:5
**transfer** [2] - 13:18, 56:1
**transferred** [1] - 13:3
**transpired** [1] - 12:16
**transported** [2] - 24:22, 71:11
**transporting** [1] - 117:20
**traveled** [1] - 67:12
**trays** [1] - 71:11
**treatment** [4] - 112:11, 112:12, 119:17, 119:21
**tried** [1] - 24:10
**trios's** [1] - 68:19
**Truck** [10] - 27:13, 27:16, 43:12, 57:2, 63:13, 63:18, 79:18, 80:2, 103:7, 106:7
**truck** [10] - 18:5, 50:14, 50:21, 50:24, 54:5, 71:11, 82:20, 82:23, 83:7
**trucks** [9] - 13:8, 13:9, 17:22, 17:23, 18:1, 18:5, 18:9, 18:10, 82:23
**true** [2] - 102:25, 122:5
**Trust** [2] - 14:8, 14:9
**trust** [2] - 7:14, 113:6
**try** [4] - 34:15, 57:11, 92:6,

93:11
**trying** [5] - 15:2, 17:4, 20:13, 66:1, 92:21
**Turio** [1] - 25:4
**turn** [4] - 6:24, 9:18, 81:20, 113:16
**turned** [2] - 14:24, 15:13
**turning** [1] - 16:2, 32:10
**two** [33] - 3:13, 4:15, 10:24, 11:14, 12:9, 17:1, 22:10, 24:22, 25:13, 26:6, 26:12, 29:18, 30:16, 32:17, 41:11, 43:5, 57:2, 62:19, 63:6, 66:20, 74:14, 81:15, 81:24, 82:7, 95:25, 98:2, 103:16, 103:21, 104:5, 107:22, 117:13, 117:19
**two-count** [1] - 3:13
**two-way** [1] - 74:14

## U

**U.S** [2] - 1:10, 117:8
**ultimate** [1] - 80:22
**ultimately** [5] - 25:24, 27:25, 95:23, 96:20, 100:18
**unable** [2] - 59:23, 60:24
**unclear** [4] - 107:7, 109:12, 109:14, 109:21
**uncommon** [1] - 69:14
**under** [13] - 7:4, 7:7, 7:14, 7:19, 7:23, 22:16, 92:20, 97:14, 111:24, 112:16, 112:25, 118:25, 119:1
**underage** [1] - 112:9
**undermine** [1] - 100:22
**understood** [2] - 59:15, 84:2
**UNITED** [2] - 1:1, 1:3
**United** [24] - 1:11, 3:3, 3:5, 3:6, 3:9, 3:16, 3:25, 9:22, 44:4, 44:12, 47:9, 50:10, 89:18, 110:13, 114:18, 115:5, 115:17, 115:20, 117:19, 118:14, 118:15, 118:19, 119:1, 119:13
**unlawfully** [1] - 114:10
**unless** [3] - 47:14, 47:19, 47:25
**unlikely** [2] - 101:8, 101:17
**unloading** [1] - 17:21
**unlocked** [8] - 53:4, 53:5, 53:9, 54:12, 54:14, 54:15, 98:14
**unnecessary** [1] - 92:22
**unopened** [1] - 52:25
**unpack** [1] - 15:5
**unpaid** [1] - 115:23
**unphotographed** [1] - 64:4
**unsleeve** [1] - 71:10
**unsleeved** [1] - 13:16
**unsworn** [1] - 66:19

**up** [48] - 3:17, 3:20, 3:23, 10:5, 17:3, 17:7, 19:3, 19:5, 20:15, 21:11, 23:8, 24:6, 26:15, 28:11, 41:2, 41:5, 42:10, 49:15, 49:23, 50:7, 51:3, 53:14, 67:21, 71:15, 77:3, 81:9, 81:25, 84:15, 86:8, 86:23, 88:14, 90:23, 97:7, 104:16, 104:22, 105:14, 106:17, 109:13, 112:1, 116:23, 117:4, 117:11, 117:15, 117:18, 117:25, 120:14
**upper** [1] - 101:25
**upset** [1] - 20:19
**US** [8] - 90:6, 91:7, 91:8, 92:20, 105:3, 106:8, 114:24, 118:10
**USA** [8] - 42:18, 42:25, 57:3, 98:1, 98:3, 103:5, 103:19, 106:6
**use** [6] - 47:24, 58:5, 69:3, 112:15, 112:16, 114:11
**used** [15] - 44:12, 44:14, 44:15, 44:17, 44:20, 44:21, 47:5, 47:21, 52:3, 64:23, 68:18, 68:21, 68:22, 69:3, 74:3
**using** [3] - 1:20, 47:19, 77:14
**USPS** [19] - 46:3, 46:6, 46:7, 46:13, 46:19, 48:7, 48:17, 48:24, 49:8, 49:13, 51:12, 51:24, 54:23, 65:23, 69:6, 70:21, 98:17, 100:18, 109:9

## V

**V.T** [1] - 25:9
**V.T.'s** [1] - 68:19
**Vance** [2] - 79:22, 80:1
**varies** [1] - 42:14
**various** [2] - 16:24, 90:17
**vast** [2] - 56:19, 78:12
**vehicle** [3] - 50:2, 50:4, 50:5
**vendetta** [1] - 72:16
**vendors** [2] - 14:12, 23:22
**verbal** [2] - 74:13, 109:20
**verbally** [1] - 74:1
**Vermont** [1] - 57:15
**versus** [2] - 3:3, 111:4
**via** [3] - 29:2, 29:3, 96:6
**victim** [2] - 4:8, 5:7
**victims** [6] - 4:9, 5:8, 106:3, 106:4, 106:8, 115:6
**video** [6] - 64:12, 64:15, 65:7, 84:18, 84:19, 100:3
**videos** [1] - 84:18
**violate** [1] - 116:19
**violation** [1] - 3:15
**violations** [1] - 112:21

**violence** [3] - 111:20, 111:21, 111:24
**violent** [1] - 111:13
**Virginia** [2] - 57:9, 57:13
**visible** [2] - 102:1, 102:12
**Vivica** [1] - 25:4
**voice** [1] - 88:4
**VS** [1] - 1:5
**vulnerable** [1] - 94:1

## W

**W-I-G-N-A-L-L** [1] - 10:10
**Wade** [1] - 53:20
**waive** [1] - 115:25
**walk** [1] - 54:16
**walked** [2] - 50:7, 53:24
**want** [14] - 22:15, 26:6, 28:8, 37:10, 38:12, 76:6, 76:9, 77:22, 79:18, 80:4, 86:12, 113:15, 116:5, 116:6
**wanted** [2] - 12:14, 20:20
**wanting** [1] - 20:20
**warmer** [1] - 49:6
**warrant** [10] - 20:23, 26:18, 28:21, 30:20, 63:24, 66:8, 66:9, 66:12, 68:17, 99:11
**warrant's** [1] - 66:16
**wash** [2] - 31:17, 31:20
**washed** [2] - 68:5, 68:6
**Washington** [1] - 57:16
**ways** [3] - 31:19, 73:25, 74:10
**website** [1] - 69:12
**week** [1] - 18:19
**weeks** [1] - 117:19
**weigh** [2] - 72:19
**Wells** [1] - 79:3
**West** [4] - 12:3, 12:21, 83:9, 92:19
**western** [1] - 11:15
**whereas** [1] - 80:25
**WHEREOF** [1] - 122:9
**White** [64] - 12:3, 12:17, 12:19, 13:1, 13:12, 13:16, 17:1, 17:5, 17:11, 17:18, 18:14, 18:21, 27:21, 43:25, 44:3, 45:7, 45:19, 46:25, 47:6, 50:10, 51:6, 52:2, 52:13, 52:14, 53:8, 53:9, 55:13, 55:18, 55:25, 56:7, 58:21, 59:4, 59:14, 60:19, 60:25, 61:5, 61:11, 61:15, 61:17, 61:18, 61:21, 61:24, 62:2, 62:3, 71:23, 72:6, 72:9, 72:12, 75:19, 80:16, 80:19, 80:21, 82:3, 83:1, 85:19, 85:20, 86:6, 91:13, 92:15, 93:2, 93:7, 96:18
**whole** [2] - 81:16, 110:17

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR    Document 50    Filed 01/19/22    Page 138 of 139

**wide** [2] - 54:2, 54:5
**WIGNALL** [2] - 2:3, 10:1
**Wignall** [3] - 9:23, 10:9, 75:10
**Williams** [1] - 122:3
**WILLIAMS** [1] - 1:16
**window** [1] - 12:13
**Wisconsin** [4] - 14:7, 14:8, 14:9, 57:16
**wish** [3] - 4:9, 94:20, 94:23
**wishes** [2] - 106:21, 118:6
**witness** [5] - 9:21, 10:2, 10:5, 89:17, 89:20
**WITNESS** [21] - 2:2, 10:9, 59:18, 84:1, 84:7, 84:11, 84:19, 84:25, 85:8, 85:16, 86:3, 86:10, 86:12, 87:3, 87:10, 87:14, 87:24, 88:4, 89:24, 94:19, 122:9
**witnesses** [4] - 4:13, 94:20, 94:23, 98:9
**women** [1] - 111:20
**word** [2] - 36:19, 58:6
**words** [1] - 80:20
**work** [12] - 18:19, 18:20, 31:19, 34:14, 55:20, 71:15, 72:6, 76:2, 81:24, 92:3, 92:18, 110:19
**worked** [21] - 15:15, 16:6, 16:25, 17:1, 17:10, 17:20, 18:16, 50:10, 50:11, 50:19, 52:8, 55:13, 59:9, 61:14, 64:21, 86:1, 88:15, 88:17, 89:10, 89:12, 100:14
**worker** [2] - 91:18, 91:23
**workers** [1] - 70:16
**working** [11] - 17:19, 18:15, 47:11, 47:13, 47:15, 72:11, 79:7, 87:25, 88:18, 88:25, 96:19
**works** [2] - 45:8, 70:24
**written** [5] - 39:5, 39:8, 74:2, 120:10, 120:13
**wrote** [3] - 74:11, 74:16, 74:22

**Y**

**year** [5] - 16:2, 82:1, 107:21, 107:22, 109:10
**years** [17] - 3:17, 3:21, 3:22, 10:20, 11:1, 11:3, 11:9, 70:11, 70:15, 81:10, 90:7, 107:4, 107:22, 107:24, 109:2, 113:10, 114:7
**York** [1] - 57:14
**young** [4] - 109:1, 109:4, 112:2, 112:3
**yourself** [3] - 88:25, 91:5, 111:25
**youth** [1] - 109:3

**Z**

**ZIP** [1] - 58:18
**zoom** [2] - 29:7

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01042-CJW-MAR   Document 50   Filed 01/19/22   Page 139 of 139